**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No. 23-CR-116 (JDB)** |
| | : | |
| **v.** | : | |
| | : | |
| **NDUBUISI JOSEPH OKAFOR,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRE-TRIAL DETENTION**</u>

The United States of America, by and through the undersigned attorneys, respectfully submits this memorandum in support of its oral motion that the defendant be detained pending trial pursuant to 18 U.S.C. § 3142 (f)(1)(C) (offense with a maximum term of greater than 10 years' imprisonment under the Controlled Substances Act) and 18 U.S.C. § 3142 (f)(2)(A) (serious risk of flight) of the statute governing release or detention of a defendant pending trial. In this case, there is a rebuttable presumption of detention pursuant to 18 U.S.C. § 3142(e)(3)(A).

Defendant Okafor should be held without bond pending trial to ensure the safety of the community due to his dangerous prescribing patterns. If Okafor is out of custody, he has incredibly dangerous tools at his disposal—his pen, prescription pad, and a valid D.C. medical license. That is all he needs to continue to fuel the opioid epidemic in the D.C., Maryland and Virginia region and beyond.

Further, as outlined in this memorandum, Okafor poses a serious risk of flight. He has a longstanding history of dishonest and fraudulent behavior, strong international ties, and a demonstrated intent and ability to evade government monitoring, such that conditions like home confinement or placement in the High Intensity Supervision Program would be insufficient to ensure his return to court. These characteristics are evident not only through his dangerous prescribing,

1

where he took efforts to evade government detection, but through his prior convictions in the District of Maryland, case 8:07-CR-190 (PJM). There, he was sentenced to 65 months' incarceration, 3 years of supervised release, and $802,252.80 restitution following convictions to federal tax evasion, false income tax returns and health care fraud charges stemming from an elaborate scheme, where Okafor reported false information to the Internal Revenue Service and tax preparers, established sham corporations in the Bahamas to create false expenses and disguise personal income, diverted money from his medical practice by writing checks from the corporate bank account for personal expenses, and caused his medical practice to file false income tax returns. Finally, as outlined further below, Okafor has retained his Nigerian citizenship, has international connections, and the financial means to relocate outside of the United States. In a single search of his residence on April 11, 2023, law enforcement recovered over $31,000 cash hidden throughout his bedroom.

There is no condition or combination of conditions apart from detention that would ensure the safety of the community and the defendant's return to court. This Court should detain him pending trial. The government requests that the following points and authorities, as well as any other facts, arguments, and authorities presented at the detention hearing, be considered in the Court's determination regarding pre-trial detention.

## I.    **Introduction**

Ndubuisi Joseph Okafor, M.D. is a medical doctor with citizenship in the United States and Nigeria. He is presently registered with the Drug Enforcement Administration ("DEA") to prescribe controlled substances.[1] Okafor has held a medical license in Washington, D.C. for varying periods

---

[1] The DEA served Okafor with an Immediate Suspension Order upon his arrest. The order cites instances where Okafor prescribed to individuals with no associated public records, indicating the prescriptions were written to fictitious patients. DEA further cited Okafor's dangerous prescribing patterns. Accordingly, Okafor's prescribing privileges were suspended

since 1992, as well as a medical license in the state of Maryland until 2005.[2] He is currently licensed by the D.C. Board of Medicine.

On April 6, 2023, a federal grand jury returned an indictment against Okafor, charging him with sixteen counts of illegal distribution of oxycodone and oxycodone acetaminophen (Schedule II Controlled Substances) in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).[3] These counts have a penalty of a term of imprisonment up to 20 years. On April 11, 2023, defendant Okafor was arrested and search warrants were executed at his residence in Maryland and his medical practice in D.C.

**II.    <u>Legal Standard</u>**

When seeking pre-trial detention, the government must establish by clear and convincing evidence that the defendant is a danger to the community. The Government must establish by a preponderance of the evidence that a defendant poses a risk of flight. *United States v. Vortis*, 785 F.2d 327, 328-29 (D.C. Cir. 1986). There are four factors under Section 3142(g) that the Court should consider and weigh in determining whether to detain the defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any

---

pending a final determination. Okafor may file a written request for a hearing to contest the order.

[2] After serving his federal sentence in case 8:07-CR-00190 (PJM), Okafor applied for reinstatement of his medical licenses in Maryland and the District of Columbia in 2013. The Maryland Board of Physicians denied reinstatement of Okafor's medical license, citing his criminal history as well as two medical malpractice disputes. The D.C. Board of Medicine, however, reinstated Okafor's medical license with probationary conditions on May 22, 2013. On August 17, 2015, the D.C. Board of Medicine lifted the probationary conditions and Okafor's medical license was fully reinstated.

