**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Criminal Action No. 23-116 (JDB)** |
| **NDUBUISI JOSEPH OKAFOR,** | |
| **Defendant.** | |

## ORDER

Before the Court is defendant Ndubuisi Joseph Okafor's motion to reconsider Magistrate Judge Upadhyaya's order granting the government's request to detain Okafor pretrial. On April 6, 2023, a grand jury indicted Okafor on sixteen counts of distribution of a controlled substance outside of the legitimate practice of medicine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). Judge Upadhyaya held a detention hearing on April 14, 2023 and granted the government's motion for pretrial detention, concluding that no condition or combination of conditions of release will reasonably assure Okafor's appearance. On May 30, 2023, Okafor filed the present motion for reconsideration of that detention order, which is now fully briefed and ripe for resolution. For the reasons explained below, the Court will deny the motion.

## Background

### I.    Factual Background

Okafor is a 63-year-old internal medicine physician who owns his own practice in Washington, D.C. Gov't Mem. in Opp'n to Def.'s Mot. for Pretrial Release [ECF No. 24] ("Opp'n") at 2; Mot. for Review & Recons. of Bond with Mem. of P. & A. & Req. for Hr'g [ECF No. 20] ("Mot.") at 2. In 2008, Okafor was convicted of federal charges for tax evasion, false income tax returns, and health care fraud in the District of Maryland, which resulted in a 65-month sentence of imprisonment. Opp'n at 3. While he was serving his sentence, his D.C. medical

license lapsed.  Id.[1]  Once released from custody, he applied for reinstatement of his medical license in D.C. and in Maryland.  Id.  The Maryland Board of Physicians denied his application, but the D.C. Board of Medicine reinstated his license with probationary conditions in May 2013; those conditions were lifted in August 2015.  Id.

The FBI opened an investigation into Okafor after it received information from law enforcement agencies in D.C., Maryland, Virginia, and North Carolina about prescriptions from Okafor that were connected to drug trafficking networks.  Opp'n at 3.  The investigation ultimately uncovered prescriptions for controlled substances from Okafor all over the United States.  Id.  The investigation also revealed that Okafor's opioid prescriptions featured false patient names and addresses.  Id.  Okafor "issue[d] prescriptions, typically opioids—oxycodone and codeine—in exchange for $200 to $250 cash."  Id. at 4.  He often prescribed "multiple types of opioids to the same person and excessive amounts of promethazine/codeine and/or oxycodone."  Id.[2] Investigators "identified strong ties between the defendant's practice and drug traffickers."  Id.

The government retained a medical expert, Dr. Donald Sullivan, to analyze Okafor's prescribing practices.  Opp'n at 4.  Dr. Sullivan reviewed approximately 1,400 prescriptions issued by Okafor between January 2020 and January 2023.  Id. at 5.  Okafor prescribed more than 200,000 controlled substance pills between March and November 2022 alone.  Id.  Dr. Sullivan concluded that "many of the prescriptions issued by the defendant were not for a legitimate medical purpose to patients who were abusing and/or diverting them."  Id.  He based this opinion on, among other factors, "[e]xtremely high doses of oxycodone," "combinations of controlled substances known to

---

[1] The record is silent as to whether or at what point his Maryland medical license lapsed.

[2] "Promethazine with codeine liquid is commonly diverted and abused.  Typically mixed with sprite or alcohol, this combination is colloquially known as 'purple drank,' 'purp,' 'sizzurp,' or 'lean.'  Oxycodone is marketed as OxyContin, among others.  Oxycodone is also available in combination products such as Percocet, which combines oxycodone and acetaminophen."  Opp'n at 4 n.3.

be abused and diverted," "[p]atients issued prescriptions for [combinations known to be abused and diverted] for extremely long periods of time," and "[p]atients traveling long distances to have prescriptions filled." Id. at 5–6.  Ultimately, Dr. Sullivan opined that Okafor "wrote hundreds of prescriptions for promethazine with codeine liquid, narcotic pain killers, and stimulants that were not for a legitimate medical purpose to many patients who were abusing and/or diverting these medications." Id. at 7.  He further opined that "many of these patients were placed at extreme risk of overdose based on the medications prescribed by the defendant" and that he "had no doubt whatsoever that the defendant's medical practice was a pill mill for the illegal prescribing of oxycodone, promethazine with codeine liquid, dextroamphetamine-amphetamine, and methadone." Id.

