**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No. 23-CR-116 (JDB)** |
| | : | |
| **v.** | : | |
| | : | |
| **NDUBUISI JOSEPH OKAFOR, M.D.** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' MOTION TO ADMIT EVIDENCE INTRINSIC TO**
**THE CHARGED CONDUCT AND PURSUANT TO FED. R. EVID. 404(b)**

The United States, by and through undersigned counsel, respectfully files this Motion to permit the introduction of evidence at trial that is intrinsic to the charged conduct. To the extent this Court finds any of the proffered evidence extrinsic, the government seeks to admit it for non-propensity purposes under Federal Rule of Evidence 404(b). In support of its motion, the government relies on the following points and authorities, and such other points and authorities as may be cited at a hearing on this matter.

The defendant was at the helm of a national criminal drug distribution ring, made possible by his status as a medical doctor and license to prescribe controlled substances. Entrusted with these privileges, the defendant wantonly prescribed dangerous, addictive controlled substances, including opioids, for cash payments outside the usual course of professional practice and not for a legitimate medical purpose to his co-conspirators, whom he knew to be diverting and abusing the controlled substances. He also illegitimately prescribed controlled substances to individual patients in exchange for cash from his medical practice. In total, the defendant illegally issued controlled substance prescriptions in at least 37 states and the District of Columbia in an effort to conceal the true scope of his illegal prescribing.

The defendant is charged in a twenty-nine-count Superseding Indictment with Unlawful Distribution of Controlled Substances, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C), Conspiracy to Unlawfully Distribute Controlled Substances, in violation of Title 21, United States Code, Section 846, Maintaining a Drug Involved Premises, in violation of Title 21, United States Code, Section 856(a)(l), and Aiding and Abetting, in violation of Title 18, United States Code, Section 2. Trial is scheduled to begin on October 14, 2024. The charges in the Superseding Indictment arise from allegations that the defendant both conspired to and did unlawfully distribute dangerous, addictive substances to individuals with no legitimate medical need for them and maintained his medical practice for that purpose.

The defendant's illicit distribution of controlled substances includes distributions to law enforcement sources posing as walk-in patients (Counts 3 – 8) and a civilian patient, J.V. (Counts 9 – 11). In each instance, the individuals presented themselves as a patient seeking treatment for a purported medical problem, and the defendant, without meaningful examination or assessment, prescribed large quantities of opioids to that individual outside the course of professional practice and not for a legitimate medical purpose. The defendant also distributed controlled substances to co-conspirators who sought unnecessary prescriptions from the defendant under their own names, variations of their names, or fake identities. The defendant issued these prescriptions on demand, despite being fully aware that multiple prescriptions were going to the same person and that the patient identities were false.

To prove the charges at trial, the government seeks to admit evidence of the defendant's guilt falling into four general categories: 1) co-conspirator evidence; 2) drug distributions to law enforcement sources and civilian patient J.V.; 3) the defendant's falsification of J.V.'s medical records following notification of J.V.'s death; and 4) expert review and analysis of the defendant's

2

prescribing and financials. As outlined more fully herein, evidence in each category is intrinsic to the charged conduct. To the extent this Court finds that it is not, it is separately admissible as evidence of the defendant's knowledge, intent, and absence of mistake under Fed. R. Evid. 404(b).

## I.     FACTUAL BACKGROUND

### A.     The Defendant

The defendant, Ndubuisi Joseph Okafor, was an internal medicine doctor who owned and operated Okafor Medical Associates, LLC, a medical practice, located at 7603 Georgia Avenue Northwest in Washington, D.C. (hereinafter "Okafor Medical Associates") and held the assigned National Provider Identifier (NPI) number 1164534947.[1] The defendant was licensed to practice medicine in Washington, D.C. for varying periods since 1992. From 2008 to 2013, the defendant's medical license in the District of Columbia was suspended after his conviction in the District of Maryland and subsequent incarceration.[2] Until 2005, the defendant was also licensed to practice medicine in the State of Maryland. The defendant's D.C. medical license was provisionally reinstated in 2013 and expires at the end of 2024. During the period alleged in the Superseding Indictment, and at the time of his arrest on April 11, 2023, the defendant was only licensed by the D.C. Board of Medicine to practice medicine pursuant to license number MD19779, and he was licensed by the DEA to prescribed controlled substances only in the District of Columbia pursuant to registration number FO4353188.

---

[1]     A National Provider Identifier (NPI) is a unique identification number issued to health care providers in the United States, and is used for Medicare, commercial insurance, and other billing. An individual provider's NPI remains with the provider regardless of job or location changes.

[2]     In July 2008, the defendant was convicted of tax evasion, filing false income tax returns, and health care fraud and sentenced to 65 months imprisonment in *United States v. Ndubuisi Okafor*, Case No. 8:07-CR-00190 (D. Md.).

## B.      Background Concepts and Practices

The Controlled Substances Act ("CSA"), codified at Title 21, United States Code, Section 801, *et. seq.,* and further defined in Title 21 of the Code of Federal Regulations ("C.F.R."), governs the manufacture, distribution, and dispensation[3] of controlled substances[4] in the United States. While it is generally unlawful for a person to knowingly or intentionally distribute a controlled substance, licensed doctors may do so under certain circumstances. *See* 21 U.S.C. §§ 841(a)(1), 829(a), (b). Some of the rules governing the issuance of prescriptions by licensed doctors include:

1)   Prescribers may only issue controlled substance prescriptions for legitimate medical purposes and acting in the usual course of professional practice. *See* 21 C.F.R. § 1306.04. To run afoul of this provision, a doctor must knowingly or intentionally prescribe in an unauthorized manner. *See generally*, *Ruan v. United States*, 142 S. Ct. 2370 (2022).

2)   The prescription must be made out to the patient receiving it, and include that patient's true name, address, phone number, and date of birth. *See* 21 C.F.R. § 1306.05(a).

---

[3]      The term "dispense" means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance. The term "distribute" means to deliver (other than by administering or dispensing) a controlled substance. *See* 21 U.S.C. § 802(10)-(11).

[4]      The term "controlled substance" means a drug or other substance, or immediate precursor, included in Schedule I, II, III, IV and V, as designated by Title 21, United States Code, Section 802(c)(6), and the C.F.R.. Drugs and substances are assigned to one of five schedules ("Schedule I-V"), depending on the drug or substance's potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.   Oxycodone is classified as a Schedule II controlled substance. *See* 21 C.F.R. § 1308.12(b)(l)(xiv). Oxycodone, sometimes prescribed under the brand name Percocet, is used to treat severe pain, and as with other opioids, was highly-addictive. The designation "Schedule II" means the drug or other substance had a high potential for abuse. While oxycodone has a currently accepted medical use with severe restrictions, abuse of the drug or other substances may lead to severe psychological or physical dependence. Promethazine with Codeine Oral Solution is classified as a Schedule V controlled substance. *See* 21 C.F.R. § 1308.15(c)(l). The designation "Schedule V" means the drug or other substance had a lower potential for abuse than Schedule IV substances and consisted of preparations containing limited quantities of certain narcotics. Schedule V drugs are generally used for antidiarrheal, antitussive, and analgesic purposes.

3) Prescribers may not issue refills for Schedule II controlled substance prescriptions (including Oxycodone). 21 C.F.R. § 1306.12.

4) To issue a controlled substance prescription, a provider must have a license through the DEA to prescribe in the state in which the prescription is being filled. A DEA license is state specific, thus, a provider who is only licensed only to issue prescriptions in the District of Columbia, cannot lawfully issue controlled substance prescriptions in other states. *See* C.F.R. § 1306.03.

To help enforce these regulations, individual states have prescription drug monitoring programs ("PDMP"), which are electronic databases that track controlled substance prescriptions. *See* Manasco AT, Griggs C, Leeds R, Langlois BK, Breaud AH, Mitchell PM, Weiner SG. Characteristics of state prescription drug monitoring programs: a state-by-state survey. Pharmacoepidemiol Drug Saf. 2016 Jul;25(7):847-51. However, the system is not fool proof, and signs of illicit prescribing can often go undetected. For example, providers, pharmacists, and law enforcement do not have unfettered access to the data, though prescribers and pharmacists are usually allowed to obtain reports on patients they are directly treating. *See* Gabay M. Prescription Drug Monitoring Programs. Hosp Pharm. 2015 Apr;50(4):277-8. Further, many states have legal protections that prevent law enforcement access to these reports. *Id*. Finally, there is limited interstate data sharing between PDMPs, which in turn limits the monitoring of patients who cross state boundaries to obtain medications and of doctors who prescribe in multiple states.

Pharmacists have a "corresponding duty … in relation to a prescribing physician" to ensure prescriptions are lawfully dispensed. See C.F.R. § 1306.04 ("The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."). When presented with indicators that a prescription may be illegitimate, a pharmacist may refuse to fill it. These indicators may include prescriptions written for out of state patients, high doses of opioids,

patients traveling long distances to fill prescriptions, patients attempting to fill a prescription too soon, and patients attempting to fill a prescription for another person. *See, e.g. United States v. Nasr*, 2021 U.S. Dist. LEXIS 22264, at *6-7 (E.D. Ky. Feb 5, 2021). As testimony at trial will establish, pharmacists are often reticent to fill prescriptions to be picked up by individuals other than the named patient. However, pharmacists may be more likely to permit a named patient's family member to pick up the medication on the patient's behalf. Evidence at trial will further establish that pharmacies may not fill subsequent controlled substance prescriptions for a patient until the time period covered by the prescription has passed. For example, once a pharmacy filled a 30-day prescription for oxycodone 30 mg for a patient, a pharmacy could not fill another oxycodone 30 mg prescription for the same patient until the 30 days had passed. Thus, a patient receiving controlled substance prescriptions under multiple identities would be able to obtain significantly higher quantities of any given substance.

