

U.S. Department of Justice

MATTHEW M. GRAVES
United States Attorney

District of Columbia

*Judiciary Center*
*601 D Street NW*
*Washington, DC 20530*

September 13, 2024

**By Email**

John O. Iweanoge, II
THE IWEANOGES' FIRM, PC
1026 Monroe Street, NE
Washington, D.C. 20017

    Re:    United States v. Ndubuisi Joseph Okafor, M.D.
               Case No.: 23-CR-116 (JDB)
               Expert Notice

Dear Counsel:

      Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, the United States hereby provides notice that it may introduce the testimony of experts in the fields of pharmacy, medicine, and pain management. The government may further introduce lay testimony from pharmacists, a Drug Enforcement Administration Document and Media Exploitation (DOMEX) branch team supervisor, and a financial analyst from the Federal Bureau of Investigation (FBI).

      As required by Rule 16, the following disclosures related to expert witnesses Donald Sullivan and Timothy King include a complete statement of all opinions rendered by these witness that the government intends to use during its case-in-chief at trial under Federal Rules of Evidence 702, 703, or 705, or during its rebuttal to counter testimony that the defendant has timely disclosed under (b)(1)(C). It additionally includes the bases and reasons for the opinions of the witness, the qualifications of the witness, publications authored by the witness in the previous 10 years, and a list of all other cases in which, during the previous 4 years, the witness has testified as an expert.

**I.**      **PHARMACY**

      **Dr. Donald Sullivan, R.Ph., Ph.D.**

      The government intends to call Dr. Sullivan as an expert in the field of Pharmacy. Dr. Donald Sullivan is a Professor of Clinical Pharmacy at The Ohio State University College of

Pharmacy and has been so employed for approximately ten years. Dr. Sullivan was previously employed as a Professor of Pharmacy Practice at Ohio Northern University. Dr. Sullivan received his PH.D. in Pharmaceutical Administration in 1996, a Master of Science in Pharmaceutical Administration in 1991, and a Bachelor of Science in Pharmacy in 1990, all from The Ohio State University. In addition to his degrees, Dr. Sullivan holds a certification in Medication Therapy Management from the American Pharmacists Association. Dr. Sullivan has been published in numerous peer reviewed journals, editor reviewed publications, and is the author of five published books. He has also completed numerous peer reviewed professional publications, including on topics related to prescription drug diversion. A full summary of Dr. Sullivan's professional credentials is included in his curriculum vitae, which is attached as **Exhibit A** to this notice. Additionally, Dr. Sullivan is a licensed pharmacist and previously worked in retail pharmacy.

In sum, Dr. Sullivan has been teaching state and federal drug laws regarding controlled substance prescribing and dispensing for more than 25 years. He has over 12 years of experience in reviewing physician, nurse practitioner, and physician assistant patterns of illegal prescribing of prescription medication and controlled substance for diversion and/or abuse. He has also reviewed over 750,000 prescriptions from prescribers for red flags of drug diversion and abuse, and taught classes on illegal prescribing and prescription drug diversion.

At trial, Dr. Sullivan will testify about his education, training, qualifications, and experience consistent with his curriculum vitae.

Dr. Sullivan previously testified as an expert in the field of Pharmacy in the following cases:

- Drug Enforcement Administration, Hearing on an Order to Show Cause and Immediate Suspension of Registration to Pronto Pharmacy, LLC, Docket No. 19-42, 2019
- *Douglas v. Gemmel Pharm. Grp., Inc.*, Superior Court of San Bernardino County, 2014
- Drug Enforcement Administration, Hearing on an Order to Show Cause as to BestAid Pharmacy, Dallas, TX, 2011.
- Drug Enforcement Administration, Hearing on an Order to Show Cause and Proposed Revocation of East Main Street Pharmacy's DEA Certificate of Registration, Docket No. 09-48, 2009
- Drug Enforcement Administration, Hearing on an Order to Show Cause to Grider Drug #1 and Grider Drug #2 and Proposed Revocation of their Retail Pharmacy Registrations, Docket No. 08-19, 2007

