**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

    **v.**

**NDUBUISI JOSEPH OKAFOR,**

    **Defendant.**

**Criminal Action No. 23-116 (JDB)**

<u>**MEMORANDUM OPINION**</u>

Defendant Ndubuisi Okafor faces charges centered around allegations that he used his medical license to illegally distribute controlled substances. In particular, he is charged with conspiracy to unlawfully distribute controlled substances in violation of 21 U.S.C. § 846; maintaining drug-involved premises and aiding and abetting in the same in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2; and twenty-seven counts of unlawful distribution of controlled substances and aiding and abetting in the same in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. <u>See</u> Superseding Indictment [ECF No. 34] ("Indictment") at 5–9. Trial is scheduled for October of this year.

Currently before the Court is a raft of motions from both sides. Okafor moves to dismiss the indictment and to suppress certain evidence. <u>See</u> Okafor's Mot. to Dismiss With Mem. of P. & A. [ECF No. 41] ("Mot. to Dismiss"); Mot. to Suppress Evid. Derived From Computers, Phone, iCloud and/or Social Media Acct. Searches [ECF No. 40] ("Mot. to Suppress").[1] The government counters with motions of its own, seeking permission to use certain evidence at trial and asking

---

[1] Okafor also filed a motion asking the Court to exclude one piece of evidence the government sought permission to introduce in one of its motions. <u>See</u> Def.'s Mot. in Lim. 1 Concerning Alleged Victim J.V. [ECF No. 46]. Because this motion operates in effect as an opposition to the government's motion, the Court treats it as such.

the Court to preclude Okafor from engaging in trial tactics the government views as inappropriate. See U.S.'s Mot. to Admit Evid. Intrinsic to the Charged Conduct and Pursuant to Fed. R. Evid. 404(b) [ECF No. 37] ("Mot. to Admit Evid."); U.S.'s Suppl. to its Mot. to Admit Intrinsic Evid. & Pursuant to Fed. R. Evid. 404(b) [ECF No. 63] ("Suppl. to Mot. to Admit Evid."); U.S.'s Mot. in Lim. to Impeach the Def. with his Prior Conviction Pursuant to Fed. R. Evid. 609 & Specific Instances of Conduct Under Rule 608 [ECF No. 39] ("Mot. to Impeach"); U.S.'s Omnibus Mot. in Lim. [ECF No. 38] ("Omnibus Mot.").

The motions are now fully briefed and ripe for resolution.

## Background[2]

Okafor, a District of Columbia-based doctor, headed a national drug distribution ring beginning around May 2021 and ending upon his arrest in April 2023. See Indictment at 5; Mot. to Admit Evid. at 1. To do so, Okafor leveraged his status as a physician, prescribing oxycodone and promethazine with codeine—both controlled substances under the Controlled Substances Act, 21 U.S.C. § 801 et. seq.; see 21 C.F.R. §§ 1308.12(b)(1)(xiv), 1308.15(c)(1)—to co-conspirators and individual patients in pursuit of profit rather than treatment. See Indictment at 5.

In broad strokes, the scheme went something like this. Co-conspirators sent Okafor prescription requests with patients' names, dates of birth, pharmacy addresses, and drug types and quantities. Indictment at 6. Despite knowing that the patient information was frequently false, Okafor would oblige. Id. at 7. In exchange for each prescription, the co-conspirators would pay Okafor cash in the range of $180 to $300. Id. The co-conspirators would then use or sell the substances. Id.

---

[2] The following summary is based on the factual assertions in the indictment and the government's motions, which the Court relates solely as a summary of what the government intends to prove at trial. The Court's reliance on these alleged facts for purposes of this opinion should not be construed as an endorsement of their truth, which is a determination for the jury.

To avoid detection by state authorities, Okafor often issued the prescriptions across state lines, and sometimes prescribed the same medications to the same purported patients in many states and listing different home addresses—or, conversely, to the same co-conspirators in the same states under <u>different</u> names.  <u>Id.</u>; Mot. to Admit Evid. at 6–7, 9.  Okafor frequently changed the listed first name to avoid detection while retaining the real patient's last name, in the hope that otherwise skeptical pharmacists would think the co-conspirators were merely picking up family members' prescriptions.  Mot. to Admit Evid. at 6.  All told, Okafor issued prescriptions in this manner in at least thirty-seven states and the District of Columbia, despite being licensed to prescribe only in the District of Columbia.  <u>Id.</u> at 1, 3, 22.

As to the individual patients, the story is simpler: from his medical office, Okafor would prescribe large quantities of controlled substances "on demand" to patients without any meaningful examination, and again often in exchange for cash payment.  <u>Id.</u> at 2, 6, 9.  He would sometimes issue these prescriptions to his patients' real names and other times to pseudonyms to enable them to collect more prescriptions than would otherwise be possible.  <u>Id.</u> at 8–9.  For one patient, for instance—whom the government intends to present as a witness at trial—Okafor wrote at least nineteen oxycodone and promethazine with codeine prescriptions within a three-month period.  <u>Id.</u>

The government indicted and arrested Okafor in April 2023 and filed a superseding indictment a year later.

<u>**Analysis**</u>

I.      <u>**Motion to Dismiss**</u>

Okafor moves to dismiss the indictment on two primary grounds: that the Controlled Substances Act is unconstitutionally vague as applied to him, and that it in fact <u>cannot</u> apply to him given his status as a registered doctor.  Each ground for dismissal can be rejected easily.  In

ruling on each, the Court is mindful that it must presume the truth of the government's proffered facts. United States v. Park, 938 F.3d 354, 358 (D.C. Cir. 2019); see also United States v. Ballestas, 795 F.3d 138, 148–49 (D.C. Cir. 2015).

**A.  The law is not unconstitutionally vague as applied to Okafor.**

Okafor first contends that the Controlled Substances Act is unconstitutionally vague as applied to him. Mot. to Dismiss at 4. The argument draws on the precept that a conviction violates due process "if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." Holder v. Humanitarian L. Project, 561 U.S. 1, 18 (2010) (quoting United States v. Williams, 553 U.S. 285, 304 (2008)). But to survive such a challenge, a statute's scope need not "be clear in every application." Id. at 21; see also United States v. Sandlin, 575 F. Supp. 3d 16, 30 (D.D.C. 2021). Instead, the statute need only provide fair notice "as applied to the particular facts at issue." Humanitarian L. Project, 561 U.S. at 18. So long as Okafor's conduct was "clearly proscribed," he "cannot complain of the vagueness of the law as applied to the conduct of others." Id. at 18–19 (quoting Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 495 (1982)).

Okafor's alleged conduct was clearly proscribed. As relevant here, the Controlled Substances Act makes it a federal crime to "knowingly or intentionally" distribute or dispense a controlled substance, "[e]xcept as authorized." 21 U.S.C. § 841(a). There is no dispute that Okafor in fact distributed or dispensed controlled substances. This case therefore turns on the authorization exception, under which registered doctors like Okafor are "authorized" to prescribe controlled substances without violating the statute, see id. § 822(b), so long as they issue the prescription "for a legitimate medical purpose" and "acting in the usual course of [their]

professional practice," 21 C.F.R. § 1306.04(a).  If they prescribe controlled substances outside of those guardrails, however, registered doctors are "subject to the penalties provided for violations" of the Controlled Substances Act.  Id.