[3] 21 U.S.C. § 812 establishes Schedules for controlled substances that present a potential for abuse and the likelihood that abuse of the drug could lead to physical or psychological dependence on it. Such controlled substances are listed in Schedule I through Schedule V, depending on the level of potential for abuse, the current medical use, and the level of possible physical dependence. Controlled substance pharmaceuticals are listed as controlled substances, from Schedule II through V, because they are also considered drugs for which there is a substantial potential for abuse and addiction.

person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

**III.   Argument**

Under the unique facts of this case, the Court should detain defendant Okafor and conclude: (1) there is no condition or combination of conditions that would assure the safety of the community; (2) there is no information in the defendant's personal background and characteristics that would serve as a basis to rebut the presumption of dangerousness and (3) the defendant poses a serious risk of flight. Therefore, defendant Okafor should be detained. *See* 18 U.S.C. § 3142(e)(1).

**A.   Nature and Circumstances of the Offenses Charged**

Okafor is an internal medicine physician who owns his practice, Okafor Medical Associates PLLC, in northwest Washington, D.C. He was licensed by the D.C. Board of Medicine in 1992, and his current license expires at the end of 2024. He has medical license number MD19779. Additionally, prior to his arrest, defendant Okafor was authorized by the DEA to prescribe controlled substances in Schedules II-V with DEA license number FO4353188, provided the controlled substances are issued for a legitimate medical purpose and Okafor is acting in the normal course of professional practice.

Defendant Okafor stands charged with sixteen violations of Title 21 of the United States Code, whereby he is alleged to have unlawfully prescribed opioids and other controlled substances to individuals, a confidential source and undercover officers, in a manner in which was both outside the usual course of professional practice and without a legitimate medical purpose.

The FBI opened an investigation into Okafor after it received information from multiple law enforcement agencies in D.C., Maryland, Virginia, and North Carolina regarding prescriptions from Okafor being connected to local drug trafficking networks. As the investigation developed, controlled

substance prescriptions from Okafor have been recovered as far south as Florida, as far north as New York, and as far west as North Dakota.

As part of the investigation, numerous subjects were detained by law enforcement when they were found to be in possession of opioid prescriptions issued by Okafor. Open source and law enforcement database research on many of the names on these prescriptions showed the names or addresses were false. In several instances, law enforcement spoke with Okafor on the phone about subjects' questionable prescriptions. During these conversations, law enforcement only had to provide Okafor with the patient's name and date of birth in order for Okafor to verify them.[4] Law enforcement interviewed some subjects who had been caught with Okafor's prescriptions. Law enforcement learned that Okafor would issue prescriptions, typically opioids—oxycodone and codeine—in exchange for $200 to $250 cash.

Law enforcement was also notified by numerous major pharmacies of questionable prescribing habits by Okafor. The questionable habits included prescribing multiple types of opioids to the same person and excessive amounts of promethazine/codeine and/or oxycodone.[5]

Law enforcement has also identified connections between Okafor's practice and drug traffickers. *See* Government's Supplemental Sealed Filing in Support of Pre-trial Detention.

The merits of the government's case illustrate Okafor's significant danger to the community, in which he was trusted to serve both as a doctor and as an individual authorized to prescribe

---

[4] During one of these calls, Okafor informed law enforcement that his valid prescriptions included an ICD code and DC CS number handwritten by Okafor.

[5] Promethazine with codeine liquid is commonly diverted and abused. Typically mixed with sprite or alcohol, this combination is colloquially known as "purple drank", "purp", "sizzurp", or "lean." Oxycodone is marketed as OxyContin, among others. Oxycodone is also available in combination products such as Percocet, which combines oxycodone and acetaminophen.

dangerous opioids.

*Overall Analysis of Okafor's Prescribing*

As part of its investigation, the government retained a medical expert, Dr. Donald Sullivan, RPh, PhD ("Dr. Sullivan"), to review Okafor's overall prescribing practices. Dr. Sullivan is a Professor of Pharmacy Practice and Science at Ohio State University. He is a Professor of Clinical Pharmacy at the Ohio State University College of Pharmacy, and received his bachelor's, master's, and doctorate degrees from the Ohio State University's College of Pharmacy. In total, Dr. Sullivan has been teaching in pharmacology for more than twenty years and has been published in approximately twenty peer-reviewed publications.