## II.   Procedural Background

On April 6, 2023, a grand jury indicted Okafor on sixteen counts of unlawful distribution of a controlled substance outside the practice of medicine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  See Indictment [ECF No. 1].  Okafor was arrested on April 11, 2023 and appeared before Judge Upadhyaya the next day.  Opp'n at 1–2; Apr. 12, 2023 Min. Entry.  Upon the government's motion for pretrial detention, Judge Upadhyaya held a detention hearing that began on April 14, 2023 and continued to April 18, 2023.  See Apr. 14, 2023 Min. Entry; Apr. 18, 2023 Min. Entry.  Following the hearing, Judge Upadhyaya granted the government's motion and ordered Okafor detained pending trial, concluding that "Okafor has failed to rebut the presumption that he poses a serious risk of flight if released."  Order of Detention Pending Trial [ECF No. 17] ("Detention Order") at 8; see Apr. 18, 2023 Min. Entry.

Okafor filed a motion in this Court on May 30, 2023 for reconsideration of Judge Upadhyaya's detention order.  See Mot.  The government responded in opposition, see Opp'n, and

also filed a sealed supplement in support of its motion, <u>see</u> Suppl. to Opp'n [ECF No. 25]. Okafor did not file a reply in support of his motion.

## **Legal Standard**

A defendant ordered detained by a magistrate judge may file "a motion for revocation or amendment of the order" with "the court having original jurisdiction over the offense." 18 U.S.C. § 3145(b). Although the D.C. Circuit has not ruled on the matter, every circuit to consider the issue has found that a magistrate judge's detention order is subject to <u>de novo</u> review. <u>See</u> <u>United States v. Hunt</u>, 240 F. Supp. 3d 128, 132–33 (D.D.C. 2017) (collecting cases from numerous Circuits that support this proposition). This Court has previously reviewed such orders <u>de novo</u>. <u>See, e.g.</u>, <u>United States v. Klein</u>, 533 F.Supp.3d 1, 7, (D.D.C. 2021); <u>United States v. Padilla</u>, 538 F. Supp. 3d 32, 38–39 (D.D.C. 2021).

Under the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141–3156, "Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes that are 'the most serious' compared to other federal offenses." <u>United States v. Singleton</u>, 182 F.3d 7, 13 (D.C. Cir. 1999) (quoting <u>United States v. Salerno</u>, 481 U.S. 739, 747 (1987)). Hence, a defendant may be detained pending trial and thus is entitled to a detention hearing only if defendant was charged with certain enumerated offenses, 18 U.S.C. § 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of trying to obstruct justice or threaten, injure, or intimidate a witness or juror, <u>id.</u> § 3142(f)(2)(A)–(B).

The BRA also provides that the court "shall" order pretrial detention if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). When there is probable cause to believe that the defendant committed a crime enumerated in 18 U.S.C.

§ 3142(e)(3)(A)–(E), a rebuttable assumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community" attaches.  Id. § 3142(e)(3).  Accordingly, "the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'"  United States v. Vasquez-Benitez, 919 F.3d 546, 550 (D.C. Cir. 2019).  Under that inquiry, the court must "take into account the available information" concerning four statutory factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g)(1)–(4).

"When the basis for pretrial detention is the defendant's risk of flight, the government is required to demonstrate the appropriateness of detention . . . by a preponderance of the evidence." United States v. Sabol, Crim. A. No. 21-35-1 (EGS), 2021 WL 1405945, at *4 (D.D.C. Apr. 14, 2021) (citing United States v. Xulam, 84 F.3d 441, 442 (D.C. Cir. 1996)).