The government will present evidence that the manner in which the defendant prescribed to co-conspirators was designed to circumvent these rules and pharmacy practices.

### C.   The Co-Conspirator Distributions and Drug Premises Evidence

The defendant's drug distribution conspiracy operated like a business, where the defendant sold prescriptions in exchange for cash. He had several regular, trusted customers, whom he prescribed to in a blatantly illicit manner, and in far greater numbers than the average patient. These trusted customers enjoyed special treatment. They were issued prescriptions upfront without payment, on the understanding that they would reimburse the defendant later, and the defendant kept tab sheets of money they owed him. They were issued prescriptions on demand in response to text messages, in the names and quantities they requested. They were issued prescriptions under numerous, often fake, identities and across multiple states, allowing them to obtain extraordinary

amounts of controlled substances. And the defendant knew these customers were traveling across the country to fill his prescriptions, and he enabled their illicit conduct by sending electronic prescriptions to the states on their routes.

At trial, the government will introduce evidence regarding eleven of these trusted customers and establish that they were in a conspiracy with the defendant to illegally distribute controlled substances. Of these eleven co-conspirators, one will testify as a cooperating witness.[5] Evidence from certain co-conspirators (Cooperating Witness 1 (CW-1) and Co-Conspirators 5, 7, 8, and 9) will primarily be offered in support of the drug premises count, and to provide insight on how the distribution conspiracy worked. The evidence will ultimately demonstrate that a primary purpose of the defendant's medical practice was the illicit distribution of controlled substances. Although the prescriptions to CW-1 and Co-Conspirators 5, 7, 8, and 9 are not charged as distinct counts in the Superseding Indictment, they are intrinsic to the conspiracy and drug premises charge and probative of the defendant's knowledge and intent to conspire to unlawfully distribute controlled substances and maintain a drug-involved premises at Okafor Medical Associates.

Evidence related to Co-Conspirators 1, 2, 3, 4, and 6, too, will provide proof of the conspiracy and drug premises charges. However, this evidence will also be offered to prove the counts charging substantive distributions to co-conspirators (Counts 12 – 29), outlined below:

---

[5]     For the purposes of this filing, the co-conspirators have been given the following designations: CW-1 (Cooperating Witness 1), and Co-Conspirators (CC's) 1 – 10. The government previously provided the names of the non-cooperating co-conspirators to defense and provides them to the Court in a sealed exhibit attached to this Motion. *See* Gov. Ex. A (under seal). If additional cooperators are identified through the government's investigation, it will notify defense and the Court.

| Counts | Distributions |
|--------|---------------|
| 12 – 13 | Two promethazine with codeine prescriptions requested by Co-Conspirator 6 via text exchange with the defendant and issued by the defendant in the names of fake patients. |
| 14 – 20 | Seven oxycodone prescriptions requested by Co-Conspirator 2 via WhatsApp[6] exchange with the defendant and issued by the defendant in the names of fake patients. |
| 21 – 25 | Five oxycodone prescriptions issued to Co-Conspirator 2 under fake identities in the state of Ohio, where the defendant had no DEA license to issue controlled substance prescriptions there and knew the co-conspirator was traveling to fill prescriptions issued by the defendant under fake names. |
| 26 – 29 | Four oxycodone prescriptions requested by Co-Conspirator 4 via an Instagram Messenger conversation with the defendant's secretary (Co-Conspirator 3) that were then issued electronically by the defendant. |

**D.    Evidence in Support of the Drug Premises Counts**

**i.    Cooperating Witness 1**

Although Cooperating Witness 1 ("CW-1") routinely received controlled substance prescriptions from the defendant during the period alleged in the Superseding Indictment, the defendant did not examine CW-1 or ask them about their purported injury or ailment that necessitated the controlled substance prescriptions. Instead, the defendant fulfilled CW-1's written requests for prescriptions with no physical examination. CW-1 requested prescriptions for themself under a pseudonym and requested additional prescriptions for multiple fake patients when CW-1 and the defendant met in an exam room or an office at Okafor Medical Associates. The requests included fake patients' names, dates of birth, the requested controlled substances, the amount in milliliters or number of doses, and the pharmacy name and location where CW-1 intended to pick up the controlled substances.

---

[6]    WhatsApp is an instant messaging and voice-over-IP service.

To receive prescriptions in a fake patient's name, CW-1 at times provided false identification information to Co-Conspirator 3 ("CC-3"), an employee at Okafor Medical Associates (discussed more fully below), who would then create a patient profile in Okafor's Electronic Health Record (EHR) system.[7] The fake patient profile enabled the defendant to send the prescription electronically and created the impression that the prescription was for an actual patient seen by the defendant. In exchange for cash payment, the defendant electronically submitted CW-1's controlled substance prescriptions to the pre-selected pharmacy. Thereafter, CW-1 would travel to multiple pharmacies, including out-of-state pharmacies, in order to collect the numerous controlled substance prescriptions issued by the defendant. Electronic prescription data confirms the defendant wrote at least 19 oxycodone and promethazine with codeine prescriptions to CW-1 under numerous identities within a three-month period.

The Government intends to present evidence of prescriptions issued to CW-1 and testimony by CW-1 as to how they received the prescriptions and their interactions with the defendant at his medical practice.

### ii.   Co-Conspirator 5

During the period alleged in the Superseding Indictment, the defendant issued numerous prescriptions for promethazine with codeine and oxycodone to Co-Conspirator 5 ("CC-5") outside the usual course of professional practice and not for a legitimate medical purpose. The defendant's prescriptions to CC-5 bore CC-5's last name and at times, an alternative first name, and the defendant's prescriptions to CC-5 bore at least 10 different home addresses in 4 states.

---

[7]     An electronic health record is a digitized version of a patient's paper medical chart. The EHR makes the patient's information available instantly and securely to an authorized user.

In addition to receiving controlled substance prescriptions, a review of CC-5's Instagram account revealed that CC-5 advertised oxycodone and promethazine with codeine for sale online. CC-5's advertisements included several photographs of medications that appear to be taken in an examination room at Okafor Medical Associates. The advertisements featured prescription and soda bottles containing gold and purple-colored liquids (often referred to as "drink" or "purple drink"[8]), which CC-5 labeled "3 of tris" and "2 of pai" in the advertisements.[9] CC-5 posted his Instagram advertisements within days of receiving prescriptions from the defendant. The government will introduce photographs of the advertisements from CC-5's Instagram account and of the exam room at Okafor Medical Associates where the advertisement photos appear to have been taken, along with the prescription data which confirmed the defendant issued prescriptions for CC-5.

Finally, the government intends to introduce papers recovered during the search warrant execution at the defendant's office, which list notes regarding prescriptions for CC-5, along with what appears to be a balance sheet listing the amount CC-5 owed the defendant. Notably, CC-1's name also appears on the same balance sheet.

### iii.    Co-Conspirator 8

During the period alleged in the Superseding Indictment, the defendant issued at least 24 prescriptions for oxycodone and at least 133 prescriptions for promethazine with codeine in at least 21 states to CC-8 or a CC-8 alias or affiliate. Of these prescriptions, approximately 41 were issued

---

[8]     "Drink" is a colloquial term for a recreational drug made by mixing promethazine with codeine liquid with a soft drink.

[9]     "Tris" is believed to refer to "Tris Pharma" and "pai" is believed to refer to "PAI Pharma," both manufacturers of promethazine with codeine liquid medications.

bearing CC-8's true name, and 116 to fake patients who bore CC-8's last name. Law enforcement agents further identified at least 8 additional aliases that CC-8 used to receive controlled substance prescriptions issued by the defendant. The government intends to introduce evidence of the defendant's prescribing to CC-8 and that much of the patient information used is false.

The government will also introduce evidence that the defendant kept track of money CC-8 owed him. For example, on November 25, 2022, CC-8 sent the defendant $800.00 through Zelle[10], and labeled the payment as "Balance [of $]1150." Law enforcement agents also seized documents at Okafor Medical Associates showing the defendant tracked CC-8's outstanding balance for the prescriptions he issued to CC-8. The government will also admit papers recovered during the search of the defendant's practice, which reference prescriptions to CC-8 and his false identities, as well as an apparent tab sheet tracking how much CC-8 owed the defendant for the prescriptions.

### iv.   Co-Conspirator 9

During the period alleged in the Superseding Indictment, the defendant wrote at least 223 controlled substance prescriptions to purported patients bearing Co-Conspirator 9 (CC-9)'s last name across at least 14 different states.[11] Additionally, law enforcement identified at least 13 other identities CC-9 used to obtain controlled substance prescriptions from the defendant. The government intends to introduce evidence of the defendant's prescribing to CC-9 and their use of false patient information.

In addition, the government intends to introduce evidence that CC-9 requested prescriptions from the defendant via WhatsApp. CC-9 provided the defendant with names, dates

---

[10]     Zelle is a peer-to-peer money transfer service.