.
With respect to this case, Dr. Sullivan will testify on matters related to the corresponding responsibility pharmacists have when dispensing controlled substance prescriptions to make sure they are for a legitimate medical purpose, and that a prescription for a controlled substance which purports to be a valid prescription, but is not issued for a legitimate medical purpose, is not a valid prescription according to the Controlled Substances Act and, is thus illegal. Dr. Sullivan will further testify as to the role pharmacists play in ensuring medications are dispensed appropriately. Dr. Sullivan will testify regarding how a pharmacist should assess a prescription prior to filling it, to include for over or under utilization, therapeutic duplication, drug-disease contraindications,

drug-drug interactions, drug allergy interactions, incorrect drug dose or duration of treatment, and clinical abuse or misuse.

Dr. Sullivan will further testify to the sort of assessment pharmacists make to ensure prescription drugs are not being abused or diverted. He will testify that this assessment looks for "red flags" or "issues" with a prescription that may cause the pharmacist to determine that the prescription is not for a legitimate medical purpose and decide not to issue it. A list of 19 common "red flags" that Dr. Sullivan will testify to are contained within his Expert Report, which is attached as **Exhibit B**. Moreover, Dr. Sullivan will testify regarding Prescription Drug Monitoring Programs ("PMP" or "PDMP") in various states, and how pharmacists may use their state's PMP to help in the assessment of the legitimacy of a controlled substance. Dr. Sullivan will also testify that pharmacists do not always have access to other states' PMPs, and other roadblocks pharmacists may face in identifying drug abuse or diversion.

For this case, Dr. Sullivan reviewed PMP data from 37 states, Puerto Rico, and the District of Columbia. In doing so, he reviewed over 6,800 controlled substance prescriptions that were issued by Dr. Okafor between January 1, 2020, and April 11, 2023. He also reviewed Surescripts (electronic prescription) data of over 10,000 prescriptions issued by Dr. Okafor from January 1, 2021, through April 11, 2023. Through his review of this data, he was provided with a comprehensive picture of Dr. Okafor's prescribing. Dr. Sullivan also assessed many of these prescriptions for potential red flags of abuse and/or diversion. In his report, he noted numerous red flags associated with Dr. Okafor's prescriptions.

Dr. Sullivan analyzed, and will testify to, Dr. Okafor's prescribing specifically with respect to prescriptions for medication containing oxycodone and promethazine with codeine, to include the number of prescriptions filled and their dosage strengths. Dr. Sullivan will testify regarding the proper uses for oxycodone, common doses, and circumstances under which a patient may be prescribed various quantities of the drug. He will discuss problematic red flags that he observed throughout Dr. Okafor's prescribing of oxycodone, as outlined in his report. He will also identify certain patients for whom Dr. Okafor's prescribing was particularly problematic, due to the numerous red flags as well as that patient's morphine milligram equivalent number, also outlined in his report.

As to promethazine with codeine, Dr. Sullivan will testify that this medication is highly abused and diverted, so much so that numerous major pharmacy chains have stopped dispensing it, and many state boards of pharmacy have alerted their pharmacists of its misuse potential. Dr. Sullivan will testify to proper prescribing of promethazine with codeine, to include the amount prescribed and the proper duration of treatment through this medication and how it compares to the quantities and duration Dr. Okafor prescribed for. Dr. Sullivan will also testify that promethazine with codeine represented 43% of Dr. Okafor's controlled substance prescriptions across state PMPs (filled prescriptions) and that approximately 85% of these were issued outside of the DC area and for quantities far in excess of the commonly prescribed amount. Dr. Sullivan will also identify a number of patients who received these prescriptions in far greater quantities and for longer courses of treatment than is common. Dr. Sullivan will also analyze problematic prescribing patterns for this medication across numerous states outside of the D.C. area. Dr. Sullivan's report outlines these areas in detail.

In sum, Dr. Sullivan will opine that Dr. Okafor wrote hundreds of prescriptions for oxycodone and promethazine with codeine that were not for a legitimate medical purpose and that Dr. Okafor's medical practice was a pill mill for the illegal prescribing of these medications. The basis of Dr. Sullivan's opinions will be his education, training, and experience, and review of the data as laid out in detail in his expert report.