According to the indictment, Okafor issued prescriptions "regardless of [his] patient's individual diagnosis and for periods of time that were inconsistent with accepted use," Indictment at 6; "exchange[d] controlled substance prescriptions for cash" with the knowledge that his co-conspirators "would pick up and divert the controlled substances" for profit, id.; knowingly prescribed to false names and addresses, id. at 7; falsified medical records to cover up his unlawful activities, id. at 7–8; and more.  These activities are not borderline cases that lend themselves to a good-faith dispute over proper pain management.  They fall in the heartland of the statute, which aims to criminalize those who sell drugs "not for legitimate purposes, but primarily for the profits to be derived," with a particular concern for "the diversion of drugs from legitimate channels to illegitimate channels."  United States v. Moore, 423 U.S. 122, 135 (1975) (cleaned up).

Moreover, this statute is particularly ill-suited for an as-applied vagueness challenge.  Cf. United States v. Robinson, 253 F. Supp. 3d 1, 3 (D.D.C. 2017) (collecting cases rejecting vagueness challenges to § 841).  As Okafor notes, to convict him under § 841, the government will need to convince a jury that he "knowingly or intentionally acted in an unauthorized manner." Ruan v. United States, 142 S. Ct. 2370, 2376 (2022).  So Okafor did not violate the statute unless he was "aware that what he [did was] precisely that which the statute forbids," such that he was "under no necessity of guessing whether the statute applie[d] to him."  Screws v. United States, 325 U.S. 91, 104 (1945); see, e.g., United States v. McHugh, 583 F. Supp. 3d 1, 21 (D.D.C. 2022). Because "a scienter requirement may mitigate a law's vagueness," Vill. of Hoffman Ests., 455 U.S. at 499, Okafor fails to establish that his (by hypothesis) knowingly unauthorized conduct was

not clearly proscribed.

**B.  Doctors are vulnerable to prosecution under the Controlled Substances Act.**

Next, Okafor points out that the standard the government is using to prosecute him comes from a regulation interpreting the Controlled Substances Act ("CSA"), not the language of the CSA itself.  See Mot. to Dismiss at 7 (citing 21 C.F.R. § 1306.04(a)).  And, he continues, that regulation is unlawful because Congress did not intend registered doctors to be subject to prosecution under the CSA.  See id. at 13 ("One cannot both (1) have a DEA registration . . . and (2) be guilty of issuing an unauthorized prescription that was authorized by that registration."); id. at 8 ("It was the manifest purpose and intent of the drafters of the CSA and § 841 simply does not apply to a person who has received a DEA license to issue controlled substances.").  It follows, Okafor says, that the indictment—premised as it is on an invalid regulation—is void and fails to give sufficient notice of the allegations against him.

The argument fails twice over.  First, the suggestion that registered doctors are immune from CSA prosecution was flatly rejected by the Supreme Court in United States v. Moore, 423 U.S. 122 (1975).  The Court there rebuffed the argument that "a licensed physician . . . was exempted from prosecution under § 841 by virtue of his status as a registrant."  Id. at 124.  Noting that the CSA exempts "certain activities," not "certain persons," id. at 131, the Court held that "registered physicians can be prosecuted under § 841 when their activities fall outside the usual course of professional practice," id. at 124.  That is precisely the sort of prosecution Okafor faces.

Second, Okafor's "notice"-related complaint about the indictment itself—as opposed to the underlying theory of prosecution—demands too much of the indictment.  Okafor protests that the indictment "does not include an allegation that . . . [Okafor] knew the charged prescriptions were unauthorized."  Mot. to Dismiss at 9.  It seems that Okafor objects only to the absence of the word

"unauthorized," as the indictment alleges that he "knowingly and intentionally distribute[d] and dispense[d] controlled substances, outside the scope of professional practice and not for a legitimate medical purpose." Indictment at 9. But just two years ago the Supreme Court explained that an indictment under § 841 "need not set forth . . . a lack of authorization." Ruan, 142 S. Ct. at 2379 (citing 21 U.S.C. § 885). And in any event, indictments need not incant magic words, and the indictment here does plenty to "inform [Okafor] of the precise offense of which he is accused so that he may prepare his defense." United States v. Williamson, 903 F.3d 124, 130 (D.C. Cir. 2018) (quoting United States v. Verrusio, 762 F.3d 1, 13 (D.C. Cir. 2014)); see also United States v. Abou-Khatwa, 40 F.4th 666, 675 (D.C. Cir. 2022) ("The indictment need only contain 'a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" (quoting Fed. R. Crim. P. 7(c)(1))) (cleaned up).[3]

Accordingly, the Court will deny Okafor's motion to dismiss.

## II.   Motion to Suppress

Next, Okafor moves the Court to suppress some of the evidence the government uncovered during two different searches, one of Okafor's office and the other of his home. Both searches were executed pursuant to search warrants, but Okafor argues that the warrants were insufficiently particularized and therefore violated the Fourth Amendment. Mot. to Suppress at 1. Okafor does not challenge the warrants in their entirety; instead, he challenges them only insofar as they permitted the search of his computers, phone, iCloud, and/or social media accounts. Id. And he challenges them on only one basis: that the warrants did not "describe the search methodology"

---

[3] Okafor seems also to suggest that the indictment must be dismissed because it "illegitimizes a medical standard for patient treatment that is within the contours of District of Columbia law." Mot. to Dismiss at 5. The Court has no occasion to explore what would happen if federal and state law conflicted because Okafor offers no reason to believe that they do. He says only that "[a] review of the statutes shows that there are set standards delineating how physicians in the District of Columbia may treat pain patients." Id. at 6. He does not point to any such statute, and the Court has difficulty imagining that the District of Columbia permits the sort of illegitimate drug distribution that the government alleges. See 48 D.C. Code § 903.08(a)–(d).

the government planned to use.  Id. at 1–2.[4]

The Fourth Amendment requires that a warrant "particularly describe the place to be searched and the person or things to be seized."  United States v. Grubbs, 547 U.S. 90, 97 (2006); see U.S. Const. amend. IV.  Nothing in the Amendment's text adds that the warrant must also describe "the precise manner in which [it is] to be executed," Grubbs, 547 U.S. at 98 (quoting Dalia v. United States, 441 U.S. 238, 255 (1979)), and no binding decision "requires a search protocol before a warrant may be issued," Matter of Black iPhone 4, 27 F. Supp. 3d 74, 79 (D.D.C. 2014) (emphasis omitted).

Okafor suggests that the Constitution might nonetheless demand that a warrant specify a search protocol when it authorizes a search of electronic media.  The Court need not decide this question because, regardless, the warrants were executed in objective good faith.  Under the good-faith exception to the exclusionary rule, "evidence seized in reasonable, good-faith reliance on a search warrant" need not be excluded, even if the warrant is found lacking.  United States v. Griffith, 867 F.3d 1265, 1278 (D.C. Cir. 2017) (quoting United States v. Leon, 468 U.S. 897, 905 (1984)).  And "the fact that a neutral magistrate has issued a warrant is the clearest indication" that the officers acted in good faith.  Messerschmidt v. Millender, 565 U.S. 535, 546 (2012); see also United States v. Thorne, 548 F. Supp. 3d 70, 130–31 (D.D.C. 2021); United States v. Hill, 575 F. Supp. 3d 185, 193–94 (D.D.C. 2021).