As part of this investigation, Dr. Sullivan reviewed approximately 1,400 prescriptions from the District of Columbia Prescription Drug Monitoring Program (PDMP)[6] issued by Okafor and dispensed from January 2020 to January 2023, as well as some prescriptions from North Carolina, Florida, New Jersey, Virginia, and Pennsylvania issued by Okafor. Based on his expert review, many of the prescriptions issued by Okafor were not for a legitimate medical purpose to patients who were abusing and/or diverting them. Between March and November 2022, Okafor prescribed more than 200,000 controlled substance pills during the timeframe of this indicted conduct, including more than 64,000 Schedule II pills.

Dr. Sullivan noted there were several red flags of prescribing controlled substances for abuse and/or diversion in Okafor's patients. These included:

---

[6] Prescription Drug Monitoring Programs (PDMP) consist of statewide electronic databases, which collect designated data on prescription-controlled substances dispensed within the individual states. The PDMP collects prescription data from pharmacies primarily for Schedule II through V controlled substances. As such, the accuracy of the information depends on the correct input of the information by the pharmacies.

- Extremely high doses of oxycodone;

- Large numbers of prescriptions written for promethazine with codeine liquid, a highly abused and diverted medication;

- Large quantities of promethazine with codeine prescribed per prescription;

- Patients issued prescriptions for promethazine with codeine for extremely long periods of time;

- Extremely high doses of the stimulant dextroamphetamine-amphetamine;

- Patients prescribed immediate release oxycodone and promethazine with codeine liquid at the same time, a combination known to be abused and diverted;

- Other combinations of controlled substances known to be abused and diverted; and

- Patients traveling long distances to have prescriptions filled for promethazine with codeine liquid.

Dr. Sullivan explained that promethazine with codeine liquid is a highly abused and diverted medication, typically used for short-term relief of cough. Appropriate clinical use is from a few days to a maximum of a few weeks. According to D.C. PDMP data, Okafor issued 518 new and refill prescriptions for promethazine with codeine, representing 40% of all of his prescriptions for controlled substances. Dr. Sullivan noted that this is an extraordinarily high percentage of a prescriber's controlled substance prescriptions. Further, Dr. Sullivan observed that most prescribers only issue prescriptions for promethazine with codeine liquid in quantities of up to 120 mL. However, 85% of Okafor's prescriptions for promethazine with codeine exceeded 180 mL, an amount rarely prescribed due to its intended short-term use and potential for abuse or diversion. Further, there were multiple patients issued prescriptions for promethazine with codeine liquid for weeks up to months

of treatment. Dr. Sullivan opined that these prescriptions were not for a legitimate medical purpose.

Additionally, Dr. Sullivan opined that several patients were prescribed oxycodone 20 mg tablets to be taken 4 times daily. Some were prescribed even higher doses. Dr. Sullivan noted that oxycodone 20 mg is rarely prescribed in clinical practice, especially by an internal medicine physician, because it is an extremely high dose of oxycodone and placed the patients at high risk for an overdose. When oxycodone 20 mg is prescribed at this dose, it is known to be abused and/or diverted. Dr. Sullivan identified more than twenty patients in the D.C. PDMP data that were receiving in excess of 150 MMEs/day – an extremely high number – and oftentimes the oxycodone was prescribed in tandem with another opioid, a benzodiazepine (such as Alprazolam or "Xanax"), or with the promethazine with codeine, further putting patients at risk for addiction and possible overdose.[7] Dr. Sullivan observed similar patterns in prescription data from other states. In some instances, patients had MMEs of 270, an extremely high number that placed the patient at extreme risk for an overdose.

In conclusion, Dr. Sullivan opined that Okafor wrote hundreds of prescriptions for promethazine with codeine liquid, narcotic pain killers, and stimulants that were not for a legitimate medical purpose to many patients who were abusing and/or diverting these medications. The types