## Analysis

Okafor is charged with crimes that trigger § 3142(e)(3)(A)'s rebuttable presumption that "no condition or combination of conditions would reasonably assure . . . [his] appearance . . . as required."  Detention Order at 5.  After Okafor's detention hearing, Judge Upadhyaya concluded that Okafor did not rebut the presumption in light of the preponderance of evidence presented by the government that he presents a risk of flight.  See id. at 7–8.  The government does not argue that Okafor presents a risk of dangerousness to the community, so the Court will focus on whether

Okafor presents a risk of flight justifying pretrial detention by analyzing the factors enumerated in 18 U.S.C. § 3142(g)(1)–(3).[3]

## I.    Nature and Circumstances of the Offense

The Court first considers "the nature and circumstances of the offense charged." 18 U.S.C. § 3142(g)(1). Okafor is charged with sixteen counts of distribution of a controlled substance outside of the legitimate practice of medicine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). See Indictment. He faces a penalty of up to 20 years' imprisonment on each count. Detention Order at 6; see § 841(b)(1)(C). "The substantial term of imprisonment authorized by [Okafor]'s charges . . . provide[s] [him] with reason to flee." Padilla, 538 F. Supp. 3d at 48; see United States v. Bikundi, 47 F. Supp. 3d 131, 134 (D.D.C. 2014) ("[C]onsiderable punishment gives the defendant a substantial incentive to flee the United States." (internal quotation marks omitted)). This factor accordingly weighs in favor of pretrial detention.

## II.    Weight of the Evidence

The Court next assesses the weight of the evidence supporting the charges against Okafor. 18 U.S.C. § 3142(g)(2). To succeed on its case, the government must prove for each charged count that Okafor "knowingly or intentionally . . . manufacture[d], distribute[d], or dispense[d], or possess[ed] with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1).

The weight of the evidence is strong. The government's case "include[s] evidence of Okafor's dangerous prescribing patterns, including video and audio recordings of undercover officers and confidential sources visiting Okafor's medical practice." Detention Order at 6. The

---

[3] The fourth factor—"the nature and seriousness of the danger to any person or the community that would be posed by the person's release," § 3142(g)(4)—is inapposite here since the government does not argue that Okafor should be detained based on his danger to the community.

evidence shows that "the defendant communicated with individuals who sought controlled substance prescriptions under multiple names in exchange for money," which "demonstrates his knowledge that he was prescribing outside the standard of professional practice."  Opp'n at 11. Recordings reveal that Okafor "warned [his patients] to not fill their prescription at certain pharmacies, demonstrating his knowledge that his prescribing practices were under scrutiny."  Id. at 11–12.  His prescriptions were "centrally blocked" by Walmart and Sam's Club pharmacies nationwide "due to his dangerous prescribing practices."  Id. at 12.  Walmart's reasons for blocking his prescriptions included

> evidence of "pharmacy shopping" (that is, one patient traveling to multiple pharmacies to fill prescriptions); patients residing outside of the trade area of a given pharmacy; total number or percentage of controlled substances prescribed; evidence of Okafor writing prescriptions for similar medication, dosage, directions and/or diagnoses for numerous individuals; patients insisting on paying for their prescriptions refills with cash; unusually large quantity or high starting dose for the prescription; and providing the same diagnosis for a majority of his patients.

Id. at 13.  Okafor was also on notice that his prescribing practices were being investigated by Kaiser Permanente, id., and law enforcement investigators interviewed several individual pharmacists who refused to fill Okafor's prescriptions, id. at 14–15.

Law enforcement also recovered evidence from Okafor's home and medical practice "further connecting the defendant to local drug trafficking networks and demonstrating his knowledge that he was prescribing to drug traffickers who were diverting his prescriptions." Opp'n at 11.  This evidence includes "a notebook that appears to reflect monetary balances owed to the defendant by numerous known drug traffickers" and "conversations [recovered from his personal electronic devices] where individuals appeared to message the defendant requesting multiple controlled substance prescriptions in exchange for cash, along with the names, dates of birth, and pharmacy information that should accompany the prescription."  Id.