[11]     Notably, some of these prescriptions were written to purported patients bearing CC-5 and CC-9's names in combination.

of birth, addresses, and pharmacy information, and the defendant filled the requested prescriptions. Further, the government intends to introduce papers recovered during the search of the defendant's office, including notes regarding illicit prescriptions for CC-9. Moreover, electronic prescription data confirms that the defendant sent controlled substance prescriptions to CC-9 and false identities he used.

Next, the government intends to introduce evidence that, on and around November 29, 2022, CC-9 was incarcerated in Arlington County, VA. During a search of CC-9's jail cell, guards recovered papers listing nicknames and phone numbers, including individuals (including CC-5) who also received controlled substances from the defendant. CW-1 is also expected to testify that several of the names on the list were individuals CW-1 knew to be receiving controlled substance prescriptions from the defendant and diverting or abusing them. Finally, during his incarceration, CC-9 placed phone calls to others to explain how they could go about receiving controlled substance prescriptions from the defendant. The government intends to introduce these recorded jail calls as co-conspirator statements in furtherance of the conspiracy.

### v.   Co-Conspirator 10

The government intends to introduce evidence of two distinct interactions between Co-Conspirator 10 (CC-10) and law enforcement. First, on February 8, 2022, CC-10 attempted to fill a prescription for oxycodone at a pharmacy in Apex, North Carolina. When the pharmacy refused to fill the prescription, CC-10 attempted to have it filled at a pharmacy nearby, which notified law enforcement. Law enforcement asked CC-10 to provide proof that the prescription was legitimate. In response, CC-10 called a person labeled "Dr. O" on CC-10's phone.

About one year later, on January 9, 2023, a pharmacist in Buffalo, New York contacted the police regarding a suspicious promethazine with codeine prescription to a patient with initials

"H.C.", a name used by CC-10 to receive prescriptions from the defendant. After receiving notice, local police waited for someone to attempt to pick up the prescription for "H.C." While waiting, officers received an additional notice that another nearby pharmacy received three prescriptions issued by the defendant to three different individuals for promethazine with codeine. The pharmacist called the defendant's office, and a representative confirmed the defendant issued the prescriptions. Eventually, local police made contact with CC-10 and two others during a traffic stop. In CC-10's car, officers discovered numerous documents listing patient names and pharmacy information along with notes such as "re-route", "resend", "new patient" and "scored" next to a date. Officers also found multiple prescription bottles of oxycodone and a bottle of promethazine with codeine prescribed by the defendant, a bottle of simple syrup, and 8 oxycodone pills. Electronic prescription data confirmed that the defendant issued at least 6 of the oxycodone prescriptions referred to in these documents.

The government intends to introduce the electronic prescription data related to the New York and North Carolina prescriptions, the defendant's agent's confirmation that the defendant issued the prescriptions, and the evidence recovered from CC-10's vehicle in New York.

### E.    Unlawful Distributions to Co-Conspirators

#### i.    Co-Conspirator 1 and Co-Conspirator 2

The defendant issued at least 127 prescriptions for promethazine with codeine to Co-Conspirator 1 (*"CC-1"*) and at least 21 fake patients bearing CC-1's last name across at least 12 states. The defendant issued at least 105 prescriptions for promethazine with codeine to Co-Conspirator 2 ("CC-2") and at least 35 fake patients bearing variations of CC-2's last name across at least 12 states. The defendant also wrote CC-1 and CC-2 at least 20 and 5 controlled substance prescriptions for oxycodone, respectively. Law enforcement agents identified at least 21 other

13

identities that CC-2 used, and at least 7 other identities that CC-1 used, to obtain controlled substance prescriptions issued by the defendant.

Electronic communications between the defendant and CC-1 revealed that CC-1 routinely requested controlled substance prescriptions for numerous fake patients, in jurisdictions outside of where the defendant was licensed to prescribe. Electronic prescription data confirmed that the defendant issued the prescriptions as requested by CC-1. In electronic communications between CC-2 and the defendant, CC-2 also routinely requested controlled substance prescriptions in various fake patient's names. For instance, on December 6, 2022, CC-2 wrote the defendant using WhatsApp, "You never sent none of my Oxys to Ohio," and provided a list of patient names (none of which were CC-2's name). The defendant responded, "All was sent last night." Electronic prescription data confirmed the defendant sent oxycodone prescriptions to various pharmacies in Ohio as requested by CC-2.[12] The Ohio prescriptions requested by CC-2 are charged substantively in Counts 14-20.

On March 3, 2023, CC-2 and two others were arrested in Noble County, Ohio after being stopped in a vehicle. Law enforcement officers recovered approximately $5,700 in cash from the occupants of the vehicle and a red notebook listing fake patient names, organized under headings such as "drink" and "oxy". The red notebook also contained a list entitled "February Pickups" which named numerous individuals along with notes such as "10 oz Tris" and "473."[13] Electronic prescription data confirmed that the defendant issued prescriptions for oxycodone for the fake

---

[12]    CC-2's true place of residence is in the greater D.C. metropolitan area, and the evidence at trial will establish that CC-2 and others traveled out of state to fill the defendant's prescriptions.

[13]    "Tris" refers to "Tris Pharma," a major manufacturer of promethazine with codeine liquid. "473" refers to a bulk container of promethazine with codeine liquid, which is 1 pint (473 ml).

patients' names listed in the red notebook on February 2 and 23, 2023. Moreover, following his arrest on March 3, CC-2 called CC-1, who was with the defendant. CC-1 put the defendant on the phone with CC-2. In this recorded jail call, CC-2 asked whether CC-1 told the defendant what had happened, referred to the defendant as "boss" and asked the defendant to help him pay bail.[14] The red notebook prescriptions are charged substantively in Counts 21-25.

The Government intends to introduce evidence of the defendant's prescription data to CC-1 and CC-2, including their alias names, and that most of the patient names and information provided by CC-1 and CC-2 were false. The Government also intends to introduce evidence of communications between CC-1, CC-2, and the defendant, including the WhatsApp and text messages and CC-2's recorded jail call to CC-1 and the defendant at trial.

### ii. Co-Conspirator 3 and Co-Conspirator 4

Co-Conspirator 3 ("CC-3") was employed by the defendant at Okafor Medical Associates from approximately September of 2022 until the defendant's arrest in April 2023. Over the course of CC-3's employment, the defendant also wrote CC-3 and CC-3's family members approximately 30 controlled substance prescriptions for oxycodone. CC-3 often acted as an intermediary between the defendant and the other co-conspirators, relaying messages and reminding them to send payments for the prescriptions written by the defendant, and as discussed above, created fake patient profiles in the defendant's EHR system for a fee.

The government will introduce evidence that CC-4 utilized CC-3 to obtain controlled substance prescriptions from the defendant. Counts 26 – 29 charge distributions of oxycodone to four purported patients identified by an Instagram messenger exchange between CC-3 and CC-4.

---

[14]    Financial information reviewed by the Government does not reveal whether or not the defendant paid CC-2's bail.

In the exchange, CC-4 provided the patient information to CC-3 and made requests such as "verify they calling now" and "refill bouta cash app."[15] CC-3 wrote to CC-4, "Send this cash app so he can do some of this work before he leave … Cause he ready to go to." Electronic prescribing data confirmed that the defendant sent in oxycodone prescriptions for the purported patients provided to CC-3 by CC-4 the same day these messages were sent. Prescribing data further revealed that the defendant wrote at least 20 prescriptions for oxycodone and 15 prescriptions for promethazine with codeine to Co-Conspirator 4 ("CC-4") in at least 4 different states. Law enforcement also identified at least 20 other identities CC-4 used to obtain controlled substance prescriptions from the defendant.

CC-4, like several other co-conspirators, was found to be in possession of illicit prescriptions issued by the defendant. CC-4 was arrested following a traffic collision on March 3, 2023. In CC-4's vehicle, law enforcement officers found numerous prescription bottles of promethazine with codeine, which were prescribed by the defendant. Local law enforcement also found lists of names with corresponding pharmacy information. CC-4 also had driver's licenses and identification cards, bearing CC-4's photograph, and bank cards, in alternate names. Electronic prescription data confirmed that the defendant wrote prescriptions for oxycodone in some of these alias names. The Government also intends to introduce at trial the defendant's prescription data as to CC-4 and the evidence recovered from CC-4's vehicle.

---

[15]     Evidence at trial will establish that "verify they calling now" likely refers to a pharmacist contacting the defendant's office in order to verify that he wrote the controlled substance prescription CC-5 was attempting to obtain, that "refill" refers to a request for a prescription refill, and "bouta cash app" indicates that CC-5 would pay for the requested prescriptions. Cash App is a peer-to-peer payment application that allows users to transfer money to other users.

### iii.  Co-Conspirator 6

In late November 2022, local pharmacists notified law enforcement officers in Clinton County, Pennsylvania that Co-Conspirator 6 ("CC-6") attempted to collect suspicious prescriptions bearing CC-6's last name. After conducting a traffic stop, law enforcement officers seized from CC-6's vehicle multiple bottles of promethazine with codeine prescribed by the defendant. Most of the prescriptions were for individuals with CC-6's last name, and CC-6 claimed to be picking up prescriptions for CC-6's numerous sick family members. CC-6 also claimed one of the individuals named on the prescription bottle, A.J., was his girlfriend. When a Clinton County police officer contacted the defendant in response, the defendant confirmed the validity of the prescriptions notwithstanding the fake patient names.