Reviewed and Approved By:    /s/_____
                             Donald Sullivan, R.Ph., Ph.D.

## II.     MEDICINE AND PAIN MANAGEMENT

**Dr. Timothy King, M.D.**

The government intends to call Dr. Timothy King as an expert in the field of Medicine and Pain Management.  As outlined in his curriculum vitae, Dr. King has 49 years of clinical practice in pain management and four decades of experience providing pain management instruction to medical providers, government agencies, law enforcement, insurance companies, and attorney groups.

Dr. King is currently employed as medical staff at the Beaver Island Rural Health Center in Beaver Island, Michigan. Prior to that, he founded Advanced Pain and Anesthesia Consultants, P.C., and worked there for approximately twenty-four years. He has worked as a pain management specialist and pain consultant throughout his career at numerous institutions. He received his medical agree from Indiana University School of Medicine in 1975 and completed a residency in Anesthesiology at the University of Washington in 1978. He has been certified by the American Board of Anesthesiologist with added certifications in Pain Management for thirty years. He is further certified by the American Board of Pain Medicine (since 1994) and the American Board of Addiction Medicine (since 2015). He has an active medical license in the states of Indiana and Michigan, and inactive licenses in Illinois, Oregon, Washington, California, Alaska, and Arizona.

Dr. King has previously testified as an expert in the field of Medicine and Pain Management. A comprehensive overview of Dr. King's credentials, education, training, and prior court testimony are attached as **Exhibit C** (curriculum vitae) and **Exhibit D** (prior testimony). At trial, Dr. King will testify about his training, qualifications, and experience consistent with his curriculum vitae.

With respect to this case, Dr. King will testify about the requirement under federal law for a physician to prescribe controlled substances only for a legitimate medical purpose while acting in the usual course of his professional practice. *See* 21 C.F.R. § 1306.04. Dr. King will explain and apply the standards for prescribing controlled substances as a physician. *See United States v. Hughes*, 895 F.2d 1135, 1144 (6th Cir. 1990) ("Expert testimony is admissible in criminal cases to establish the 'generally acceptable standards of medical practice for issuing prescriptions.'"); *United States v. Kirk*, 584 F.2d 773, 785 (6th Cir. 1978) (expert testimony "as to the traditional procedures and techniques followed by physicians is entirely permissible").

Dr. King will also testify that he reviewed material related to the 26 specific incidents of Distribution of a Controlled Substance as charged in the Indictment, outlined in detail in his report, which is attached to this filing as **Exhibit E** (report) and **Exhibit F** (J.V. report). Dr. King will testify that he was retained to review such material and conduct an independent analysis to opine as to whether each prescription was issued in the usual course of the professional practice of medicine and for a legitimate medical purpose.

Dr. King will testify that he reviewed information, including but not limited to medical records (if they existed), PDMP and Surescripts data, autopsy and medical examiner records (as applicable), electronic health records, co-conspirator evidence, information, and conversations, information from the D.C. Board of Medicine, and audio and video recordings of patient visits with Dr. Okafor, as it related to the 19 patients identified in the 26 specific incidents of Distribution of a Controlled Substance as charged in the Superseding Indictment, Counts 3-29. Dr. King's reports, which outline his bases and opinions in detail, are attached to this filing as **Exhibits E** and **F**. Dr. King will testify that he was retained to review such material and conduct an independent analysis to opine as to whether prescription(s) issued to the patients identified in the Superseding Indictment were issued in the usual course of the professional practice of medicine and for a legitimate medical purpose.

He is expected to testify that an inherent part of the legitimate practice of medicine is documentation of patient examinations, assessment, and diagnosis, and that failure to document relevant data is "a significant deviation from the standard of care." *See* **Exhibit E** (report). He will explain that failure to provide such documentation is "regarded as an indication that a thorough examination and proper assessment did not occur" and "failing to perform a thorough examination is outside the usual course of professional practice." *Id*.