The warrants here justified good-faith reliance.  Okafor does not dispute that the warrants were issued by a neutral magistrate pursuant to probable cause that evidence related to Okafor's

---

[4] Okafor also says in passing, without elaboration, that the warrants "failed to place any limit on the scope of the searches and seizures."  Id. at 3.  The Court cannot tell if this is a separate argument or if it is in service of the search protocol argument.  See Matter of the Search of Apple iPhone, IMEI 013888003738427, 31 F. Supp. 3d 159, 167 (D.D.C. 2014) (asking for a search protocol from the government only to "help limit the possibility that locations containing data outside the scope of the warrant will be searched").  If it is a separate argument, it is unpersuasive.

alleged criminal activities would be found on his electronic devices and accounts.  And on the only dimension Okafor does challenge—methodological description—the warrants exceeded what any binding authority required.  They listed in detail some of the proposed search strategies, which would include:

> [S]urveying various file 'directories' and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by 'opening,' reviewing, or reading the images or first few 'pages' of such files in order to determine their precise contents; 'scanning' storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic 'keyword' searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

Ex. A to U.S.'s Mot. for Leave to File Exhibits Under Seal [ECF No. 51-1] ("Ex. A") at 70; see also Ex. B to U.S.'s Mot. for Leave to File Exhibits Under Seal [ECF No. 51-2] ("Ex. B") at 62 (similar).  The warrants also explained, over the course of pages, why the government required the flexibility to go beyond those methodologies as necessary: "Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches" given the difficulty of predicting where and how digital files will be stored."  Ex. A at 69; see also Ex. B at 61 (same).

In sum, the warrants went to great lengths to alert the magistrate, to the extent possible, to the methods the government anticipated using.  Cf. United States v. Burgess, 576 F.3d 1078, 1094 (10th Cir. 2009) ("[I]t is folly for a search warrant to attempt to structure the mechanics of the search and a warrant imposing such limits would unduly restrict legitimate search objectives.").  And the warrants explained and justified the limits of the government's ability to predict its methodology.  Cf. Griffith, 867 F.3d at 1276 (a search warrant "may allow a broader sweep when a reasonable investigation cannot produce a more particular description").  In light of the dearth of authority requiring the warrants to contain additional methodological limitations, it cannot be said

that the searching agents were unreasonable in "presum[ing them] to be valid." Leon, 468 U.S. at 923; see also Thorne, 548 F. Supp. 3d at 132 ("Defendant's suggestion that an individual law enforcement agent seeking a warrant should be expected to succeed where all of these bodies have thus far left the issue unresolved is unreasonable.").

For the foregoing reasons, the Court will deny Okafor's motion to suppress.

## III.   **Motion to Admit Evidence**

The government seeks to present evidence of various acts that it characterizes as either "intrinsic," and therefore not subject to Federal Rule of Evidence 404(b), or "extrinsic" but nonetheless admissible under that rule. See Mot. to Admit Evid. at 1. As explained below, the Court will admit all but one piece of the government's evidence.

Rule 404(b) governs the admissibility of "[e]vidence of any other crime, wrong, or act." Fed. R. Evid. 404(b). Because a crime with which a defendant is charged is not an "other" crime, the first step under Rule 404(b) is to determine whether the rule applies at all. If the evidence goes to this crime or act, in other words, Rule 404(b) has nothing to say about it. Courts dub this category of acts "intrinsic," and define it by reference to three buckets: an act is intrinsic if it "(a) is part of the charged offense; (b) is offered as direct evidence of the charged crime; or (c) was performed contemporaneously with the charged crime and facilitated" it. United States v. Roberson, 581 F. Supp. 3d 65, 72 (D.D.C. 2022); see also Abou-Khatwa, 40 F.4th at 677. This is a "narrow" set of acts that excludes evidence merely necessary to, for instance, "complete the story" or "explain the circumstances" surrounding a crime. Roberson, 581 F. Supp. 3d at 71 (cleaned up); see United States v. Bowie, 232 F.3d 923, 928 (D.C. Cir. 2000).

"Evidence of any other crime, wrong, or act," meanwhile, is evidence of an extrinsic act and thus subject to Federal Rule of Evidence 404(b). See United States v. McGill, 815 F.3d 846,

879 (D.C. Cir. 2016).  But an act's status as extrinsic does not exclude it from evidence.  To the contrary: Rule 404(b) "is a rule of inclusion rather than exclusion," Bowie, 232 F.3d at 929, that permits evidence of extrinsic acts for many purposes, among them to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).   And extrinsic acts in a conspiracy prosecution are generally granted "considerable leeway" to, for instance, "inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to explain to the jury how the illegal relationship between the participants in the crime developed."  United States v. Mathis, 216 F.3d 18, 26 (D.C. Cir. 2000) (quoting United States v. Williams, 205 F.3d 23, 33–34 (2d Cir. 2000)); see also McGill, 815 F.3d at 879.

Next to that long list of permissible purposes stands one forbidden one.  Rule 404(b) prohibits exactly one type of evidence: extrinsic evidence "which lacks any purpose but proving character." Bowie, 232 F.3d at 930.  So Okafor's blanket objection to this evidence on Rule 404(b) grounds can succeed only if the evidence (a) is extrinsic and (b) will serve no purpose other than to demean Okafor's character.   As discussed below, each type of evidence the government proposes to introduce is either intrinsic or carries a legitimate, non-character purpose under Rule 404(b) and thus is not barred by that rule.

But passing Rule 404's test does not guarantee admission: "Evidence admissible under Rule 404(b) may still be prohibited under Rule 403's balancing of prejudice and probativeness." Abou-Khatwa, 40 F.4th at 679; see also Bowie, 232 F.3d at 930.  And because the Court has significant Rule 403 concerns about two of the government's pieces of evidence—concerns that are fatal to one—it discusses those following the Rule 404(b) analysis.

### A. Rule 404(b) does not bar any of the government's proffered evidence.

An initial note.  Some of the evidence bears on what the government calls "charged" conduct—that is, distributions that the government has charged as distinct distribution counts (counts 12–29 of the indictment) under 18 U.S.C. § 841.  See Mot. to Admit Evid. at 7.  Other evidence bears on distributions that the government calls "uncharged" conduct—distributions the government has not charged as distinct counts, but that it nonetheless contends were made during and in furtherance of the charged conspiracy, and as part of the charged crime of maintaining drug premises.  Id.  Although helpful shorthand, this distinction does not dictate the Rule 404(b) analysis, because, as the government points out, acts can be intrinsic even if they evidence distributions that were not charged individually.  If uncharged acts are part of or provide direct evidence of the conspiracy or maintenance of drug premises charges, they will nonetheless qualify as intrinsic.  McGill, 815 F.3d at 881.  Accordingly, the Court does not segregate "uncharged" from "charged" distributions for purposes of the Rule 404(b) analysis.