---

[7] Dosage in one or multiple concurrently prescribed opioids is measured through Morphine Milligram Equivalents ("MME"). MME measures a patient's daily dosage of opioids, based upon a conversion factor of the strength of the opioid (using morphine as a base of 1) and the quantity of the controlled substance prescribed per day. The U.S. Centers for Disease Control and Prevention ("CDC") have medically determined the relative strength of opioids and made the list publicly available. On November 4, 2022, the CDC released an update to its 2016 Guideline for Prescribing Opioids for Chronic Pain. The 2022 Guidelines Recommendations do not include an absolute dosage threshold, but note that for opioid-naive patients, "clinicians should prescribe the lowest effective dosage" and if opioids are continued for subacute or chronic pain, "clinicians should use caution when prescribing opioids at any dosage, should carefully evaluate individual benefits and risks when considering increasing dosage, and should avoid increasing dosage above levels likely to yield diminishing returns in benefits relative to risks to patients." The Guidelines note, in part, the importance of clinicians weighing the risks and benefits of increasing opioid dosages to ≥50 MME, but instruct that "[t]he recommendations related to opioid dosages are not intended to be used as an inflexible, rigid standard of care; rather, they are intended to be guideposts to help inform clinician-patient decision-making."

of controlled substances prescribed, their strengths, extremely high doses, high patient MMEs, and drug combinations were well-known patterns and red flags of illegal prescribing for diversion and/or abuse by patients. Dr. Sullivan further concluded that many of these patients were placed at extreme risk of overdose based on the medications prescribed by Okafor, and Dr. Sullivan had no doubt whatsoever that Okafor's medical practice was a pill mill for the illegal prescribing of oxycodone, promethazine with codeine liquid, dextroamphetamine-amphetamine, and methadone.

### The Charged Conduct

The indictment currently charges Okafor with 16 counts of unlawful distribution of controlled substances. These counts reflect 16 prescriptions issued by Okafor to either a confidential source or undercover officers posing as patients. Each visit was recorded. At each visit, the source or undercover was prescribed oxycodone or oxycodone acetaminophen in exchange for cash, given to Okafor in the examination room.

As part of this investigation, an additional expert – Dr. Timothy King – was retained to examine the defendant's prescribing practices, and review audio and video recorded confidential source/undercover officer visits to Okafor's practice.[8] The expert opined that Okafor's prescribing to these individuals, as observed in the recorded visits, was outside the usual course of professional practice and without a legitimate medical purpose. An analytical review of Okafor's prescribing to these individuals proves that he failed to conform to the accepted practice of medicine when it came to his prescribing practice and that he directly exhibited many of the red flags.

_____

[8] This expert earned his medical degree from Indiana University and was a resident at the University of Washington in the fields of anesthesiology. He is Board-certified in pain anesthesiology, pain medicine, pain management, and addiction medicine.  He has practiced in the fields of anesthesia and pain medicine for over 40 years, with a specialty in pain medicine for at least the last 30 years.

With regards specifically to CS, UC 1, UC 2, and UC 3 as identified in the Indictment, this medical expert did an analysis of the CS/UC visit recordings that agents obtained with Okafor. His expert opinion was specifically sought to determine if Okafor acted within the usual course of medical practice and issued prescriptions for a legitimate medical purpose with regards to these specific visits. As a result of his analysis, he clearly opined that all of the prescriptions that were distributed to the CS/UCs in their recorded visits were outside the usual course of professional practice, without a legitimate medical purpose, and not within the standard of care practiced in the District of Columbia, in violation of 21 C.F.R. § 1306.04.

The expert's conclusions about Okafor's illegal prescribing are supported on multiple grounds. He found that there was simply no meaningful or medically acceptable exam or care performed during any of the CS/UC recordings. Here, Okafor wrote opioid prescriptions for no reported pain, or in a couple of instances for purported vague back or knee pain, even though he never went through any of the proper steps to justify such a prescription. For all the recorded visits, he did not perform any sort of comprehensive physical exam on the CS/UCs—nor did he take any sort of thorough medical history documenting the provenance of the pain, prior use of pain medications, screenings for addiction-related issues, or any significant history related to the alleged pain. The observed procedures performed during the CS/UC visits were, if anything, a basic blood pressure, and/or breathing check. Additionally, Okafor used opioids as a primary treatment option for every recorded visit. This is in contradiction to all established guidelines nationally by the CDC, and specifically in violation of the D.C. Board of Health's published guidelines for prescribing opioids for pain, which demand that opioids are not the preferred primary options for treatment of acute or chronic pain.

Based on his review of the recordings, the expert observed that Okafor was "operating a classic pill mill." This clinic had the hallmarks of a pill mill because he regularly prescribed opioids to patients without taking any medical history, performing any physical examination, establishing an actual diagnosis, medical monitoring, or required documentation. Additionally, he observed what appeared to be actual "drug deals" where Okafor would exchange each provided prescription for cash in the exam room. The CS/UCs were often able to pick their own pills, with little to no questioning. Based on his training and experience in the observed recordings, the expert noted that the behavior exhibited at Okafor's practice would not occur at a normal internal medicine practice, including boisterous behavior, smoking, and long waits in crowded waiting rooms.