The only mention of this factor in Okafor's motion is a complaint that "the Magistrate Judge erroneously considered the medical expert in support of the strength of the government's case." Mot. at 10. But, as demonstrated above, there is ample evidence supporting his guilt even without considering the expert opinion.

Hence, the strength of the government's evidence against Okafor supports pretrial detention because, paired with the serious penalty he faces, it "provide[s] [him] with reason to flee," Padilla, 538 F. Supp. 3d at 48.

## III.    History and Characteristics of the Defendant

The Court lastly considers Okafor's "history and characteristics."  18 U.S.C. § 3142(g)(3). As part of this inquiry, the Court considers his "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings."  Id. § 3142(g)(3)(A).

The government contends that "defendant's (1) well-documented history of dishonesty both generally and with the court system specifically; (2) fraudulent behavior; and (3) avoidance of significant obligations supports the conclusion that he cannot be trusted to abide by even the most restrictive conditions of release," Opp'n at 16–17, and that his "financial sophistication and international ties demonstrate that he is a flight risk," id. at 21.  Okafor primarily argues that there are less restrictive combinations of conditions that would minimize any flight risk he poses, namely release into the pretrial High Intensive Supervision Program ("HISP") with GPS monitoring.  Mot. at 11.

Okafor has a history of dishonesty and evading the authorities.  He has prior convictions in the District of Maryland for tax evasion, filing false income tax returns, and health care fraud.

Opp'n at 17.  The conduct underlying these convictions spanned eight years during which "Okafor evaded his taxes by reporting false information to the Internal Revenue Service and tax preparers . . . ; establish[ed] sham corporations in the Bahamas to create false expenses and disguise personal income; . . . . [and] caused his medical practice to file false income tax returns." Id.  He also "ple[d] guilty to defrauding Medicare and other health benefit programs."  Id. at 18. The sentencing judge in the Maryland case found that Okafor "obstructed [the] investigations by creating fraudulent documents such as post-dated patient notes in his medical files and phony invoices related to his medical practice."  Id. at 19.  Once he completed his sentence of imprisonment in the District of Maryland case and was on supervised release, he violated his conditions of release by submitting fraudulent monthly supervision reports that understated his expenses and income.  Id. at 20.  He later minimized his convictions in his application to renew his medical license, characterizing them as merely "billing errors on three patients" and "business record errors."  Id. at 19 (internal quotation marks omitted).

Further, there is evidence that Okafor continues to conceal income from authorities:

[d]uring the April 11, 2023 search warrant execution, law enforcement recovered a W-2 in the amount of $149,730.00 written out to someone personally connected to the defendant who, from all information reviewed by FBI, has never been employed by the defendant's medical practice and is in fact employed elsewhere, suggesting that the defendant has continued to hide income from the government.

Opp'n at 21.  This history of fraud and deception—including violating court orders— "demonstrates a brazen willingness to deceive law enforcement, probation, and the court, such that he cannot be trusted to abide by any condition this Court might impose short of detention."  Id. at 21.

Okafor is also in substantial debt, both to the government and private entities.  He is in "at least $1 million of debt to numerous creditors, including the IRS and other federal, state, and local

9

government authorities."  Detention Order at 7; see also Opp'n at 20–21.  He was also ordered to pay $800,000 in restitution in the District of Maryland case and has only paid $1,700 of that balance.  Detention Order at 7; see also Opp'n at 18.  These unpaid financial obligations provide Okafor with a reason to flee.  Accord Detention Order at 7 (concluding that his significant debt "provide[s] a motive to flee prosecution").

In addition to displaying a propensity to deceive and having substantial debts, Okafor also has strong international ties, the financial resources to accomplish flight, and displays sophistication in international financial transactions, all of which increase his risk of flight.  Okafor owns a home in Lagos, Nigeria[4] and has "recently traveled internationally for several weeks at a time."  Opp'n at 22.  Okafor is also a citizen of Nigeria and, despite his debts, has the financial resources to flee, as evidenced by the approximately $210,000 that law enforcement recovered from his person, home, and business checking account.  Opp'n at 21–22.  These factors lend credibility to Okafor's flight risk.