On November 14, 2022, CC-6 complained to the defendant via text message about his long wait at Okafor Medical Associates. CC-6, believing the defendant failed to send prescriptions he had previously requested, asked the defendant to resend two promethazine with codeine prescriptions for purported patients bearing CC-6's last name. Electronic prescription data confirmed that the defendant twice sent the prescriptions as requested. Two of these prescriptions are charged substantively as Counts 12 -13 in the Superseding Indictment.

The Government intends to at trial introduce papers referencing CC-6 recovered during the search warrant execution at the defendant's medical practice, the defendant's prescription data regarding CC-6, including CC-6's alias names, an apparent tab sheet tracking how much CC-6 owed the defendant, the communications between defendant and CC-6, and evidence recovered by local law enforcement officers from CC-6's vehicle in November 2022.

F.    **The Unlawful Distribution of Oxycodone to Law Enforcement Sources and Civilian Patient J.V.**

i.    **Distributions to Law Enforcement Sources**

The defendant's unlawful distribution of controlled substances was not limited to his co-conspirators. He also unlawfully prescribed controlled substances to his patients and individuals purporting to be his patients. As part of the government's investigation, law enforcement sources, posing as walk-in patients, visited the defendant's practice on sixteen occasions. Each time, the defendant prescribed oxycodone to these undercover officers (UCs) and a confidential source (CS).[16] These visits were recorded, and the recordings were reviewed by a medical expert who found that the defendant prescribed oxycodone to the UCs and CSs outside the course of professional practice, and not for a legitimate medical purpose on each of the sixteen visits. Six of the defendant's unlawful distributions to the UCs and a CS are charged substantively as Counts 3 – 8 of the Superseding Indictment. The Government intends to introduce evidence of both charged and uncharged distributions to the UCs and CS.

ii.    **Distributions to Patient J.V.**

On November 17, 2022, patient J.V. suffered a fatal overdose. After an autopsy, the Office of the Chief Medical Examiner of Virginia determined that J.V. had died from oxycodone and

---

[16]    The Confidential Source agreed to permit the Government to audio and video record his/her patient visit with the defendant. In total the CS-1 had seven visits with the defendant and received one prescription for oxycodone/acetaminophen 5/325 mg and six prescriptions for oxycodone/acetaminophen 10/325 mg. Oxycodone/acetaminophen 5/325 and oxycodone/acetaminophen 10/325 are also known by the brand name Percocet. Three of these distributions are charged in the Superseding Indictment. Three UCs (UC-1, UC-2, and UC-3) collectively obtained eight oxycodone prescriptions from the defendant. The Superseding Indictment charges two distributions each to UC-2 and UC-3.

diphenhydramine toxicity.[17] From January 2021 until his death, the defendant prescribed J.V. oxycodone on 31 separate occasions. The government charged three of the 31 unlawful distributions as Counts 9 – 11 in the Superseding Indictment. Like the UCs and CS, as discussed more fully below, medical experts found that the defendant's prescriptions to patient J.V. were issued outside the course of professional practice, not for a legitimate medical purpose.

G.      **The Falsification of J.V.'s Medical Records**

After his son's death, J.V.'s father filed a complaint against the defendant with the D.C. Board of Medicine on February 23, 2023. On March 15, 2023, the D.C. Board of Medicine ordered the defendant to respond to this complaint via certified mail. Shortly after this notice, beginning March 19, 2023, the defendant used his EHR system to create backdated records of approximately 45 purported medical appointments J.V. had with the defendant for the period of October 2019, to November 16, 2022 – the day before J.V.'s death. Notably, even after receiving notice of J.V.'s overdose death and falsifying J.V.'s records, the defendant continued to unlawfully prescribe oxycodone to his co-conspirators.

The government intends to introduce: 1) charged and uncharged distributions by the defendant of oxycodone to J.V.; 2) expert analysis of the defendant's purported treatment of J.V.; 3) the D.C. Board of Medicine's request for information regarding J.V., including the complaint filed and correspondence sent to the defendant; 4) the backdated records and notes related to patient J.V., including the audit log from the EHR provider that demonstrates each note was both created and signed months after J.V.'s death and within days of the D.C. Board of Medicine's request for information. Further, the government may offer fact testimony from an acquaintance

---

[17]     The Government does not intend to introduce evidence or imply that the defendant's unlawful prescriptions for oxycodone caused J.V.'s overdose death.

of J.V. went to the defendant's office with him on several occasions. This individual also received controlled substance prescriptions from the defendant.

### H. Expert Analysis of the Defendant's Prescribing

#### i. Overall Analysis of the Defendant's Prescribing

The government plans to call a pharmacy expert who reviewed the defendant's Surescripts electronic prescription data and state PDMP data from states where the defendant prescribed controlled substances.[18] The government anticipates the expert will provide background information as to the existence of PDMP databases throughout those states, as well as the state laws which require pharmacies operating in those states to report the controlled substances listed in the PDMP data. For instance, the government anticipates the expert will testify that 1) states require pharmacies to submit accurate data, with that data being compiled and maintained in a central and searchable database; 2) these databases allow medical practitioners to check if their patients are receiving controlled substance prescriptions from other doctors, which is a red flag that a patient is an addict or is selling their medication; 3) the databases are also accessible to some administrative and regulatory agencies, as well as some law enforcement, to maintain oversight of medical practitioners' prescribing practices; and 4) this type of oversight is commonplace, and the DEA employs multiple divisions to review prescribing practices for potential abuse and diversion of prescription medication.

---

[18]   Dr. Sullivan, discussed below, reviewed a number of prescriptions from the District of Columbia PDMP issued by the defendant and dispensed between January 6, 2020, and January 5, 2023. As the investigation progressed, the government obtained electronic prescribing data and state PDMP data to cover the entire period of the charged conduct. This additional analysis will be presented as evidence at trial.

Through expert testimony, the government will also present common prescribing practices and patterns, or "red flags," that indicate a prescription may be unlawful. "Red flag" evidence includes, but is not limited to, a prescriber issuing prescriptions for: 1) high volume, doses or morphine milligram equivalents ("MME")[19] of controlled substances; 2) dangerous combinations of controlled substances, such as benzodiazepines and opioids; 3) the same strength and quantity of medication to many patients with the same or same few diagnosis codes; and patients who 4) travel long distances to a particular doctor from whom they are receiving controlled substance prescriptions; 5) fill controlled substance prescriptions at multiple pharmacies; and 6) pay with cash although they have insurance.

In addition to the background information on PDMPs and red flags generally, the government will present statistical and analytical review of the defendant's prescribing practices from January 1, 2020, to April 13, 2023, along with summary exhibits detailing findings, which will aid the jury in understanding the nature of these red flags identified in the defendant's prescribing practices. Specifically, the government intends to present evidence demonstrating that

---

[19]     Morphine milligram equivalents regularize and describe the strength of opioid prescriptions. For reference, one mg of hydrocodone is the equivalent of 1 MME; one mg of oxycodone is 1.5 MME; one mg of oxymorphone is 3 MME; one mg of hydromorphone is 4 MME; and one 20-mg daily dose of methadone is 4 MME. In 2022, the CDC released revised Guidelines for Prescribing Opioids for Chronic Pain ("2022 Guidelines). The 2022 Guidelines do not include an absolute dosage threshold for opioid prescriptions, but note that for opioid-naive patients, "clinicians should prescribe the lowest effective dosage" and if opioids are continued for subacute or chronic pain, "clinicians should use caution when prescribing opioids at any dosage, should carefully evaluate individual benefits and risks when considering increasing dosage, and should avoid increasing dosage above levels likely to yield diminishing returns in benefits relative to risks to patients." The 2022 Guidelines note, in part, the importance of clinicians weighing the risks and benefits of increasing opioid dosages to ≥50 MME but instruct that "[t]he recommendations related to opioid dosages are not intended to be used as an inflexible, rigid standard of care; rather, they are intended to be guideposts to help inform clinician-patient decision-making." *See* https://www.cdc.gov/mmwr/volumes/71/rr/rr7103a1.htm (last visited June 17, 2024).

the DEA issued the defendant a license to prescribe controlled substances only in the District of Columbia, the only place where he was licensed to practice medicine. Notwithstanding his D.C.-specific DEA license, PDMP data showed the defendant issued controlled substance prescriptions in at least 37 other states.

### ii.    Dr. Donald Sullivan

Dr. Donald Sullivan reviewed the defendant's PDMP from D.C., during the period of January 6, 2020, to January 1, 2023, and limited PDMP data from North Carolina, Florida, New Jersey, Virginia, and Pennsylvania. The D.C. PDMP showed that the defendant issued close to 1400 controlled substance prescriptions in the District of Columbia within that time frame. On review, Dr. Sullivan found the defendant's prescriptions for promethazine with codeine and narcotic pain killers (i.e., opioid pain medication) were not issued for a legitimate medical purpose. Dr. Sullivan noted that 1) many of the defendant's patients appeared to be diverting or abusing the medication; 2) the prescribed substances, strength, and quantities calculated to MMEs; and 3) the drug combinations presented well known patterns and red flags for diversion or abuse by patients. Dr. Sullivan specifically found that many of the defendant's patients, including patient J.V., were put at an extreme risk of overdose based on the defendant's prescribing.