Dr. King is expected to further discuss the appropriate use of opioid medications, including that a physician may not issue a controlled substance prescription to a patient without conducting a proper physical examination, obtaining patient history, reviewing any past medical records, assessing function and pain, defining psychosocial risk factors, and considering the patient's mental health status and any past history of drug or alcohol use. Dr. King will testify that a physician must establish a medical condition in support of opioid therapy after addressing and exercising universal precautions. He will testify as to the appropriate quantities and strengths of opioid medications, to include oxycodone and promethazine with codeine, and their proper uses. Dr. King will also discuss the abuse and misuse potential of these substances. Dr. King will further opine as to the proper prescribing of antibiotics, and their prevalence on the black market.

In addition to discussing the standards for prescribing controlled substances and his analysis of the patients noted in his report, Dr. King will opine at trial on: 1) the legitimacy of a physician issuing a controlled substance prescription to a patient without examination or in absentia; 2) the legitimacy of issuing oxycodone in combination with cyclobenzaprine and/or promethazine with codeine (to include that the combination of these medications indicates drug abuse or diversion); and 3) the legitimacy of a physician issuing numerous controlled substance prescriptions to the same patient at the same time, or in close succession. Dr. King will opine that Dr. Okafor's prescribing to the patients outlined in his report was illegitimate regardless of whether the patient was diverting the medication to another individual or taking the medication themselves.

Finally, the United States expects that Dr. King may also respond to hypothetical questions based on the evidence introduced at trial. *See*, *e.g.*, *United States v. Coffman*, 574 F. App'x 541, 553 (6th Cir. 2014) ("[H]ypothetical questions to an expert witness are permissible[.]"); *United States v. Collins*, 78 F.3d 1021, 1037 (6th Cir. 1996) (the government may properly ask expert witness "to assume 'hypothetical' facts" consistent with the proof at trial).

Reviewed and Approved By:  /s/_____
Timothy E. King, M.D.

### III.    LAY WITNESS TESTIMONY

While the witnesses mentioned herein are fact witnesses, given the potentially sophisticated nature of the PDMP, Surescripts, pharmacy, and financial testimony anticipated at trial, the United States makes the following disclosures out of an abundance of caution pursuant to Rule 701, 702, 703, and 705 of the Federal Rules of Evidence.

#### A. Pharmacists

In addition to the expert medical testimony outlined above, the government intends to call additional fact witnesses who are licensed pharmacists and whose testimony will include some discussion of their view of the appropriate nature and circumstances of prescribing controlled substances. These individuals include the following potential witnesses:

- Pharmacist 1 - P.B., R.Ph., CVS Pharmacy, Apex, NC
- Pharmacist 2 - R.O., R.Ph., Walgreens Pharmacy, Apex, NC
- Pharmacist 3 - J.R., R.Ph., Sinclair Pharmacies, Warsaw, NY
- Pharmacist 4 - E.P., R.Ph., Hocks Vandalia Pharmacy, Vandalia, OH
- Pharmacist 5 - W.K., R.Ph., Riesbeck's Pharmacy, Cambridge, OH
- Pharmacist 6 - C.V., R.Ph., Walls Medicine Center, Grand Forks, ND
- Pharmacist 7 - S.B., R.Ph., Embrace Pharmacy, Grand Forks, ND
- Pharmacist 8 - K.H., R.Ph., Dakota Clinic Pharmacy, Fargo, ND
- Pharmacist 9 - Y., R.Ph., Dakota Clinic Pharmacy – SU, Fargo, ND
- Pharmacist 10 – K.K., R.Ph., Walmart Pharmacies
- Pharmacist 11 – I.M., R.Ph., Walmart Pharmacies
- Pharmacist 12 – A.N., R.Ph., Walmart Pharmacies

Pharmacist 1 ("Ms. B") and Pharmacist 2 ("Ms. O") were working at pharmacies in Apex, North Carolina, in the time surrounding co-conspirator 10 (CC-10)'s arrest February of 2022. Ms. B and Ms. O will discuss their stores' receipt of prescriptions issued by Dr. Okafor, the red flags noted in those prescriptions, and why, ultimately, personnel from Ms. O's store contacted local police to intercept the individual coming to fill the prescription. These pharmacists will also discuss their attempts to verify these prescriptions by calling Dr. Okafor's office. In each instance, the pharmacists refused to fill the prescriptions issued by Dr. Okafor based on their concerns about whether the prescriptions were issued outside the usual course of professional practice and without a legitimate medical purpose. *See* FBI Serial 62 and attachments; ECF No. 37 at 12 – 13, 23 – 24;

(Government's Motion to Admit Evidence Intrinsic to the Conspiracy and 404(b)).