All of the evidence, the Court concludes, is permissible under Rule 404(b)—some as intrinsic (and therefore not subject to the rule) and some as extrinsic but offered for a non-character purpose.

  i.  Intrinsic Acts

First, the government represents that it will introduce evidence—testimonial and documentary—of numerous illicit prescriptions Okafor wrote his patients and purported patients during the period of the conspiracy and the maintenance of the drug premises.  Adopting the government's naming system, this describes portions of the evidence the government proffers regarding Cooperating Witness 1, see Mot. to Admit Evid. at 9; Co-Conspirator 5, id. at 9–10; Co-Conspirator 8, id. at 11; Co-Conspirator 9, id. at 11–12; Co-Conspirator 10, id. at 12–13; Co-

Conspirators 1 and 2, id. at 15; Co-Conspirators 3 and 4, id. at 16; Co-Conspirator 6, id. at 17; three undercover officers and one confidential source, id. at 18; and a patient dubbed J.V., id. at 19.   It also describes part of the evidence the government purports to have uncovered while executing its search warrants.   Id. at 25.   Only some of these distributions were charged independently, but all are intrinsic: each is "an act that is part of" at least one of the charged offenses, Bowie, 232 F.3d at 929, because each shows Okafor distributing controlled substances during the period the indictment covers—the exact activity that underlies all three categories of charges (conspiracy, distribution, and maintaining drug premises) facing Okafor.   The acts are intrinsic whether the evidence comes in the form of the prescriptions themselves, see, e.g., Mot. to Admit Evid. at 9, 16, testimony regarding the prescriptions, e.g. id., Okafor's notes and papers documenting the prescriptions, e.g. id. at 10–12, 25, physical bottles of medicine prescribed by Okafor, e.g. id. at 17, or conversations (for example with pharmacists) in which Okafor confirmed that he wrote a prescription, e.g. id. at 12–13, 17; see also Suppl. to Mot. to Admit Evid. at 4.   In all events, the evidence is of an act—writing prescriptions—intrinsic to the charged crimes.

Next, the government wishes to present evidence of conversations, in various forms, where co-conspirators requested prescriptions from Okafor for themselves or pseudonyms, or where they instructed others how to do so.   This describes portions of the evidence the government proffers regarding Cooperating Witness 1, Mot. to Admit Evid. at 8; Co-Conspirator 9, id. at 12; Co-Conspirators 1 and 2, id. at 14–15; Co-Conspirators 3 and 4, id. at 16; and Co-Conspirator 6, id. at 17.   It also describes some of the evidence found pursuant to the search warrant.   Id. at 25.   Some of these conversations occurred in person at Okafor's medical practice; others occurred over messaging apps.   Either way, because the conversations solicited the controlled substances Okafor is charged with distributing, they were "performed contemporaneously with" and "facilitated" the

charged crimes and are therefore intrinsic.  See Roberson, 581 F. Supp. 3d at 73 (messages soliciting the charged crime are intrinsic acts).  By the same token, Co-Conspirator 5's Instagram advertisements for controlled substances, featuring photographs of medications apparently taken in Okafor's examination room, are intrinsic, as they provide direct evidence of an act—solicitation of customers—taken during and in facilitation of the conspiracy.  See Mot. to Admit Evid. at 10. And the same goes, too, for various documents on which the government says Okafor kept track of the money his co-conspirators and patients owed him for the illicit prescriptions, as well as documents recovered from Co-Conspirators 9 and 10 listing patient names and tracking prescription activity: these documents were prepared during the conspiracy and to facilitate its primary goal, that is, the collection of profit.  See id. at 10, 12–13, 17, 25.

Okafor's co-conspirators' use of fake identities is similarly intrinsic.  The government says it will produce evidence that the co-conspirators carried identification and bank cards in alternate names, and that co-conspirators frequently picked up prescriptions using false names.  This describes portions of the evidence the government proffers regarding Cooperating Witness 1, id. at 9; Co-Conspirator 5, id., Co-Conspirator 8, id. at 11; Co-Conspirator 9, id.; Co-Conspirator 10, id. at 13; Co-Conspirators 1 and 2, id. at 13–15; Co-Conspirator 4, id. at 16; and Co-Conspirator 6, id. at 17.  Because the fake identities were used "contemporaneously" with the conspiracy and "facilitated" the co-conspirators in their quest to multiply the amount of drugs they could obtain, this evidence is intrinsic and falls outside the governance of Rule 404(b).

The government also plans to introduce evidence of the manner in which Okafor prescribed controlled substances to a cooperating witness, undercover law enforcement officers, and a patient the government calls "J.V."  Id. at 8–9, 18–19.  According to the government, Okafor prescribed these patients controlled substances after little or no examination, essentially on demand.  This

evidence too is intrinsic, because Okafor's issuance of these prescriptions and the care he took while doing so is precisely the conduct underlying the prosecution.  See United States v. Robinson, 68 F.4th 1340, 1347 (D.C. Cir. 2023) (evidence that doctor "scarcely examined" patients and an undercover officer supported the conclusion that he "simply did not establish a proper relationship with his patients before prescribing them oxycodone").  And the government's anticipated presentation of cash seized from various members of the conspiracy, Mot. to Admit Evid. at 14, 25, is similarly intrinsic, because Okafor and other members of the conspiracy possessed the cash as part of the conspiracy, which had a primary "goal," McGill, 815 F.3d at 882, of accumulation of profit.

      ii.    Extrinsic Acts

Not all the government has to offer is intrinsic, however.  For instance, the government intends to introduce evidence that pharmacists and pharmacies around the country took note of Okafor's suspicious prescribing practices and refused to fill his prescriptions, called authorities, or imposed nationwide blocks on his prescriptions.  See Mot. to Admit Evid. at 12, 23–24; see also Suppl. to Mot. to Admit Evid. at 1–2.  Although pharmacists' refusals to fill Okafor's prescriptions might provide attenuated support for the notion that Okafor issued prescriptions, it is not "direct evidence," Roberson, 581 F. Supp. 3d at 72, of those allegedly unlawful prescriptions.  Nor, more obviously, is their refusal "part of the charged offense" or done to facilitate it, id.—to the contrary, the pharmacists were trying to prevent the distributions.

The evidence is nonetheless not barred by Rule 404(b).  The characterization as extrinsic only means that Rule 404(b) governs it.  And Rule 404(b), recall, excludes only acts offered only to show Okafor's character.  Bowie, 232 F.3d at 929–30.  The inference that the government wants the jury to draw from the fact that Okafor's prescription practices "concerned pharmacists so much

. . . that they stopped filling his prescriptions," <u>Robinson</u>, 68 F.4th at 1347, is not the forbidden character inference but rather that Okafor had notice that his practices were beyond the pale. Evidence inspiring such an inference is permissible under Rule 404(b), which lists intent, knowledge, absence of mistake, and lack of accident as acceptable purposes.

Similar reasoning applies to the government's financial analysis suggesting that Okafor transitioned his medical practice "to a primarily cash business" "leading up to and during the charged conspiracy." Mot. to Admit Evid. at 25. To begin with, that the transition was done "leading up to" the conspiracy counts as a strike against it in the intrinsic test, which focuses largely on "temporal proximity." <u>United States v. Thorne</u>, Crim. A. No. 18-389 (BAH), 2020 WL 122985, at *13 (D.D.C. Jan. 10, 2020).[5] But more important, again, is what the fact of the financial transition shows. The government wants jurors to draw an inference: that Okafor knew his dealings were shady and took steps to evade authorities as a result. This is not intrinsic—but, by the same token, it is permissible under Rule 404(b) as evidence of intent, preparation, plan, knowledge, absence of mistake, and lack of accident.