The nature and circumstances of the offense weigh in favor of detention.

### B.       <u>Weight of the Evidence Against the Defendant</u>

The second factor to be considered, the weight of the evidence, also clearly weighs in favor of detention. The evidence against Okafor is incredibly strong, both as to the illegality of the prescriptions written by Okafor and as to his consciousness of the imminent danger that he was putting his patients in through those prescriptions.

First, as outlined above, the objective evidence of the inappropriate and illegal nature of Okafor's prescribing is overwhelming. Second, there is also evidence of Okafor' knowledge that his prescribing practices were outside of the usual course of professional practice and put his patients at imminent risk of overdose and death. In fact, prior to the charged conduct in this case, Okafor was put on notice that his prescriptions were inappropriate and dangerous. For example, in late September 2021, Okafor received official notice from Walmart, Inc. ("Walmart") that he was centrally blocked by all Walmart Pharmacies, meaning that no Walmart or Sam's Club Pharmacy nationally could fill

a controlled substance prescription written by him, due to his dangerous prescribing practices.

Through its investigation, law enforcement learned Walmart has three levels of "refusal to fill" prescriptions. Okafor was blocked by Walmart pharmacists at each level. The first level – a "Refusal to Fill" or "RTF" may be issued by a pharmacist against a specific prescription, based on that pharmacist's identification of a "red flag" and their inability to clear it. In this context, a "red flag" means an indication that the medication sought is being abused or diverted, such as a patient's desire to pay cash for the prescription despite having insurance, the prescription appearing to be edited or forged, or if a prescriber was prescribing a high amount of controlled substances not consistent with the prescriber's specialty. The second level – a "Blanket Refusal to Fill" or "BRTF" is a refusal to fill any controlled substance prescription from a specific physician. BRTFs are issued by pharmacists, based on his/her professional judgement, and are based on the physician rather than the specific prescription. The third and final level of Walmart Pharmacy's refusal to fill is called a Central Block or Corporate Block.

Prior to Walmart's Central Block of Okafor on September 28, 2021, pharmacists at Walmart locations in the D.C., Maryland and Virginia areas had issued first level "Refusals to Fill" on approximately 69 prescriptions written by Okafor for controlled substances. Some of the red flags listed included Okafor prescribing drugs with opposite effects to the same patient, Okafor writing for similar medications, dosages, directions and or diagnoses for numerous patients, Okafor writing for a combination of commonly abused drugs that can cause medical complications, Okafor writing for unusually large quantities or high doses of medication, Okafor writing prescriptions for medications that did not match the patient's diagnoses, the patient residing outside of the typical trade area of the pharmacy, or the patient exhibiting behaviors consistent with drug diversion.

As a result of the issues described in part above, approximately 9 Walmart stores in the greater D.C. area had issued second level "Blanket Refusals to Fill" Okafor's controlled substance prescriptions. These BRTFs thus prevented patients from being able to fill any Okafor controlled substance prescription at the Walmart store in question.

As of September 28, 2021, Okafor was "centrally blocked" by Walmart, meaning Walmart and Sam's Club pharmacy locations nationwide were thereafter prohibited from filling controlled substance prescriptions written by Okafor. Walmart identified a number of "red flags" in Okafor's prescribing practices, including, among others: evidence of "pharmacy shopping" (that is, one patient traveling to multiple pharmacies to fill prescriptions); patients residing outside of the trade area of a given pharmacy; total number or percentage of controlled substances prescribed; evidence of Okafor writing prescriptions for similar medication, dosage, directions and/or diagnoses for numerous individuals; patients insisting on paying for their prescriptions refills with cash; unusually large quantity or high starting dose for the prescription; and providing the same diagnosis for a majority of his patients. Okafor received notice of Walmart's central block and his prescribing practices did not change.

In addition to being centrally blocked by Walmart, Okafor was on notice that his prescribing practices were being investigated by Kaiser Permanente, as well. Okafor continued to prescribe at dangerously high rates, and all indicted conducted occurred after Okafor was aware that all Walmart and Sam's Club pharmacies could no longer fill any of Okafor's controlled substance prescriptions. Additionally, Okafor warned one of the UCs during a visit to not fill his prescription at Walmart – indicating that, in 2022, he knew he was unable to have his patients fill prescriptions at Walmart locations.