Okafor claims that the government overstates his risk of flight because "he possesses no valid passports and/or travel documents and even if he did, the court and/or the government can put him on the no-fly list"; he "never fled the United [States] . . . during the pendency of his prior case"; and "the United States has [an] extradition treaty with Nigeria."  Mot. at 6, 10.  Okafor claimed at the detention hearing that both his U.S. and Nigerian passports had been recently stolen

---

[4] During the detention hearing, when the government presented evidence of Okafor's home in Nigeria, Okafor "represented that the property he owned in Nigeria was a dilapidated and uninhabitable bungalow," Opp'n at 22–23, in an attempt to "mitigat[e] any risk that [he] would seek to evade prosecution by travelling there," Detention Order at 7–8.  The government then presented evidence, including photographs of the home, during the second day of the hearing that contradicted that assertion, showing that the property was "a waterfront home in an upscale gated community" with "a car parked outside" and that the trash had recently been taken out.  Id. at 8; see also Suppl. to Opp'n at 12–15.  Okafor attempts to counter that characterization by attaching different photographs of the home that portray it as run-down.  See Exs. 1–20 to Mot. [ECF No. 20-1].  The Court will not resolve this factual dispute.  What is relevant here is that Okafor has a home in Nigeria to which he could flee; the condition of the home, while perhaps minimally relevant, is not central to the Court's analysis.

but presented no evidence supporting that claim.  Opp'n at 23.  Judge Upadhyaya accordingly did not credit that assertion, Detention Order at 8, and neither will this Court.  Further, the government notes that "while in theory [Okafor] could be placed on a 'no-fly' list, any last minute or in-person booking would likely go undetected," Opp'n at 23, meaning he would still have the ability to flee.  Moreover, the fact that the United States and Nigeria have an extradition treaty is of little relevance here—any mechanisms available under the treaty to bring Okafor back to the United States are a remedy if he flees, not a factor that mitigates his risk of flight.  Finally, the Court acknowledges that although Okafor did not flee during the pendency of his District of Maryland case (but he did disobey other orders in that case), it does not necessarily follow that he will not attempt to flee in this case, where he faces more serious charges and penalties.

In any event, even crediting these points, Okafor's other characteristics and history of deceit and concealment support pretrial detention.  His "substantial familiarity with the commercial and financial laws of other countries, sophistication in arranging international financial transactions and in moving money across borders, and . . . facility for concealing the existence and location of significant quantities of money and other assets," United States v. Anderson, 384 F. Supp. 2d 32, 35–36 (D.D.C. 2005), together with his history of fraud, deception, and concealment make him a very strong flight risk.  See Bikundi, 47 F. Supp. 3d at 134–38 (concluding defendant was a flight risk because she had "overseas ties," access to funds in the foreign country, a prior conviction for fraud, a history of deceit and misrepresentations, and sophistication with international financial transactions).

Notwithstanding the foregoing, Okafor argues that he should be released pending trial because "[h]is continued detention will create and continues to create undue hardship to his defense" and makes him unable to "transition his patients who are in need of continued medical

care." Mot. at 9–11.  While the Court is sensitive to the inconvenience of being detained pending trial, these are not particularly relevant considerations in the § 3142(g) analysis.

### Conclusion

The government has met its burden of showing by a preponderance of the evidence that, due to Okafor's strong ties to and home in Nigeria and extensive history of fraud and deception, Okafor has failed to rebut the presumption that he poses a serious risk of flight.  Hence, the Court concludes that it cannot fashion any combination of conditions that would reasonably assure his appearance as required, and thus it will deny Okafor's motion for reconsideration of the detention order and order him to remain detained pending trial.

\*       \*       \*

For the foregoing reasons, and upon consideration of the entire record herein, it is hereby

**ORDERED** that [20] defendant's motion for review and reconsideration of bond is **DENIED.**

**SO ORDERED.**

_____/s/_____
JOHN D. BATES
United States District Judge

Dated: July 27, 2023