### iii.    Dr. Timothy King

Timothy King, M.D. reviewed the defendant's prescriptions to patient J.V., the CS, and to the UCs. On review, Dr. King determined that there was no meaningful or medically acceptable exam or care performed by the defendant during any of these visits. Further, Dr. King found that the defendant wrote controlled substance prescriptions without any reported pain, or for reports of vague pain, and never took the usual steps to justify the prescription to the patient. Moreover, the

defendant failed to establish a comprehensive medical history including the provenance of the pain, prior pain medication use, or screen for substance or mental health issues. The defendant consistently used opioids as the primary treatment option for every visit. Dr. King found the defendant's prescribing was in contradiction to the CDC's established national guidelines, and in violation of the D.C. Board of Health's published guidelines for prescribing opioids for pain.

### iv. Pharmacists' Refusals to Fill the Defendant's Controlled Substance Prescriptions[20]

On 69 occasions, pharmacists from Walmart locations in D.C., Maryland, and Virginia refused to fill the defendant's prescriptions, and noted several red flags of diversion among the defendant's patients, including that the defendant prescribed similar medications, dosages, directions, and diagnoses for numerous patients; wrote for unusually high quantities or dosages of medications, prescribed medication with the opposite effect to the same patient; prescribed combinations of medications that can cause medical complications; the average age of the defendant's patients was under 40; the patients often traveled more than 60 miles to the pharmacy; the medications did not match the patient's diagnosis.

Like the individual pharmacists and Dr. Sullivan, Walmart's Global Investigations unit also identified red flags for diverting and abuse, including that patients paid for prescriptions with cash; the defendant provided the same diagnosis for the majority of his patients; and that he was

---

[20]    Pursuant to 21 C.F.R. § 1306.04, pharmacists have a corresponding responsibility to ensure a prescription for a controlled substance is effective, that is the prescription must have been issued for a legitimate medical purpose by the individual medical practitioner acting in the usual course of his or her professional practice. Moreover, pharmacists may refuse to fill prescriptions if they are unable to resolve red flags that may indicate diversion or addiction, including patients who see multiple doctors and fill at multiple pharmacies; highly diverted medications; drug interactions; general practitioners writing high quantities and doses; cash payments even when the patient has insurance; and patient behaviors that are indicative of addiction.

an outlier for the total number or percentage of controlled substance prescriptions that he issued. In September 2021, the defendant was notified by letter that after a review of his prescribing patterns and practices, he was "centrally blocked" by Walmart and Sam's Club pharmacies nationwide, meaning they would no longer fill his controlled substance prescriptions.

In addition to evidence that Walmart notified the defendant of the central block, evidence across the conspiracy demonstrates that pharmacists often called the defendant to try and obtain additional information, verify prescriptions, or discuss their concerns about a prescription. And his statements to confidential sources demonstrates that he knew pharmacies were suspicious of his prescriptions. For example, on July 12, 2022, while discussing his prescription for Percocet to the CS, the defendant explained that it may be difficult for the CS to get the prescription and advised the CS not to fill their Percocet prescription at Walmart or CVS.

At trial, the government will admit evidence, such as the letter from Walmart notifying the defendant of their decision, interviews of pharmacists who refused to fill the defendant's prescriptions, and Dr. Sullivan's testimony about his review of the defendant's prescribing data as intrinsic and directly probative of the defendant's knowing and intentional distribution of controlled substances outside the course of legitimate medical practice, not for a legitimate medical purpose (Counts 3 – 29).

## I.    Search Warrant Evidence

Law enforcement searched Okafor Medical Associates and the defendant's residence and seized funds from the defendant's business checking account in April 2023 pursuant to warrants authorized by the United States District Court for the District of Columbia and the District of

Maryland.[21] From Okafor Medical Associates, law enforcement seized numerous records, files, written material, and electronic devices. From the defendant's residence, law enforcement seized papers, records, electronics, and approximately $31,000 in cash hidden throughout his bedroom. From the defendant's person, law enforcement recovered his cell phone and over $2,000 in cash. Separately, law enforcement executed search warrants on the defendant's electronic devices and on CC-3 and CC-4's Instagram accounts.

At trial, the government intends to introduce material from the defendant's electronic devices showing his communications and monetary exchanges with co-conspirators. The government will also present evidence of the same from CC-3's and CC-4's Instagram accounts. The government will introduce the cash seized, notes and writings referencing prescriptions to co-conspirators and balance sheets of money owed by co-conspirators as evidence of the conspiracy and drug premises charges.

### J.    Financial Analysis

The government will present evidence at trial that, leading up to and during the charged conspiracy, the defendant transitioned Okafor Medical Associates to a primarily cash business. Further, from 2019 to 2023, the monetary inflow to the defendant's business checking account increased five-fold ($48,161.92 in 2019, $84,237.49 in 2020, $127,581.98 in 2021, $172,407.37

---

[21]     *See* In the Matter of the Search of Okafor Medical Associates, Case No. 23-SW-87; In the Matter of the Search of [the defendant's residence], Case No. 8:23-MJ-01138-GLS; and In the Matter of the Search of Funds from [the defendant's business Wells Fargo Account], Case No. 23-SZ-9. 23-SW-87 was authorized by the Hon. Robin M. Meriweather of the United States District Court for the District of Columbia on April 6, 2023, and executed on April 11, 2023. 8:23-MJ-01138-GLS was authorized by the Hon. Gina L. Simms of the United States District Court for the District of Maryland on April 10, 2023, and executed on April 11, 2023. 23-SZ-9 was authorized by the Hon. Moxila A. Upadhyaya of the United States District Court for the District of Columbia on April 10, 2023, and executed on April 11, 2023.

in 2022, and $251,070.60 in the first three months of 2023 alone). The defendant's income was positively correlated to the increase in his controlled substance prescribing.[22]

## II.     APPLICABLE LAW

### A.     Elements of the Charged Offenses

The essential elements of Conspiracy to Unlawfully Distribute Controlled Substances (21 U.S.C. § 846) are:

1. Two or more persons agreed to unlawfully distribute controlled substances;
2. The defendant knew the essential objective of the conspiracy;
3. The defendant knowingly and voluntarily involved himself in the conspiracy; and
4. There was interdependence among the members of the conspiracy.

*See* Tenth Circuit Criminal Pattern Jury Instruction 2.87 (2011).

The essential elements of Unlawful Distribution of a Controlled Substance (21 U.S.C. §§ 841(a)(1) and (b)(1)(C) are:

1. The defendant knowingly [or intentionally] distributed the controlled substance alleged in the Indictment;
2. The defendant knew at the time of distribution that the substance was a controlled substance;
3. The defendant's distribution was unauthorized, that is to say the distribution was not for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice; and
4) The defendant knew [or intended] that his distribution was unauthorized.

*See* Sixth Circuit Criminal Pattern Jury Instruction 14.02C (2023).

The essential elements of Maintaining a Drug Involved Premises (21 U.S.C. § 856) are:

1. The defendant maintained a place;
2. For the purpose of unlawfully distributing controlled substances; and
3. He did so knowingly.

---

[22] These numbers are not meant to represent the full scope of the defendant's income from proceeds of the conspiracy, rather, just that which was deposited into his business checking account.

*See* Ninth Circuit Criminal Pattern Jury Instruction 12.18 (2024)

**B.      Prosecuting Doctors Under the Controlled Substances Act**

Under the CSA and C.F.R., a prescription for a controlled substance is unlawful unless issued for a legitimate medical purpose by a registered practitioner, who is authorized by the DEA to issue controlled substances in the state, acting in the usual course of professional practice.[23] "[E]nacted in 1970 with the main objectives of combating drug abuse and controlling legitimate and illegitimate traffic in controlled substances, [the CSA] criminalizes, *inter alia*, the unauthorized distribution and dispensation of substances classified in any of its five schedules." *Gonzales v. Oregon*, 546 U.S. 243, 243 (2006). Under the CSA, medical practitioners[24], including physicians, must apply for and receive a unique registration number from the DEA to lawfully dispense Schedule II, III, IV, and V controlled substances. *See* 21 U.S.C. § 822. Such authorization is jurisdiction specific – a medical practitioner must obtain a DEA registration number for each state where the practitioner intends to prescribe controlled substances. *Id.* at § 822(b) and 21 C.F.R. § 1306.03.

Prescriptions for a controlled substance "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." *See* 21 U.S.C. § 841(a)(1) and 21 C.F.R. § 1306.04. They are also required to be "dated as of, and signed on, the day when issued" to be valid. *See* 21 C.F.R. § 1306.05(a). In addition, valid prescriptions "bear

---

[23]     In the District of Columbia, "[a] prescription for a controlled substance shall be issued or dispensed only for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice." See DCMR § 1305.2

[24]     The term "practitioner" means a medical doctor physician, or other individual licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which she or he practices, to dispense a controlled substance in the course of business. *See* 21 U.S.C. § 802(21).

the [*true*] full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner." *Id*. (emphasis added). Section 1306.04 further directs that "[a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of [the CSA] and … the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." 21 C.F.R. § 1306.04. "The responsibility for the proper prescribing and dispensing of controlled substances is upon the practicing prescriber ...." *See id*. In short, any prescription issued outside the usual course of professional practice and not for a legitimate medical purpose, or issued without a DEA license for the state in which it is issued is unlawful.