Similarly, Pharmacist 3 ("Mr. R") was working at a pharmacy in Warsaw, New York, in the time surrounding CC-10's arrest in January of 2023. Mr. R will discuss the receipt of promethazine with codeine prescriptions at his pharmacy and six other pharmacies owned by him in the greater Buffalo, New York region. Mr. R will discuss the red flags noted in these prescriptions and why he contacted local police to intercept the individual coming to fill the prescription. Mr. R will testify to his refusal to fill the prescription his store received based on concerns about whether the prescriptions were issued outside the usual course of professional practice and without a legitimate medical purpose. *See* FBI Serials 155, 156, 157, 164 and attachment; ECF No. 37 at 12 – 13, 23 – 24 (Government's Motion to Admit Evidence Intrinsic to the Conspiracy and 404(b)).

Pharmacist 4 ("Ms. P") and Pharmacist 5 ("Mr. K") were employed by pharmacies in Ohio in the times surrounding CC-2's arrest in Noble County, Ohio in March of 2023. Each pharmacists' pharmacy received suspect prescriptions by Dr. Okafor that were noted in a larger investigation into the defendant by the State of Ohio Board of Pharmacy (SOBP). The prescriptions issued to Ms. P and Mr. K's pharmacies were written out to known pseudonyms used by co-conspirators in this case. At the request of the SOBP, Ms. P and Mr. K each made recorded calls to Dr. Okafor's office to discuss prescriptions he issued to their pharmacies. These witnesses will testify to their communications with the defendant and the red flags noted in these prescriptions. *See* FBI Serials 177, 195, 197, 273, 294 and attachments; ECF No. 37 at 13 – 15, 23 – 24 (Government's Motion to Admit Evidence Intrinsic to the Conspiracy and 404(b)).

Pharmacist 6 ("Mr. V"), Pharmacist 7 ("Ms. S.B."), Pharmacist 8 ("Mr. H"), and Pharmacist 9 ("Ms. Y") were employed by pharmacies in the Grand Forks and Fargo, North Dakota areas in the times surrounding CC-8's encounter with law enforcement in late February of 2023. Each of their pharmacies received prescriptions issued by Dr. Okafor, in names associated with CC-8. These pharmacists will discuss the receipt of these prescriptions and the red flags noted in them. Mr. V will testify regarding his attempts to verify the prescription with Dr. Okafor, and that he was present when CC-8 attempted to pick up the prescription at his pharmacy. The pharmacists will discuss their reasons for informing law enforcement about their receipt of Dr. Okafor's prescriptions and their refusals to fill them based on concerns about whether the prescriptions were issued outside the usual course of professional practice and without a legitimate medical purpose. *See* FBI Serial 272 and attachments; ECF No. 63 (Government's Supplemental Motion to Admit Intrinsic Evidence and 404(b)).

Separately, the government may introduce testimony from pharmacists from Walmart pharmacies in the greater Washington, D.C. metropolitan areas, to include Pharmacist 10 (K.K.), Pharmacist 11 (I.M.), and Pharmacist 12 (A.N.) *See* FBI Serials 286, 200 and 240, respectively. These pharmacists will testify as to their receipt of prescriptions issued by Dr. Okafor and the red flags present in them. These pharmacists will discuss their refusals to fill the prescriptions based on concerns about whether the prescriptions were issued outside the usual course of professional practice and without a legitimate medical purpose. Their testimony will underly testimony from a senior investigator with Walmart who will testify regarding Walmart's nationwide block, where it determined it would no longer fill controlled substance prescriptions issued by the defendant, and

that Walmart notified the defendant of this block at the beginning of the charged conduct in this case. The government will further offer testimony from a pharmacist and representative with CVS, who will testify that their pharmacy chains, too, had a nationwide block of the defendant's controlled-substance prescriptions and that the defendant was notified of this block in approximately May of 2022.