Also extrinsic but admissible is evidence of Okafor's debts. <u>See</u> Mot. to Impeach at 7. The government concedes that the debts are not intrinsic, and instead says they provide a motive for the crimes charged and are therefore offered for a permissible Rule 404(b) purpose. The Court agrees. <u>See, e.g.</u>, <u>United States v. Kuzlik</u>, 468 F.3d 972, 975 (7th Cir. 2006) ("sorry state of [the defendant's] finances" admissible under Rule 404(b) "as evidence of his motive to embezzle"); <u>United States v. Bergstein</u>, 788 F. App'x 742, 745–46 (2d Cir. 2019) (similar).[6]

---

[5] <u>But see</u> <u>McGill</u>, 815 F.3d at 882 ("evidence of preconspiracy drug dealing" was intrinsic "as long as it continued after appellants entered into the charged conspiracy, because such evidence became direct evidence of the drug dealing within the conspiracy"); <u>United States v. Mosquera-Murillo</u>, 153 F. Supp. 3d 130, 180–81 (D.D.C. 2015) (preparation for act taken as part of conspiracy intrinsic to conspiracy).

[6] <u>Bergstein</u> held debts intrinsic rather than extrinsic but nonetheless admissible, but the Second Circuit employs a more generous test for intrinsic acts. <u>Id.</u> at 746.

Consider, too, a recorded jail call between Okafor and a co-conspirator that happened shortly after the co-conspirator's arrest.  Mot. to Admit Evid. at 15.  From jail, the co-conspirator called another co-conspirator, who put Okafor on the line; the first co-conspirator then referred to Okafor as "boss" and asked Okafor to help pay bail.  Id.  This call is not intrinsic to the charged crimes.  Neither asking nor being asked to pay bail, of course, is unlawful, nor is actually paying it.  So the call is not "part" of any charged offense, nor is it "direct evidence" of it.  See Roberson, 581 F. Supp. 3d at 72.  We come closer with the third possibility, that the call was "performed contemporaneously" with a charged offense and facilitated its commission.  Id.  The call may have facilitated the conspiracy, broadly defined, as free co-conspirators are presumably more effective than jailed ones.  But evidence is more likely to be intrinsic to a conspiracy when it furthers the specific "goals of the conspiracy" rather than being tangentially related, United States v. Khanu, 664 F. Supp. 2d 80, 83 (D.D.C. 2009), and the conspiracy's goal was making money, not freeing friends.  So the call does not fall within the "narrow" category of intrinsic acts.  Bowie, 232 F.3d at 929.

The call is nonetheless not barred by Rule 404(b).  The government does not seek to admit the call to persuade the jury of Okafor's bad character; paying bail is generally a nice thing to do.  Instead, it seeks to demonstrate Okafor's relationship to his co-conspirator.  Connecting co-conspirators is a permissible use under Rule 404(b).  See Mathis, 216 F.3d at 26.

Finally, there is the former patient the government calls J.V.  See Mot. to Admit Evid. at 18.  J.V. fatally overdosed on oxycodone and diphenhydramine, and, after a complaint from his father, the D.C. Board of Medicine inquired with Okafor about his treatment of J.V.  Id. at 18–19.  Shortly thereafter, Okafor created backdated and false records of appointments with J.V., apparently (the theory goes) to cover his tracks.  Id. at 19.  The government has not charged Okafor

with J.V.'s death, and it represents that it will not "introduce evidence or imply that [Okafor's] unlawful prescriptions for oxycodone caused J.V.'s overdose death." Id. at 19 n.17. Instead, the government wishes to introduce evidence that Okafor prescribed oxycodone to J.V.; expert analysis of those prescriptions; the Board of Medicine's inquiry; and the backdated records. Id. at 19.

The prescriptions and expert analysis are intrinsic for the reasons stated above: the act and manner of prescribing is precisely the conduct for which Okafor is charged. Neither the inquiry nor the altered records are intrinsic, however. The Board's inquiry, like the pharmacists' refusals to fill prescriptions discussed above, was obviously not part of, direct evidence of, or in facilitation of the charged crimes. And as for the falsified records, Okafor presumably created them in an effort to retain his medical license—helpful to the conspiracy but not central to it. Again, this evidence is being offered for its implications: the government wants the jury to draw the conclusion that Okafor falsified records because of a guilty mind. See United States v. Belfiore, No. 22-20, 2024 WL 2075128, at *2–3 (2d Cir. May 9, 2024) (that medical provider falsified records claiming that he had arranged an emergency appointment on behalf of a patient who died of an overdose was evidence that the provider "was not prescribing oxycodone in subjective good faith"). So, although extrinsic, the evidence satisfies Rule 404(b).

*      *      *

Setting aside for the moment Rule 403, Okafor does not seriously contest most of these conclusions on the 404(b) front. He doesn't do much more than assert a few times that the evidence the government proffers "clearly turns on [his] character and would only prove that [he] is a bad person." Def.'s Opp'n to Evid. that the Gov't Seeks to Introduce as Intrinsic Evid. or as 404(b) Evid. [ECF No. 58] ("Opp'n to Mot. to Admit Evid.") at 8–9. For the reasons given above, the

18

Court disagrees.

Meanwhile, Okafor places most of his eggs in a procedural basket: he argues that this Court "must first determine the existence and scope of the conspiracy" before it can assess whether acts are intrinsic or extrinsic to the conspiracy.  Id. at 4; see also id. at 6–7.  And, Okafor continues, because the government has failed "to prove by clear and convincing evidence" that he participated in a conspiracy, that inquiry must come out in the negative.  Id. at 5.

Okafor misunderstands the procedural posture.  Taking as true, for now, the evidence the government proffers, there is more than "sufficient" proof "to support a finding" that a conspiracy existed and that Okafor participated in it—and that is all the government must show at this juncture.  Roberson, 581 F. Supp. 3d at 76; see also Mosquera-Murillo, 153 F. Supp. 3d at 183.  Of course, as with Okafor's other requests for a preliminary determination of conspiracy, he is free to renew this objection at trial if he believes the government has failed to connect the conspiracy as promised.  See Order Denying Mot. for Prelim. Determination of Conspiracy [ECF No. 65] at 4.

The Court notes, however, that a defendant is entitled to a limiting instruction on the permissible uses of evidence if that evidence is intrinsic to some but not all charges a defendant faces.  See United States v. Hemphill, 514 F.3d 1350, 1357 (D.C. Cir. 2008).  So Okafor may receive a limiting instruction for evidence falling in this category, even if the Court has ruled that it is intrinsic for admissibility purposes.  And of course he remains free to object at trial if he believes the evidence actually unearthed strays from the government's representations in a relevant manner.

**B. Rule 403 permits the evidence related to J.V. but bars the jail call.**

That Rule 404(b)'s doors are open does not necessarily mean the evidence can come in.

Rule 404(b) evidence remains subject to Rule 403's pervasive probativeness-versus-prejudice balancing test, McGill, 815 F.3d at 880, under which "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403.  With two exceptions, Okafor does not do much to cause concern that any of the evidence discussed above fails that test, and the Court finds that it does not: the danger of unfair prejudice of the evidence does not "substantially outweigh[]" its probative value.  See id.

The most notable exception concerns the Board of Medicine's inquiry about J.V.'s death and Okafor's subsequently falsified records.  See Opp'n to Mot. to Admit Evid. at 9–10; Def.'s Mot. in Lim. 1 Concerning Alleged Victim J.V.  Both sides of the Rule 403 scale weigh heavily here.  On the one hand, the probative value is quite high: that Okafor's reaction to the Medical Board's investigation of a patient overdose was to falsify records speaks volumes about his awareness that his practices were questionable.  On the other hand, the potential for prejudice is equally concerning: although the Court expects the government to hew to its promise not to imply that Okafor caused J.V.'s death, it will be difficult for the jury not to speculate.