Despite these repeated warnings, Okafor has continued to prescribe dangerous controlled substances at rates that put his patients at imminent risk of overdose. And he would continue to do so, if permitted to continue to write prescriptions without consequence.

### C.   **Okafor's History and Characteristics**

The history and characteristics of Okafor also support pre-trial detention. In evaluating this factor, the Court should consider the defendant's character, family ties, employment, length of residence in the community, community ties, past conduct, criminal history, and record of court appearances. *See United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

The defendant's history and characteristics demonstrate that he is a flight risk. "The government is required to demonstrate the appropriateness of pretrial detention because the defendant poses a risk of flight 'by a preponderance of the evidence.'" *United States v. Bikundi*, 47 F. Supp. 3d 131, 133 (D.D.C. 2014) (quoting *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987)). "That preponderance must, of course, go to the ultimate issue: that no combination of conditions—either those set out in the Bail Reform Act itself or any others that the magistrate or judge might find useful--can "reasonably" assure that the defendant will appear for trial." *Id*. (quoting *Xulam*, 84 F.3d at 442, citing 18 U.S.C. § 3142(c))).

*The Defendant's Character and Past Conduct*

The defendant's character and past conduct also weigh significantly in favor of detention. His (1) well-documented history of dishonesty both generally and with the court system specifically; (2) fraudulent behavior; and (3) avoidance of significant obligations supports the conclusion that he cannot be trusted to abide by even the most restrictive conditions of release. These are relevant factors for this Court to consider in its analysis. *See, e.g. United States v. Otunyo*, 2020 U.S. Dist. LEXIS

14

74321, *11 (D.D.C. April 28, 2020) (detaining defendant pre-trial where evidence that defendant procured false identification documents and used fraudulent aliases in furtherance of his crimes "raise[d] the serious concern that defendant has the knowledge and ability to create and assume a new identity to escape prosecution. . ."); *United States v. Ali*, 793 F. Supp. 2d 386, 392 (D.D.C. 2011) (detention appropriate where a defendant "has repeatedly shown a willingness to misrepresent himself in his dealings with the government"); *United States v. Dodge*, 846 F. Supp. 181, 185 (D. Conn. 1994) (detention proper where the evidence suggested a "significant disrespect for lawful authority").

The defendant has a prior federal conviction under District of Maryland Case 8:07-CR-00190 (PJM) where he was convicted federally of tax evasion, filing false income tax returns and health care fraud charges. According to the plea agreement, Okafor operated a medical practice named "The Okafor Group," which provided primary care medicine in the Washington D.C. metropolitan area. From 1997 through 2005, Okafor evaded his taxes by reporting false information to the Internal Revenue Service and tax preparers regarding his personal income and the gross receipts from his medical practice; establishing sham corporations in the Bahamas to create false expenses and disguise personal income; and diverting money from his medical practice by writing checks from the corporate bank account for personal expenses. He also caused his medical practice to file false income tax returns. As a result of these schemes, the total tax loss was $781,193.

Specifically, in January 1997, Dr. Okafor hired Universal Corporate Services ("UCS") to incorporate an offshore corporation named "Eziafa International Investment Co" ("Eziafa") in the Bahamas. UCS was a company that promoted asset protection through the formation of offshore companies. According to its literature, UCS protected assets of taxpayers by "getting as many assets

out of your personal name as possible" through transfers of "money, investments and assets into a corporation. . .you control." In or about October 2000, Dr. Okafor hired UCS to incorporate an offshore corporation named "Omni Ventures Corporation" ("Omni") in the Bahamas. Both Eziafa and Omni were "sham" corporations in that these entities neither provided services nor sold products but were simply used as vehicles through which Okafor evaded lawful reporting and payment of income taxes to the United States. Specifically, Okafor diverted personal income to Eziafa and Omni in order to engage in securities trading on his own behalf and to buy property in his native country of Nigeria.

Okafor also plead guilty to defrauding Medicare and other health benefit programs. For example, Okafor caused Medicare to reimburse him for false claims by billing for hospital services that Okafor did not render and, in many instances, when Okafor was on vacation or not even present in the hospital. On one occasion on November 10, 2002, Okafor was traveling in South Carolina but submitted claims for seeing patients admitted to the Providence Hospital in Washington D.C. on that date. For this conduct, Okafor caused losses to the Medicare and other health care benefit programs of between $40,000 and $70,000. Okafor's criminal scheme spanned an 8-year period between 1997 and 2005. Further, in 1998, Okafor was placed on probation for 3 years by the Board of Physician's Quality Assurance for immoral and unprofessional conduct related to his medical practice.