### C.   Knowingly Issuing Prescriptions in an Unauthorized Manner Violates the CSA

In 2022, the Supreme Court held that to prove that a medical practitioner acted with the requisite *mens rea* under § 841(a)(1), the government must establish that the practitioner "knowingly or intentionally" both issued the prescriptions at issue and did so in an unauthorized manner. *Ruan,* 142 S. Ct. at 2375. "In practice, this means the 'except as authorized' clause [in § 841(a)] works like an additional element," in that "if a defendant produces any evidence that he or she had statutory authorization to dispense or distribute the controlled substances underlying his charges, then the prosecution must show beyond a reasonable doubt 'that the defendant knew that he or she was acting in an unauthorized manner, or intended to do so.'" *United States v. Fabode*, 2022 U.S. App. LEXIS 31186, at *6 (6th Cir. Nov. 8, 2022) (quoting *Ruan*, 142 S. Ct. at 2375). Relevant "indicia of a defendant's subjective knowledge and intent" in this context includes "circumstantial evidence" as well as "objective" considerations like whether the prescription was

issued for a "legitimate medical purpose" or within the "usual course" of "professional practice." *Id.* (quoting *Ruan*, 142 S. Ct. at 2382). Where a practitioner knowingly or intentionally issues a prescription outside the usual course of professional practice, the prescription is unauthorized and thus in violation of the CSA. *See United States v. Moore*, 423 U.S. 122, 124 (1975) (holding that "registered physicians can be prosecuted under § 841 when their activities fall outside the usual course of professional practice."); *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1137 (4th Cir. 1994) ("[A] licensed physician who prescribes controlled substances outside the bounds of his professional medical practice is subject to prosecution and is no different than a large-scale pusher.").

### D.      Intrinsic Evidence is Admissible

At trial, the government intends to introduce the aforementioned categories of evidence as intrinsic to the charged conduct. The D.C. Circuit has recognized that evidence may be "intrinsic" and thus, not subject to Rule 404(b), where it is "'of an act that is part of the charged offense'" or of "'some uncharged acts performed contemporaneously with the charged crime . . . [that] facilitate the commission of the charged crime.'" *United States v. Lorenzana-Cordon*, 141 F. Supp. 3d 35, 39 (D.D.C. 2015) (quoting *United States v. Bowie*, 232 F.3d 923, 927 (D.C. Cir. 2000)); *see also United States v. McGill*, 815 F.3d 846, 883 (D.C. Cir. 2016); *United States v. Allen*, 960 F.2d 1055, 1058 (D.C. Cir. 1992) (permitting testimony that the defendant was observing his codefendant sell drugs to an undercover officer just minutes before the police executed a search warrant for the house where the charged sale was made as intrinsic to the charged conduct and relevant to his intent to distribute and knowledge of his co-conspirator's drug cache); *United States v. Washington*, 12 F.3d 1128, 1135 (D.C. Cir. 1994) (permitting as intrinsic evidence testimony that a defendant used a false identity to obtain medical care after he fled police in a vehicle because it

helped establish his identity as a perpetrator of the charged conduct); *United States v. Badru*, 97 F.3d 1471, 1473-74 (D.C. Cir. 1996) (permitting as intrinsic evidence that the defendants smuggled heroin prior to the charged conspiracy).

Intrinsic evidence "is not subject to the limitations of Rule 404(b) because, by its very nature, it does not involve 'other crimes, wrongs, or acts,' and thus there is no concern that it might be used as improper character evidence." *Lorenzana-Cordon*, 141 F. Supp. 3d at 39. Indeed, a threshold question in determining the admissibility of evidence of other crimes and bad acts is whether the evidence, in actuality, relates to acts unconnected with those for which the defendant is charged, or instead is intertwined with the commission of charged crimes. *United States v. Machado-Erazo*, 47 F.4th 721, 728 (D.C. Cir. 2018).

### E.    The Standard for the Admission of Other Crimes Evidence

To the extent this Court finds any of the evidence outlined in this memorandum extrinsic to the charged conduct, it is still admissible as other crimes evidence under Rule 404(b). Rule 404(b) provides that evidence of "other crimes, wrongs, or acts" is not admissible to prove a defendant's character, but is admissible for any non-propensity purpose, including motive, intent, plan, preparation, pattern, modus operandi, knowledge, and absence of mistake. *United States v. Douglas*, 482 F.3d 591, 597 (D.C. Cir. 2007); *Bowie*, 232 F.3d at 926, 930 (citing Fed. R. Evid. 404(b)). "Although the first sentence of Rule 404(b) is framed restrictively, the rule itself is quite permissive, prohibiting the admission of other crimes evidence in but one circumstance—for the purpose of proving that a person's actions conformed to his character." *Bowie*, 232 F.3d at 929–30 (internal citations and quotations omitted). Accordingly, Rule 404(b) is a rule of "inclusion rather than exclusion," *id.* at 929 and should be excluded only if it is offered for the sole purpose

of proving that a person's actions conformed to his or her character. *United States v. Long*, 328 F.3d 655, 660-661 (D.C. Cir. 2003) (citing *Bowie*, 232 F.3d at 929-30).

In determining whether evidence is admissible pursuant to Rule 404(b), the court must first "determine whether the evidence is relevant to a material issue other than character." *United States v. Burch*, 156 F.3d 1315, 1323 (D.C. Cir. 1998) (citation omitted). If relevant, the other acts evidence can include "bad acts committed before and bad acts committed after the charged offense," *United States v. Latney*, 108 F.3d 1446, 1449 (D.C. Cir. 1997), or conduct that is lawful or "entirely unlawful," *Long*, 328 F.3d at 661 (citation omitted). Then, the court must determine whether, under Rule 403, the proffered evidence's probative value is substantially outweighed by the danger of unfair prejudice. *Burch*, 156 F.3d at 1323.

However, "[a] prior bad act does not have to involve the *exact* same intent of the charged offense to be relevant." *United States v. Hite*, 916 F. Supp. 2d 110, 116 (D.D.C. 2013) (citing *Long*, 328 F.3d at 661) (emphasis in original). Such evidence must meet only a "threshold level of similarity to be admissible to prove intent," meaning that they are "closely related to the offense and are probative of intent rather than mere propensity." *Long*, 328 F.3d at 661. Additionally, "to be relevant, the evidence does not have to *prove* the [d]efendant's intent, it need only make it more probable that the [d]efendant possessed the requisite intent." *Hite*, 916 F. Supp. 2d at 117 (emphasis in original). Other acts evidence is also admissible under Rule 404(b) where it corroborates testimony or tends to disprove an asserted defense. *Curtin*, 489 F.3d at 940 ("Federal courts repeatedly have held that the government may offer evidence in its case-in-chief in anticipation of an expected aspect of the defense.").

Having found the proffered evidence relevant, the court must then determine whether "its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403.

In this Circuit, the Rule 403 inquiry "will turn on the discretionary judgment of the trial court and its assessment, not of relevance, but of the evidentiary value of the Government's Rule 404(b) evidence." *United States v. Crowder*, 141 F.3d 1202, 1210 (D.C. Cir. 1998) (*Crowder II*) (*en banc*). "On the same side of the balance, the trial court will take into account the effect of a limiting jury instruction to protect the rights of the accused." *Id.*; *see also Long*, 328 F.3d at 662 (observing that appropriate "limiting instructions ordinarily suffice[s] to protect the defendant's interests," even when "the nature of the pattern evidence . . . might suggest that instructions would have marginal effect").

For evidence to be excluded, the defendant must show "compelling or unique" prejudice, *United States v. Mitchell*, 49 F.3d 769, 777 (D.C. Cir. 1995), distinct from the probative value of the evidence and distinct from the intrinsic prejudicial potential of any Rule 404(b) evidence. And where the evidence is used to prove an element of the charged offenses, its probative value is high. *United States v. Agramonte*, 304 F. Appx. 877, 879 (D.C. Cir. 2008) (where defendant charged with drug conspiracy was not found in possession of drugs, the trial court allowed 404(b) evidence about unrelated drug activity in another jurisdiction); *United States v. Bergrin*, 682 F.3d 261, 279 (3d Cir. 2012) (where the defendant was on trial for plot to murder witness, evidence of defendant's previous attempts to murder witnesses in unrelated cases permissible under 404(b) to prove intent, explaining that Rule 403 "is meant to guard against…prejudice 'based on something other than [the evidence's] persuasive weight'"); *United States v. Hanna*, 630 F.3d 505, 512 (7th Cir. 2010) ("Where, as here, a defendant is "being prosecuted for exactly what [the evidence] depicts, we have consistently rejected Rule 403 challenges") (internal citations omitted).