### B. PDMP and Surescripts Data

The government also anticipates calling Supervisor Paul Short from the Drug Enforcement Administration Document and Media Exploitation (DOMEX) branch team as a witness. Mr. Short will explain that in position with DOMEX, he compiles and analyzes data to assist in criminal investigations and prosecutions. Here, Mr. Short was provided PDMP data from 39 states as well as Surescripts data documenting prescriptions issued by Dr. Okafor. Mr. Short will testify that while PDMP data captures only controlled substance prescriptions which were subsequently filled by a pharmacist, Surescripts data captures all electronically issued prescriptions by the physician using the Surescripts software program. Using tools of data analysis, Mr. Short will present information regarding the defendant's prescribing, to include:

- The quantity of controlled substance prescriptions issued, and the variation in that number over time.
- The number of individual patients reflected in the PDMP and Surescripts who were issued controlled substance prescriptions, the types of prescriptions issued, and data as to when they were issued.
- Controlled substance prescriptions issued to individuals bearing the same name and date of birth across multiple states; the same name and different dates of birth across multiple states; the same name and dates of birth but various addresses across multiple states; the same last name across multiple states; and other biographical data of significance across the defendant's prescribing.
- Data as to controlled substances issued to certain patients but retrieved from the pharmacy by others (where the pharmacies keep and store that data).
- Data as to controlled substances issued to uncharged co-conspirators in the case, to include controlled substances issued in the co-conspirator's last name but under various first names.
- Data as to controlled substances issued by Dr. Okafor in the states where co-conspirators were intercepted by law enforcement, and when these prescriptions were issued relative to the co-conspirator's encounter with law enforcement.
- Data as to controlled substances issued by Dr. Okafor in response to receiving an electronic request (via phone or online messaging) from a co-conspirator, and when these prescriptions were issued relative to that request.[1]
- Visualizations of the defendant's prescribing through graphs, maps, and charts.

---

[1] Mr. Short was asked to provide data with respect to certain names and in provided time frames but was not provided underlying material related to the co-conspirators, such as their communications with the defendant or overall role in the case.

8

Mr. Short may also testify as to the PDMP information of Dr. Okafor, including any trends in his prescribing practices as captured through review of those PDMPs. As part of this testimony, Mr. Short will testify as to standard "red flag" evidence the DEA recognizes through their analytical review of prescribers' PDMPs. Mr. Short did not write a report, but analytical prescribing overviews created by the DEA will be provided to defense counsel in advance of trial.

### C. Financial Analysis

Matthew Sweeney is a forensic accountant with the FBI's Washington Field Office. Mr. Sweeney has almost seven years of accounting and financial experience, including in assisting the FBI in financial matters in complex investigations into fraud and drug trafficking.

To assist the jury in assessing the financial impact of the charged offenses, Mr. Sweeney will summarize the defendant's bank records from Wells Fargo Bank, N.A., Navy Federal Credit Union, and Citibank, N.A. for the period of January 2018 to April 2023. Mr. Sweeney's analysis includes summaries of bank and business records, and the flow of money, including cash, checks, insurance provider payments, and third-party merchant deposits, at each of the aforementioned banks. The Government does not consider this line of testimony to constitute expert testimony under Federal Rule of Evidence 702, and it thus makes this disclosure out of an abundance of caution.

### IV. Request for Notice of Defendants' Expert Testimony

The government hereby requests, pursuant to Fed. Crim. R. (16)(b)(1)(C), disclosure of a written summary of expert testimony the defendant intends to use as evidence at trial or at any hearing. This summary must describe the opinions of the witness, the bases and reasons therefore, and the witnesses' qualifications.

[intentionally left blank]

Please let us know if you have any questions.

Sincerely,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
United States Attorney's Office
for the District of Columbia

/s/
Meredith E. Mayer-Dempsey
Assistant United States Attorney


GLENN LEON CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

*/s/ Kathryn C. Furtado*
Kathryn C. Furtado
Trial Attorney