Judge Kollar-Kotelly's analysis in an analogous situation is instructive.  Just as here, the government there intended to introduce testimony that "specific patients" of a defendant doctor had died as a result of oxycodone.  See United States v. Robinson, Crim. A. No. 16-98 (CKK), 2017 U.S. Dist. LEXIS 234734, at *3 (D.D.C. June 19, 2017).  And just as here, the government promised not to show that the defendant "caused the death or injury" of those patients.  Id. at *2.  That court recognized, as this one does, that the testimony nonetheless posed "a significant risk that [the jury] would speculate" that the defendant had caused the deaths "and seek to punish" him

for doing so.  Id. at *5; see also United States v. Aponte Rivera, Crim. A. No. 21270 (JEB), 2023 WL 6646336, at *2–3 (D.D.C. Oct. 12, 2023).

But a significant divergence between that case—in which Judge Kollar-Kotelly excluded the evidence—and this one convinces the Court that the evidence should come in.  In Robinson, while the potential prejudice was great, the probative value of the evidence was "insignificant" because the only purpose for which the government offered the evidence of the patient deaths was that it would "help explain why the drug is highly regulated."  2017 U.S. Dist. LEXIS 234734, at *4–5.  That relatively uncontroversial point was "not . . . a contested issue" and the government did not need it "to satisfy any central element of its claims."  Id. at *4, *6.  And the court added that admission might be appropriate if the government offered the evidence for a different purpose—for instance, if the defendant "knew about some adverse health event related to a patient's oxycodone use before he issued them a prescription."  Id. at *6.

So while the potential prejudice in that case was similar, the probative value was much less.  Here, by contrast, the probative value is high.  Okafor's forgery is strongly indicative of his state of mind—something central to the government's quest to prove that Okafor knowingly prescribed in an unauthorized manner.  See Ruan, 142 S. Ct. at 2376.  Furthermore, the government contends that Okafor continued prescribing controlled substances in a dangerous manner after being notified of J.V.'s death, see U.S.'s Reply to Def.'s Opp'n to Mot. to Admit Evid. Intrinsic to the Charged Conduct and Pursuant to Fed. R. Evid. 404(b) [ECF No. 62] ("Reply to Def.'s Opp'n to Mot. to Admit Evid.") at 9—analogous to the hypothetical in Robinson about continuing dangerous prescribing practices after receiving notice of adverse health consequences resulting from oxycodone use.

This is a close call.  But "Rule 403 tilts . . . toward the admission of evidence in close

cases," such that "the balance should be generally struck in favor of admission." United States v. Whitmore, 359 F.3d 609, 619 (D.C. Cir. 2004) (internal quotation marks omitted). Accordingly, the Court will permit the introduction of the evidence concerning J.V.

One other piece of evidence requires a Rule 403 analysis, and this one fails. As recited above, the government wishes to introduce a recorded jail call among Co-Conspirator 1, Co-Conspirator 2, and Okafor, wherein Co-Conspirator 2 asks Okafor to pay Co-Conspirator 2's bail. Mot. to Admit Evid. at 15. The government, it seems, wants the call in evidence to demonstrate the relationship between Okafor and his co-conspirators. But the call's probative value to that effect is extremely limited because the government has plenty of other routes to establishing that relationship, including balance sheets, WhatsApp messages, and data matching prescriptions to requests the co-conspirators made; Okafor will have a hard time trying to argue that he did not know these people. See Mot. to Admit Evid. at 10, 14–15; Thorne, 2020 WL 122985, at *6 ("[T]he probative value and unfair prejudice of an item of evidence 'may be calculated by comparing evidentiary alternatives,' and 'the probative worth of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point.'" (quoting Old Chief v. United States, 519 U.S. 172, 184 (1997))). The potential for prejudice, meanwhile—while not as high as with the J.V. evidence—is significant, as a call from jail to Okafor may associate Okafor with criminality in jurors' minds and cause them to presume that he runs in criminal circles. In light of the negligible probative value of this call and its potential for significant prejudice, the Court will exclude it under Rule 403.

Accordingly, the Court will grant the government's motion to introduce evidence in large part but deny it to the extent it seeks to introduce evidence of the jail call among Okafor and Co-Conspirators 1 and 2.

IV.   **Expert Testimony**

The government plans to offer expert testimony on Okafor's prescribing practices, including two doctors' opinions that Okafor inadequately examined patients before prescribing them controlled substances and that many of his prescriptions lacked a legitimate medical purpose. See Mot. to Admit Evid. at 20–23.

The parties are in substantial agreement about the permissible scope of this testimony. Okafor concedes that the experts may "testify as to whether any given prescription had a possible medical purpose" or "as to whether the defendant's practice of prescribing medication is consistent with standard medical practice." Opp'n to Mot. to Admit Evid. at 11–12. He objects only to expert testimony about Okafor's "state of mind" and "the definition of legal terms and the meaning of the terms 'for a legitimate medical purpose' and 'usual course of his professional practice.'" Id. at 10–11 (quoting 21 C.F.R. § 1306.04(a)).[7]

For its part, the government agrees with those limitations. It represents that its experts will not testify to Okafor's state of mind, only to objective medical standards. Reply to Def.'s Opp'n to Mot. to Admit Evid. at 11. And as for the terms "legitimate medical purpose" and "usual course of his professional practice," it explains that the experts will opine only on their medical, and not their legal, definitions. Id. "[E]xpert testimony on the medical standard of care is not tantamount to an impermissible expert opinion on the governing legal standard just because the two standards overlap," United States v. Hofschulz, 105 F.4th 923, 931 (7th Cir. 2024) (internal quotation marks omitted), so this brand of testimony is—as Okafor acknowledges—perfectly permissible.

The Court will therefore allow the proffered expert testimony.

---

[7] Okafor also expresses concern that the experts will testify about the legal standard for medical malpractice in civil cases, id. at 11–12, but the Court sees no reason to fear that this will happen.

## V.   **Impeachment of Okafor**

Should Okafor testify at trial, the government wishes to impeach his credibility using evidence of a prior conviction and four instances of what it characterizes as dishonest conduct. See Mot. to Impeach at 1, 11.  For the following reasons, the Court will grant the motion.

### A.  The government may impeach Okafor with evidence of his prior conviction.

Okafor pled guilty in the District of Maryland in July 2008 to tax evasion in violation of 26 U.S.C. § 7201; filing false income tax returns in violation of 26 U.S.C. § 7206; and health care fraud in violation of 18 U.S.C. § 1347.  Mot. to Impeach at 1.  He was sentenced to 65 months' imprisonment, released from incarceration on March 15, 2013, and placed on 36 months of supervised release.  Id.  After he submitted false expense reports to Probation, his supervised release was revoked and he was sentenced to one month of incarceration in June 2016.  See id. at 5–6; U.S.'s Reply to Def.'s Opp'n to Mot. to Impeach [ECF No. 60] at 1.

Federal Rule of Evidence 609 governs the admissibility of evidence of prior convictions used to impeach a witness.  Under that rule, admission is mandatory if "the court can readily determine that establishing the elements of the crime required proving—or the witness's admitting—a dishonest act or false statement" and less "than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later."  Fed. R. Evid. 609(a)(2), (b).  Where more than ten years have passed since the later of those two dates, admission shifts from mandatory to discretionary, such that it is appropriate "only if" the evidence's "probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect."  Fed. R. Evid. 609(b)(1).