Okafor's extreme financial sophistication and comfort level with international financial matters, particularly when utilized to deceive the government, supports the necessity of pre-trial detention. *See United States v. Anderson*, 384 F. Supp. 2d 32, 36 (D.D.C. 2005) (finding that no condition or combination of conditions would have reasonably assured the appearance of the

defendant where the offenses "demonstrate substantial familiarity with the commercial and financial laws of other countries, sophistication in arranging international financial transactions and in moving money across borders, and a facility for concealing the existence and location of significant quantities of money and other assets").

Any suggestion that Okafor has accepted responsibility for his criminal behavior and learned from his past mistakes is belied by his conduct. First, in District of Maryland Case 8:07-CR-00190 (PJM), in addition to the tax evasion and fraud charges, the sentencing judge found that Okafor obstructed both the tax and health care fraud investigations by creating fraudulent documents such as post-dated patient notes in his medical files and phony invoices related to his medical practice. Second, though he entered into a guilty plea in January of 2008, he promptly moved to withdraw his plea in February of 2008. See, U.S. District Court for the District of Maryland, Criminal Docket for Case 8:07-CR-00190 (PJM), ECF No. 54. This motion was denied. *Id.* at ECF No. 61. He later appealed the decision, which was also denied. *Id.* at ECF No. 99. Third, following his term of incarceration, he continued his pattern of dishonesty which resulted in revocation of his supervised release. Specifically, in April of 2015, he submitted a monthly supervision report, which did not note any expenses over $500.00. However, according to the defendant's personal checking account statement during the month of March 2015, he spent $750.00 at Brokerage Capitol. In May 2015, the defendant again submitted a monthly supervision report which did not note any expenses over $500.00. However according to his personal checking account statement during the month of April 2015, he spent $1,000.00 at Market Traders Institute. Finally, in July 2015 and March 2016, the defendant did not provide the probation office with accurate information relating to his employee's wages for the first quarter of 2015. The defendant was adjudged guilty of these violations and

sentenced to a term of one month incarceration.

Finally, documents recovered during the April 11, 2023 search warrant executions at Okafor's residence and medical practice suggest that Okafor and his medical practice are routinely in debt to the government and other companies. This pattern of non-payment further suggests that Okafor, at worst, has no intention of paying his debts because he intends to flee or, at best, routinely disregards serious obligations. Either support the conclusion that he is a flight risk and will not return to court if released. Law enforcement found evidence of the following:

- An invoice from LapCorp dated July 2, 2022 indicating Okafor is more than 3 months past due an obligation to pay $18,667.62.

- A notice from the Comptroller of Maryland, dated January 18, 2022, indicating that he owes $3,033.31 in taxes, dating back to 2015.

- An account statement from the D.C. Department of Employment Services, dated December 13, 2021, showing a past due balance of $8,928.11.

- A certificate of assessment and tax lien from the District of Columbia, dated July 25, 2017, showing a past due balance of $3,513.21

- A notice of Federal Tax Lien, issued in October 2015, showing a past due balance of $1,168,482.81.

While his prior convictions and past conduct do not indicate that he is guilty of the charged conduct here, the fact he has been convicted of complex health care fraud and financial crimes, indicate he has the ability and sophistication to commit these crimes, and the knowledge to know what he did was wrong. Importantly, the defendant's prior conduct and history of dishonesty demonstrates a brazen willingness to deceive law enforcement, probation, and the court, such that

he cannot be trusted to abide by any condition this Court might impose short of detention.

*Ability and Means to Flee*

Next, the defendant's financial sophistication and international ties demonstrate that he is a flight risk. First, the defendant's prior convictions showcase his advanced financial proficiency and comfort level with international banking and money transfers. Further, during the April 11, 2023 execution of the search warrant on the defendant's residence, law enforcement recovered approximately $31,000.00 in cash, some stuffed into socks, hidden in various locations. From Okafor's person, law enforcement recovered over $2,000.00 cash. Law enforcement further seized over $178,000.00 from his business checking account. Given the number of prescriptions he writes and the going price per prescription, it is highly unlikely that these figures reflect the total sum of his income. Okafor has the financial means and sophistication to flee.