## III.   ARGUMENT

The government should be permitted to introduce evidence in the four categories, outlined in detail above and summarized for ease of reference below, as intrinsic to the conspiracy and drug premises charges and as proof of the defendant's knowing lack of authorization to distribute the controlled substances charged in the Superseding Indictment.

| Co-Conspirator Evidence |
|---|
| • All charged and uncharged distributions of oxycodone and promethazine with codeine to CW-1 and the co-conspirators (including to false identities they used) for the duration of the charged conduct. |
| • Communications between CW-1, the co-conspirators, and the defendant in furtherance of the conspiracy. |
| • Testimony regarding and physical evidence seized from co-conspirators' interactions with law enforcement in furtherance of the conspiracy, to include CC-2 in Noble County, Ohio, CC-4 in Washington, D.C., CC-6 in Clinton County, Pennsylvania, CC-10 in Buffalo, New York and Apex, North Carolina, and documents seized from CC-9's jail cell in Virginia. |
| • Photographs of the advertisements from CC-5's Instagram account and of the exam room at Okafor Medical Associates where some of the photographs were taken. |
| • CC-9's jail calls discussing how to obtain prescriptions from the defendant. |
| • CC-2's recorded jail call to CC-1 and the defendant. |
| • Notes and documents related to CW-1 and the co-conspirators seized during the search of Okafor Medical Associates. |
| • Any medical files or EHR logs related to co-conspirators, CW-1, and false identities used by them. |
| **Uncharged Distributions to Law Enforcement Sources and J.V.** |
| • All recorded interactions between the UCs or the CS and the defendant. |
| • All charged and uncharged distributions to the UCs and the CS. |
| • All charged and uncharged distributions to J.V. |
| • Fact witness testimony from an acquaintance of J.V., who accompanied him to the defendant's office on several occasions. |
| **The Defendant's Falsification of J.V.'s Medical Records** |
| • J.V.'s father's complaint to the D.C. Board of Medicine, the Board's correspondence with the defendant, and the defendant's creation of backdated medical records. |
| **Expert Review and Analysis** |
| • Analytical data, exhibits, and expert analysis of the defendant's prescribing practices between January 1, 2020, and April 30, 2023. |

| |
|---|
| • Testimony from Dr. Sullivan regarding the overall trends and red flags present in the defendant's PDMP and Surescripts data for oxycodone and promethazine with codeine. |
| • Testimony from Dr. King regarding his review of the patient visits and any related files for Counts 3 – 11 (distributions to the CS, UC 2, UC 3, and J.V.). |
| • Testimony, documentation, and information from pharmacists and pharmacy chains that received the defendant's prescriptions and refused to fill them. |
| • Financial Analysis |

To the extent this Court finds the evidence extrinsic to the charged conduct, it is separately admissible under Fed. R. Evid. 404(b).

A.      The Co-Conspirator Evidence

The proffered co-conspirator evidence should be admitted as intrinsic because it is "part of" and "performed contemporaneously with" the charged crimes and "facilitate[d] [their] commission." *Bowie*, 232 F.3d at 929. Indeed, this Circuit has recognized that "where the incident offered is part of the conspiracy alleged[,] the evidence is admissible … because it is not an 'other' crime." *United States v. Hemphill*, 514 F.3d 1350, 1357 (D.C. Cir. 2008) (internal citations omitted). Courts have further permitted as intrinsic other acts evidence in conspiracy cases to: 1) link a defendant to other defendants and drug transactions for which the conspiracy was responsible, *United States v. Gaviria*, 116 F.3d 1498, 1532 (D.C. Cir. 1997); 2) show the nature of a conspiracy and "the kind of organizational control" a defendant exercised, *United States v. Mahdi*, 598 F.3d 883, 891 (D.C. Cir. 2010); and 3) show the co-conspirators' intent to act in concert, *United States v. Mathis*, 216 F.3d 18, 26 (D.C. Cir. 2000). *See also United States v. Straker*, 800 F.3d 570, 590 (D.C. Cir. 2015) (evidence of uncharged hostage takings was "relevant to ... how those defendants started to work together as kidnappers").

Here the proffered evidence does just that. The defendant wrote scores of prescriptions with fake names (and addresses) at his co-conspirators' behest so they could reach their common unlawful objective – to divert or abuse the oxycodone and promethazine with codeine. The volume and frequency of the defendant's distributions to co-conspirators is itself evidence of the conspiracy. *See United States v. MacLloyd*, 526 Fed. Appx. 434, 439 (6th Cir. 2013) ("[E]vidence of repeat purchases from a single source and large volumes of narcotics creates an inference of conspiracy."); *United States v. Wells*, 211 F.3d 988, 999-1000 (6th Cir. 2000) (no abuse of discretion in admitting 171 prescriptions that were not specifically charged in the indictment as acts in furtherance of the alleged conspiracy).

Likewise, the co-conspirator communications and payments to the defendant demonstrate each member's willful participation and the defendant's organizational control. *See Mahdi,* 598 F.3d at 891. Moreover, that numerous co-conspirators were stopped by law enforcement attempting to fill the defendant's prescriptions, and the defendant's knowledge that his co-conspirators were pharmacy shopping, demonstrates the co-conspirators' "mutual understanding regarding [the] illegal activity." *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990); *see also United States v. Hubbard*, 2017 U.S. Dist. LEXIS 62982, *22 (E.D. Ky. Apr. 26, 2017) (admitting evidence that defendant distributed bottles of pseudoephedrine to individuals who used them to manufacture methamphetamine was "direct evidence" of defendant's guilt of the conspiracy charge). Finally, physical evidence recovered from the defendant's practice referencing co-conspirators demonstrates their status as preferred customers and interdependence among one another. This evidence is intrinsic and should be admitted.

In the alternative, the co-conspirator evidence should be admitted under Rule 404(b) as evidence of the defendant's knowledge, intent, and common scheme or plan. *United States v.*

*Harrison*, 651 F.2d 353, 355 (5th Cir. 1981) (holding that the jury, "in considering the issue of exceeding the legitimate bounds of medical practice, [was not] limited to considering only prescriptions charged . . . [p]rescriptions issued at other times were admissible as evidence of plan, design or scheme.")); *see also Long*, 328 F.3d at 661 ("What matters is that the evidence be relevant 'to show a pattern of operation that would suggest intent' and that tends to undermine the defendant's innocent explanation.") (citation omitted).

**B.    Uncharged Distributions to Law Enforcement Sources and J.V.**

The uncharged distributions of controlled substances by the defendant to law enforcement sources and J.V. are admissible as intrinsic evidence to assess whether the defendant issued the charged prescriptions in an unauthorized manner. Indeed, "a jury may consider prescription data sets outside those specifically charged in the indictment to determine whether a physician has exceeded the legitimate bounds of medical practice and as evidence of a plan, design, or scheme." *United States v. Merrill*, 513 F.3d 1293, 1299-303 (11th Cir. 2008); *see also United States v. Brown*, 553 F.3d 768, 789-90 (5th Cir. 2008) (holding that the district court did not abuse its discretion in admitting evidence of other prescriptions because "[t]he critical issue at trial was whether the appellants filled [one doctor's] prescriptions knowing they were illegitimate, and appellants' experiences in filling piles of similar false prescriptions from a different doctor would speak directly to that issue").

Further, to determine whether any one prescription was issued outside the scope of the legitimate practice of medicine and without a legitimate medical need, the jury must analyze the information at the defendant's disposal when he decided to issue it. Evidence of the patient's entire treatment history with the provider, including any prior exposure to or request for controlled substances, is directly relevant to that analysis. *See, e.g., United States v. Boccone*, 556 Fed. Appx.

215, 230 (4th Cir. 2014) (entire course of patients' treatment relevant to whether defendant prescriber violated § 841(a)); *United States v. Siao*, 2023 U.S. Dist. LEXIS 201837, *27 – 33 (N.D. Cal. Nov. 9, 2023) (course of treatment, including patient file, supported sufficiency of conviction). Moreover, the uncharged distributions arise out of the same series of transactions as, and are inextricably intertwined with, the charged distributions. *See Badru*, 97 F.3d at 1474. They also complete the story of the crime. *Id*. Thus, the Court should permit their introduction.

The government alternatively seeks to introduce the defendant's uncharged distributions to law enforcement sources and J.V. as other crimes evidence under Rule 404(b). As one court in this Circuit observed, evidence of similar uncharged illegal drug prescribing activity is proper under Rule 404(b) because it tends to prove a defendant's intent and absence of mistake when he issued the charged prescriptions. *United States v. Robinson*, 255 F. Supp. 3d 199, *203 (D.D.C. June 15, 2017) (but noting that the government must have evidence the uncharged distributions were unlawful).[25]

Here, the uncharged prescriptions bear directly on the defendant's knowledge and intent with respect to the charged prescriptions and this Court should permit their introduction. *See United States v. Katz*, 445 F.3d 1023, 1029 (8th Cir. 2006) (finding that uncharged prescriptions were relevant and admissible under 404(b) as proof of knowledge and intent); *Harrison*, 651 F.2d at 355 (holding that in considering whether the defendant exceeded legitimate medical practice, prescriptions issued at other times were admissible as evidence of plan, design or scheme); *United States v. Belfiore*, 2024 U.S. App. LEXIS 11311, *11 (2d Cir. May 9, 2024) (patient file "highly

---

[25]     As to J.V. and the law enforcement sources, Dr. King analyzed all of the distributions, charged and uncharged, and found them to be outside the scope of professional practice and not for a legitimate medical purpose. As to the co-conspirators, the manner in which the prescriptions were issued demonstrates their illegality.

probative evidence" of defendant's intent and lack of mistake in prescribing oxycodone without a legitimate medical purpose). They are also "sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge [or intent] inference advocated by the proponent of the evidence." *United States v. Aminy*, 15 F.3d 258, 260 (2d Cir. 1994) (citation omitted) (internal quotation marks omitted). Moreover, evidence of uncharged distributions provides much needed background information concerning the defendant's "practice in dispensing Schedule II drugs to the same individual on a frequent basis in large quantities under at least questionable circumstances as to legitimate medical needs, and, thus, shows substantially identical acts." *United States v. Henry*, 727 F.2d 1373, 1377-78 (5th Cir. 1984), *rev'd on other grounds*, 749 F.2d 203 (5th Cir. 1984);

Nor is the proffered evidence unduly prejudicial under Rule 403. The government does not seek to admit evidence of *all* illicit distributions by the defendant, but merely ones that can be linked to co-conspirators, the UCs and CS, J.V., and J.V.'s friend. *See Robinson*, 255 F. Supp. 3d at 204 (declining to "set an exact number of uncharged patients or prescriptions that the government may present evidence on before trial" but noting that "evidence regarding [an additional] 24 patients. . . would not be excessive."). Thus, the uncharged distributions proffered by the government should be admitted.