Okafor was released more than ten years ago, placing his conviction in the discretionary

bucket.[8]  Among the factors to be weighed in that bucket are "the nature of the crime, the time of the conviction, the similarity of the past crime to the charged crime, the importance of the defendant's testimony, and the degree to which the defendant's credibility is central to the case." United States v. Jackson, 627 F.2d 1198, 1209 (D.C. Cir. 1980).  Here, nearly every factor weighs in favor of admission.

First, consider the nature of the crimes.  Were they more recent, these crimes would skip the balancing test altogether, as they each involved a dishonest act or false statement.  To be convicted of tax evasion, Okafor had to admit to "willfully attempt[ing] . . . to evade or defeat" a tax, 26 U.S.C. § 7201; of filing false income tax returns, to "[w]illfully" submitting a tax return "which he [did] not believe to be true and correct," 26 U.S.C. § 7206(1); and of health care fraud, to "knowingly and willingly . . . defraud[ing] [a] health care benefit program," 18 U.S.C. § 1347(a).  Cf. Mattiaccio v. DHA Grp., Civ. A. No. 12-1249 (CKK), 2019 WL 6498865, at *15–17 (D.D.C. Dec. 3, 2019) (admitting similar convictions under Rule 609).  And the factual statement appended to Okafor's plea agreement more than satisfies these elements, with Okafor admitting to, for instance, "reporting false information to the Internal Revenue Service," "providing his tax return preparers with false information," "establishing sham corporations to create false expenses," and making a "false statement . . . in furtherance of[] a scheme in which he knowingly, or with deliberate disregard of whether the statements were true or false, or with a conscious purpose to avoid learning the truth, obtained monies from health care benefit programs

---

[8] In its reply brief, the government argues for the first time that admission is mandatory because the ten-year clock should start upon Okafor's release from his reincarceration for violating the terms of his supervised release, rather than from his initial release.  See U.S.'s Reply to Def.'s Opp'n to Mot. to Impeach at 1.  There is some support for this approach, see Thorne, 2020 WL 122985, at *12 n.11 (collecting cases), but, as the government recognizes, the D.C. Circuit has not weighed in, see United States v. Moore, 75 F. Supp. 3d 444, 454 n.10 (D.D.C. 2014).  The Court sees no reason to resolve the question given the government's forfeiture of the argument, see Stand Up for Cal.! v. U.S. Dep't of the Interior, 204 F. Supp. 3d 212, 313 n.51 (D.D.C. 2016), and the Court's resolution of the motion in the government's favor nonetheless.

for hospital services he did not perform." Mot. to Impeach at 2–4. We are now outside the window where this conviction would be automatically admissible, but it is nonetheless notable that the counts are precisely the sort of crimes that the Federal Rules of Evidence consider most reflective of a witness's trustworthiness—and therefore most appropriate for impeachment.

Next, the time of the conviction. We are outside the ten-year window—but barely, as Okafor was released in 2013. So while these convictions are somewhat stale, they are about as fresh as any dishonesty-related conviction subject to this balancing test will be. This factor therefore weighs against admission, but weakly.

Third, the crimes with which Okafor is now charged are quite different than those of which he was convicted in 2008: those were financial crimes while these are drug crimes. There is a greater fear of prejudice resulting from admitting prior convictions "similar to the instant charge," Thorne, 2020 WL 122985, at *25, on the theory that the evidence might be taken more for propensity than for untruthfulness. No such fear exists here, so the divergence points towards admission.

Finally, should he choose to testify, Okafor's credibility will likely be "central to the trial," United States v. Moore, 75 F. Supp. 3d 444, 455 (D.D.C. 2014) (internal quotation marks omitted), which also means his testimony is "particularly important," United States v. Anderson, 174 F. Supp. 3d 104, 108 (D.D.C. 2016). In light of Ruan, the government will have to prove that Okafor "knowingly or intentionally acted in an unauthorized manner." 142 S. Ct. at 2376. And Okafor's papers thus far have consistently maintained that his alleged co-conspirators duped him, which suggests that the case may come down to whether he can persuade the jury that he meant well. See Def's Req. for a James Hearing [ECF No. 43] at 1. This factor, too, therefore weighs in favor of admission. Moore, 75 F. Supp. at 455; see also Anderson, 174 F. Supp. 3d at 107–08.

The Court acknowledges that Rule 609 prescribes a "stringent" test before a conviction more than ten years old may be admitted.  <u>Thorne</u>, 2020 WL 122985, at *7.  But it is hard-pressed to imagine a better candidate than the conviction here.  Accordingly, the Court finds that the probative value of Okafor's 2008 conviction "substantially outweighs its prejudicial effect," Fed. R. Evid. 609(b)(1), and that the government may therefore impeach Okafor with it should he testify.

### B.  The government may impeach Okafor by inquiring into prior dishonest acts, but it may not introduce extrinsic evidence of them.

The prior conviction aside, the government wishes to pursue a second strategy to impugn Okafor's character for truthfulness should he testify.  The government wants to cross-examine Okafor about what it characterizes as four instances of dishonesty.  First, the government says Okafor obstructed justice in his District of Maryland case by creating and submitting fake, backdated invoices to introduce at trial, that the government obtained and executed a search warrant based on probable cause to that effect, and that the search confirmed its suspicions.  Mot. to Impeach at 5; <u>see also</u> Order Denying Def.'s Mot. for Reconsideration of Detention Order [ECF No. 26] at 9.  Second, the government says Okafor submitted false supervision reports to the Probation Office in that case, resulting in the revocation of his supervised release.  Mot. to Impeach at 5–6.  Third, the government says Okafor submitted false statements to the D.C. and Maryland boards of medicine in which he downplayed the Maryland conviction and its penalties.  <u>Id.</u> at 6–7.  Fourth and finally, the government says Okafor lied to the magistrate judge in this case about his foreign property ownership in an effort to minimize the risk that he might flee if released pretrial, and that the magistrate judge so found.  <u>Id.</u> at 8.[9]

---

[9] The government also included in this impeachment motion allegations about debts under which Okafor apparently labored, saying that they provide evidence of motive.  Mot. to Impeach at 7–8.  As the government later

Federal Rule of Evidence 608(b) governs the impeachment of a witness using specific instances of conduct that did not lead to a conviction.  A party may inquire on cross-examination about such instances "in order to attack or support the witness's character for truthfulness," so long as they "are probative of the [witness's] character for truthfulness or untruthfulness." Fed. R. Evid. 608(b); see United States v. Miller, 738 F.3d 361, 375 (D.C. Cir. 2013).  To avoid unfounded accusations, "the questioner must be in possession of some facts which support a genuine belief that the witness committed the . . . act to which the question relates."  Whitmore, 359 F.3d at 621–22 (internal quotation marks omitted).

The Court has little difficulty concluding that these instances of conduct are probative of Okafor's untruthfulness.  Each, if true, involved lying to an authority, including multiple courts. The D.C. Circuit found an abuse of discretion in a court's exclusion of evidence that a witness lied to a court and failed to report a driver's license suspension to probation supervisors.  See Whitmore, 359 F.3d at 619; see also id. ("Nothing could be more probative of a witness's character for untruthfulness than evidence that the witness has previously lied under oath.").  Like the witness in Whitmore, Okafor lied to courts and probation officials, and lying to a medical board in an attempt to reclaim a medical license is in a similar vein.