Okafor also has strong international ties. Law enforcement recovered documents from the defendant's residence indicating that he owns property in Nigeria, to include statements from the Lagos State Government Ministry of Finance Land Use Charge Office requesting payment for overdue land use charges. Additionally, Okafor has the significant means to do so, and has recently traveled internationally for several weeks at a time. He travelled to Lagos, Nigeria for a month in March – April 2022, and again to London in December 2019. He has the means to travel internationally and has both United States and Nigeria citizenship. The defendant's foreign ties, in combination with other factors, weigh in favor of detention. *See United States v. Jamal*, 326 F. Supp. 2d 1006, 1009 (D. Ariz. 2003) (detaining United States citizen where defendant owned property overseas, had "relatively few assets in the United States and more substantial assets in Lebanon," and family had "demonstrated a willingness to live in Lebanon"); *see also United States v. Cole*, 715 F.

19

Supp. 677, 679 (E.D. Pa. 1988) (ordering defendants detained in part because they maintained ties with people living in Yugoslavia who could assist them in their relocation.)

In sum, the history and characteristics of the defendant demonstrate by a preponderance of the evidence that the defendant poses a serious risk of flight and should remain detained pending trial. *See Bikundi* 47 F. Supp. 3d at 134 (defendant detained pre-trial where 1) her financial sophistication was demonstrated through her participation in a complex fraud scheme, 2) she had connections to at least one foreign bank account in Cameroon; 3) she had strong overseas ties; and 4) she generally lacked trustworthiness given her history of misrepresentations to the government and prior criminal experience  demonstrate that she was a flight risk).

**D.** **Danger to the Community**

The fourth factor, the danger to any person or the community posed by the defendant's release, also weighs in favor of detention. The government is invoking the rebuttable presumption of detention pursuant to 18 U.S.C. § 3142(e)(3)(A). The government has already thoroughly outlined the defendant's exhibited danger to the community through his prescribing practices and the information contained within its supplemental sealed filing.

The presumption is rebuttable and does not shift the ultimate burden of proof from the government's shoulders. But it does create a burden of production on the defense to submit at least some credible evidence that might purport to overcome it. And even if the defense does submit such evidence, the presumption remains as a factor that may be considered by the Court among others in determining whether the defendant should be detained, and the presumption retains "evidentiary weight." *United States v. Dillon*, 938 F.2d 1412, 1416 (1st Cir. 1991) ("When a defendant produces such evidence, however, the presumption does not disappear. The burden of persuasion remains on

the government and the rebutted presumption retains evidentiary weight." (internal citations omitted)); *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991) ("Although the government retains the burden of persuasion, a defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption. . . .Once a defendant introduces rebuttal evidence, the presumption, rather than disappearing altogether, continues to be weighed along with other factors to be considered when deciding whether to release a defendant. . . ."); *see also United States v. Jessup*, 757 F.2d 378, 382-83 (1st Cir.1985) (arguing that the "bursting bubble" approach, whereby the presumption "bursts" once a defendant puts forth any evidence, would make the rebuttable presumption meaningless); *see also Ali*, 793 F.Supp.2d at 388 n.2 (D.D.C. 2011) ("Even if such contrary evidence or credible proffers are offered, the presumption remains as a factor to be considered by the Court amongst others in determining whether the defendant should be detained.").

Okafor engaged in polluting the District of Columbia, Maryland, and Virginia region and beyond, fueling individuals with unnecessary prescriptions for addictive opioids for cash. Okafor has not provided his patients with quality care. Instead, he has recklessly prescribed opioids for cash even when warned by several entities that his prescribing was incredibly dangerous.

All of these factors support a finding that the defendant should remain detained pending trial.

## **CONCLUSION**

The Court should grant the government's motion to detain Dr. Ndubuisi Okafor pending trial because he has demonstrated that his criminal conduct is an ongoing danger to the community and he poses a serious risk of flight.

Respectfully Submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
District of Columbia

GLENN S. LEON
CHIEF FRAUD SECTION
U.S. Department of Justice
Criminal Division

___/s/_____
Meredith E. Mayer-Dempsey
NY Bar No. 5213202
Assistant United States Attorney
United States Attorney's Office
for the District of Columbia
601 D Street, Northwest
Washington, D.C. 20530
(202) 252-7259
Meredith.Mayer-Dempsey@usdoj.gov

___/s/_____
Kilby Macfadden
IL Bar No 6295214
Principal Deputy Assistant Chief
U.S. Dept. of Justice, Criminal Division
Fraud Section
1400 New York Ave, NW
Washington, D.C. 20005
(202) 875-0363
Kilby.Macfadden@usdoj.gov