### C.      Falsifying J.V.'s Medical Records

Evidence that the defendant falsified J.V.'s medical records after he was notified of J.V.'s death bears directly on his subjective awareness that his conduct was unlawful. Thus, such evidence is intrinsic to the charged distributions to J.V. and should be admitted. *See, e.g,. Belfiore*, 2024 U.S. App. LEXIS at *6 – 7 (evidence that defendant "falsified medical records, urged a social worker to submit to submit a false affidavit in a medical malpractice case claiming that [he] had

arranged an emergency appointment on behalf of a patient who died from an overdose of a drug that [he] had prescribed" was intrinsic and supports subjective awareness of illicit prescribing); *see also United States v. Kraynak*, 553 F. Supp. 3d 245, 252 (M.D. Pa. 2021) (evidence of administrative actions taken against a doctor was intrinsic evidence of unauthorized prescribing because it indicated his knowledge as to the medical standards applicable to prescription practices as well as patient records).

Assuming *arguendo*, this Court finds evidence that the defendant falsified J.V.'s medical records after being notified of his death by the D.C. Board of Medicine to be extrinsic to the charged counts, such evidence would also be properly admitted under Rule 404(b) to prove the defendant's knowledge, intent, and absence of mistake. Particularly where, as here, the defendant continued to prescribe in an unlawful manner despite being notified of J.V.'s death, such evidence is highly probative that he knew his prescriptions were unauthorized. *See United States v. Suetholz*, 2022 U.S. Dist. LEXIS 155521, *9 (E.D. Ky. Aug. 30, 2022) (evidence of past notification that he may be overprescribing demonstrated defendant's awareness that his prescribing practices were questionable prior to the charged offenses).

### D.   Analysis of the Defendant's Prescribing and Pharmacist's Refusals to Fill his Prescriptions

This Court should also permit the aforementioned expert testimony as intrinsic to the charged conduct. Courts routinely permit expert testimony on a defendant's overall prescribing to demonstrate that he knowingly dispensed a fraudulent prescription or dispensed a prescription outside the scope of the legitimate practice of medicine. *See United States v. Lague*, 971 F.3d 1032, 1040 (9th Cir. 2020) (expert testimony on practitioner's practice-wide evidence was probative of his unlawful intent, undermining his defense at trial that the charged prescriptions amounted to "a

few bad judgments."); *Kraynak*, 2021 U.S. Dist. LEXIS 149559 at *12-13 (PDMP evidence allowed the jury to evaluate the practitioner's prescribing practices as a whole and compare those practices to other physicians within the state, which was important for the jury in evaluating whether the prescriptions were appropriate, or whether they were excessive and outside the usual course of professional practice and without a legitimate medical purpose).[26] Moreover, evidence as to the standard of care to which a health professional, like the defendant, "must adhere in order to properly prescribe [controlled substances], and whether prescriptions issued by [the defendant] were made "for a legitimate medical purpose" and "in the usual course of professional practice" is also admissible. *Robinson*, 255 F. Supp. 3d at 206; *see also United States v. Alerre*, 430 F.3d 681, 691 (4th Cir. 2005) (recognizing that a district court may rely "in part on expert testimony that [a defendant] had deviated drastically from accepted medical standards" and that "evidence that a physician consistently failed to follow generally recognized procedures tends to show that in prescribing drugs he was not acting as a healer but as a seller of wares."). Thus, this Court should admit testimony from the government's experts and regarding the defendant's overall practice and their analysis of the defendant's prescribing as evidence that the defendant's prescribing fell below the objective standard of legitimate medical care.

"In addition to overall practice evidence, circumstantial evidence of a conspiracy to distribute and dispense controlled substances not for a legitimate medical purpose and not in the

---

[26]     A "PDMP," or Prescription Drug Monitoring Program, is an electronic database that tracks controlled substance prescriptions in Tennessee. CSMD data can provide health authorities timely information about prescribing and patient behaviors that contribute to the epidemic and facilitate a       nimble      and       targeted       response.       *See* https://www.cdc.gov/drugoverdose/pdmp/index.html#:~:text=A%20prescription%20drug%20mo nitoring%20program,a%20nimble%20and%20targeted%20response.

usual course of professional practice includes 'red flags' that would have put a reasonable doctor on notice of the illegitimacy of the operation." *United States v. Duldulao*, 87 F.4th 1239, 1263 (11th Cir. 2023) (*citing United States v. Azmat*, 805 F.3d 1018, 1036 (11th Cir. 2015) ("All of the witnesses with medical backgrounds also testified that there was an abundance of red flags that should have tipped off any doctor that his patients were seeking pills."); *see also United States v. Noel*, 2021 U.S. App. LEXIS 33416, *9-10 (6th Cir. 2021) (expert testimony on "red flags" such as prescriptions written for and filled by out-of-state patients, non-insurance payments at inflated prices, high doses of opioids, and patients traveling long distances to fill prescriptions support a reasonable inference the underlying prescriptions were filled outside the usual course of professional practice). This red flag evidence can establish the defendant's knowledge of the unlawful scheme, which, combined with his conduct, may demonstrate he knowingly joined an agreement to unlawfully distribute controlled substances. *Duldulao*, 87 F.4th at 1263.

Evidence of the pharmacists' refusals to fill the defendant's prescriptions should be admitted as intrinsic evidence of the defendant's knowledge that his prescribing was unlawful. *See Robinson*, 2017 U.S. Dist. LEXIS 227422 at 4 – 5 ("[I]t is clear to the Court that testimony about the pharmacists' concerns and refusal to fill prescriptions is quite relevant. Among other things, it speaks to Defendant's state of mind and knowledge with respect to his patients and the prescriptions he was issuing."). Over the course of the conspiracy, the defendant was told by numerous pharmacists that they were concerned about his prescribing practices. Ultimately, Walmart and Sam's Club notified him that they refused to fill his controlled substance prescriptions, nationwide, on the basis of their concerns. Yet, even after Walmart's central block in September of 2021, the defendant continued to prescribe in the same dangerous manner and, in fact, the overall number of controlled substances he issued drastically increased. The

aforementioned evidence clearly demonstrates the defendant knowingly and intentionally distributed controlled substances in an unauthorized manner and should be admitted as intrinsic evidence.[27] *See Belfiore*, 2024 U.S. App. LEXIS 11311 at *6 – 7; *Kraynak*, 553 F. Supp. 3d at 252; and *Suetholz*, 2022 U.S. Dist. LEXIS 155521 at *9.

In the alternative, overall practice evidence, analysis of the defendant's prescribing, and evidence of the pharmacists' refusals to fill the defendant's prescriptions should be admitted under Rule 404(b) as evidence of the defendant's knowledge, intent, and state of mind. *See Robinson*, 2017 U.S. Dist. LEXIS 227422 at 4 – 5.

### E.   Financial Analysis

Finally, the proffered financial analysis is intrinsic to the conspiracy and drug premises charges and should be admitted. As the defendant issued more and more prescriptions, the deposits into his business checking account increased in turn. This is direct evidence that the defendant benefitted from the conspiracy and worked to bring about its aims in unlawfully distributing controlled substances, thereby enriching himself. Alternatively, the stark increase in the defendant's income illuminates his motive to unlawfully prescribe and is therefore admissible under Rule 404(b). *See e.g., United States v. Kostopoulos*, 766 Fed. Appx. 875, 881 (11th Cir. 2019) (permitting financial motive evidence as proof of thefts).

---

[27] The same holds true for the numerous calls the defendant received from law enforcement officials and pharmacists calling to verify the defendant's prescriptions issued to co-conspirators. There, too, the defendant was on notice that his prescriptions were suspect, yet he continued to prescribe in an unauthorized manner. This directly bears on the defendant's knowledge that his prescribing was unauthorized.

## IV. CONCLUSION

For all the foregoing reasons, the Government respectfully requests it be permitted to introduce the aforementioned intrinsic and probative evidence, which proves the defendant knowingly and intentionally conspired to, and did, unlawfully distribute controlled substances, and maintained Okafor Medical Associates for the same purpose.

Respectfully Submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
District of Columbia

GLENN LEON
Chief, Fraud Section
U.S. Department of Justice


/s/
Meredith E. Mayer-Dempsey
NY Bar No. 5213202
Assistant United States Attorney
United States Attorney's Office
for the District of Columbia
601 D Street, Northwest
Washington, D.C. 20530
(202) 252-7259
Meredith.Mayer-Dempsey@usdoj.gov

/s/
Kathryn C. Furtado
Arizona Bar No. 025994
Trial Attorney
U.S. Dept. of Justice, Criminal Division
Fraud Section
1400 New York Avenue, Northwest
Washington, D.C. 20530
(202) 307-2884
Kathryn.Furtado@usdoj.gov