The potential prejudice, meanwhile, is slight, though not nonexistent.  Because the proffered instances involved lying to authorities and not drug dealing, they bear only on the quality contemplated by the rule—untruthfulness—and do not pose much risk of infecting the jury's view of Okafor's propensity to commit the crimes charged here.  And because each instance is supported by at least some evidence, the questioning is not pure "accusations."  Cf. Miller, 738 F.3d at 376 (probativeness diminished and prejudice heightened because "the cross-examination would have

conceded, this is Rule 404(b) evidence, not Rule 608 evidence, see U.S.'s Reply to Def.'s Opp'n to Mot. to Impeach at 2 n.1, so the Court has discussed it alongside other Rule 404(b) evidence above.

been based on accusations, not a prior judicial finding [the witness] had lied"); see also Whitmore, 359 F.3d at 621–22.

The government goes too far, however, in insisting that it be able to introduce documentary evidence of these instances of dishonesty.  See Mot. to Impeach at 11.  While the government may "ask questions" about these instances under Rule 608, it may not "adduce extrinsic evidence" of them.  Whitmore, 359 F.3d at 619–20; see Fed. R. Evid. 608(b) (permitting specific instances of conduct "to be inquired into" but not to be supported by "extrinsic evidence"); United States v. Morrison, 98 F.3d 619, 628 (D.C. Cir. 1996).  So the government must make itself content with Okafor's answers.[10]

\*     \*     \*

Accordingly, the government's motion to impeach Okafor in the event he testifies is granted to the extent it seeks to introduce evidence of Okafor's past conviction and to cross-examine him on the enumerated instances of dishonest conduct.  It is denied to the extent it seeks permission to introduce extrinsic evidence to prove the instances of dishonest conduct.

## VI.    The Government's Omnibus Motion in Limine

Finally, the government presents a grab-bag of motions in limine asking the Court to preclude certain tactics by Okafor and to endorse others by the government.  See Omnibus Mot.  These motions are largely premature.[11]  Cf. Flythe v. District of Columbia, 4 F. Supp. 3d 222, 226 (D.D.C. 2014) ("[A] trial judge's discretion extends . . . to the threshold question of whether a

---

[10] "Rule 608(b)'s bar against extrinsic evidence does not apply when the evidence is used to contradict a statement made by a witness during her testimony."  McGill, 815 F.3d at 907; see also United States v. O'Neal, 844 F.3d 271, 277 (D.C. Cir. 2016).  So if Okafor testifies on direct examination in a way inconsistent with the materials the government wishes to introduce, it may ask the Court to reconsider this ruling.  Cf. Luce v. United States, 469 U.S. 38, 41–42 (1984) (noting that rulings in limine are "subject to change when the case unfolds, particularly when the actual testimony differs from what was contained in the . . . proffer").

[11] One of these motions asks the Court to admit co-conspirator statements in furtherance of the conspiracy subject to connection at trial.  The Court has already effectively granted this motion and so will not discuss it here. See Order Denying Mot. for Prelim. Determination of Conspiracy.

motion in limine presents an evidentiary issue that is appropriate for ruling in advance of trial." (internal quotation marks omitted)).

### A. The summary charts and exhibits may be admitted subject to reasonable notice.

The government intends to introduce summary charts in lieu of "thousands of pages of detailed prescription data and records." Omnibus Mot. at 14. Okafor objects, but principally on the ground that he has not yet seen the charts or underlying data. Def.'s Opp'n to Omnibus Mot. [ECF No. 57] at 5–6.

Federal Rule of Evidence 1006 permits the admission of a "summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. "The voluminous underlying records must themselves be admissible and 'must be made reasonably available for inspection and copying.'" Abou-Khatwa, 40 F.4th at 684–85 (quoting United States v. Fahnbulleh, 752 F.3d 470, 479 (D.C. Cir. 2014)). As long as the summaries "are accurate and nonprejudicial . . . the summaries can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of a multitude of witnesses or documents throughout the trial." Id. at 685 (cleaned up). Summary witnesses paired with such summaries, meanwhile, are subject to "strict limits" preventing them from "usurp[ing] the jury's fact-finding function by summarizing or describing not only what is in evidence but also what inferences should be drawn from that evidence." Id. (quoting United States v. Cooper, 949 F.3d 744, 750 (D.C. Cir. 2020)).

Given the nature and volume of the evidence in this case, the Court expects that summary charts and witnesses will be appropriate and helpful, provided that they meet the requirements of Rule 1006. The government, however, must make both the underlying documents and the charts themselves available to Okafor "at a reasonable time and place," Fed. R. Evid. 1006, with enough

30

time for Okafor to examine them prior to trial and raise any concerns he may have. The government represents that it will provide the charts to Okafor prior to trial, see Omnibus Mot. at 14, but it must make the underlying records available, as well, Abou-Khatwa, 40 F.4th at 684–85. Trusting that the government will comply with the rule's requirements, the Court will grant the motion.

### B. The remaining motions are premature and thus denied without prejudice.

The government's remaining motions are premature and thus denied without prejudice.

For instance, the government asks the Court to preclude Okafor from introducing evidence of lawful prescriptions, claiming that it would constitute improper character evidence. Omnibus Mot. at 2. The government quickly and wisely concedes, however, that Okafor may present such evidence "for a purpose other than character or propensity," id. at 4 n.2; see also U.S.'s Reply to Def's Opp'n to Omnibus Mot. [ECF No. 61] at 1, and the Court sees no reason to conclude that Okafor will not offer such evidence for a proper purpose—for instance, to demonstrate innocent intent, as Okafor suggests, see Def.'s Opp'n to Omnibus Mot. at 2. Accordingly, the motion is denied—without prejudice, of course, to the government's ability to object at trial if it believes Okafor is straying into improper territory.

Next, the government asks the Court to preclude Okafor "from introducing any evidence, making any statement, or asking any questions that include[] or could reasonably be expected to elicit the defendant's own hearsay statements." Omnibus Mot. at 5. As Okafor points out, the government gives nothing by way of particulars or reason to believe that there is specific improper evidence Okafor is likely to elicit. Def.'s Opp'n to Omnibus Mot. at 2. Accordingly, the motion is denied. The parties are expected to know and abide by the rules of hearsay, and are free to object to any improper hearsay that may come up at trial.

The same goes for the government's motions to order Okafor not to use "interview reports or rough notes" to impeach witnesses, Omnibus Mot. at 6, and not to present the jury with arguments about selective prosecution, id. at 7–9, trial strategy, id. at 9, plea and discovery negotiations, id. at 9, or jury nullification, id. at 10–11—none of which it gives any reason to believe will arise.  Similarly, the government indicates its intent to introduce business records at trial, id. at 11—a move the Court expects will be uncontroversial, but cannot rule on without more detail.  See Charles v. Home Depot U.S.A., Inc., Civ. A. No. 1:16-2054 (GMH), 2021 WL 4439057, at *6 (D.D.C. Sept. 28, 2021) ("[I]ssues raised in motions in limine that may benefit from further development may be deferred until a later time.").

Accordingly, the remaining motions are denied without prejudice to renewal.

## Conclusion

For the foregoing reasons, the Court will deny Okafor's motions [ECF No. 41] to dismiss, [ECF No. 40] to suppress, and [ECF No. 46] to preclude evidence about J.V.; grant in part and deny in part the government's motion [ECF No. 37] to admit evidence; grant the government's [ECF No. 63] supplemental motion to admit evidence; grant in part and deny in part the government's motion [ECF No. 39] to impeach; and grant in part and deny without prejudice in part the government's [ECF No. 38] omnibus motion in limine.

An accompanying order will issue on this date.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: September 23, 2024