UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>NDUBUISI JOSEPH OKAFOR,<br><br>Defendant. | Criminal Action No. 23-116 (JDB) |

### MEMORANDUM OPINION

In this drug-distribution prosecution of a doctor, the doctor wants the jury to hear expert testimony from another doctor defending his prescriptions of controlled substances. The government seeks to exclude the testimony. Because portions of the proposed testimony are proper while others are not, the Court will permit the expert to testify but limit the scope of his testimony.

### Background

The defendant in this case is Ndubuisi Okafor, who before his arrest was a doctor practicing in the District of Columbia. See Mem. Op. [ECF No. 71] at 2. The government alleges that Okafor headed a national drug distribution ring from 2021 to 2023. Id. To do so, Okafor leveraged his status as a physician, prescribing oxycodone and promethazine with codeine—both controlled substances under the Controlled Substances Act, 21 U.S.C. §§ 801 et seq.; see 21 C.F.R. §§ 1308.12(b)(1)(xiv), 1308.15(c)(1)—to co-conspirators and individual patients in pursuit of profit rather than treatment. Mem. Op. at 2. According to the government, Okafor routinely issued prescriptions without examining patients to assess individualized need; dispensed prescriptions to co-conspirators around the country (despite being licensed only in D.C.) for illicit redistribution; fell short of documentation requirements; and generally deviated from best practices and the law alike. Id. at 2–3. That alleged behavior led to the twenty-nine counts Okafor faces here: conspiracy to unlawfully distribute controlled substances, 21 U.S.C. § 846; maintaining drug-involved

1

premises and aiding and abetting the same, 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2; and twenty-seven counts of unlawful distribution of controlled substances and aiding and abetting the same, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. See Superseding Indictment [ECF No. 34] ("Indictment") at 5–10.

Doctors, of course, are "authorized" under § 841 to issue controlled substances in certain circumstances. See Ruan v. United States, 597 U.S. 450, 454 (2022). But that authorization extends only so far: A controlled substance prescription is unlawful if the prescriber knowingly or intentionally issued it without "a legitimate medical purpose" or outside "the usual course of his professional practice." 21 C.F.R. § 1306.04(a); see Ruan, 597 U.S. at 454. So the government's task is to prove that Okafor's prescription practices fit that description—that he acted "[i]n practical effect" "as a large-scale 'pusher' not as a physician." United States v. Moore, 423 U.S. 122, 143 (1975).

As part of its case, the government plans to turn to two unchallenged experts. The first, Dr. Donald Sullivan, is a professor of clinical pharmacy. See U.S.'s Notice of Intent to Offer Expert Trial Test. [ECF No. 67-1] ("U.S. Expert Disclosure") at 1. In addition to opining about the general role of a pharmacist in identifying suspicious prescriptions, Dr. Sullivan anticipates testifying about Okafor's worrisome prescribing practices. Id. at 2–3. Dr. Sullivan will take a bird's-eye view of Okafor's prescriptions during the relevant period: based on his review of approximately 17,000 prescriptions Okafor wrote over three years, Dr. Sullivan will speak to "red flags" in Okafor's practices, including the frequency and quantity of prescriptions. Id. at 3; see also U.S.'s Mot. to Admit Evid. Intrinsic to Charged Conduct & Pursuant to Fed. R. Evid. 404(b) [ECF No. 37] ("Mot. to Admit Evid.") at 22. The government hopes these observations will demonstrate that Okafor "wrote hundreds of prescriptions for oxycodone and promethazine with

codeine that were not for a legitimate medical purpose and that Dr. Okafor's medical practice was a pill mill for the illegal prescribing of these medications." U.S. Expert Disclosure at 4.

The government's second expert, Dr. Timothy King, will take a closer view of Okafor's conduct. See id. at 4. Whereas Dr. Sullivan drew conclusions from patterns he identified in thousands of prescriptions, Dr. King—a doctor and expert in pain management—assessed twenty-six specific incidents of controlled substance distribution charged in the Indictment. See id. at 4–5; Indictment at 9–10. To do so, he reviewed "medical records (if they existed)," prescription drug monitoring program (PDMP) "and Surescripts data, autopsy and medical examiner records (as applicable), electronic health records, co-conspirator evidence, information, and conversations, information from the D.C. Board of Medicine, and audio and video recordings of patient visits with Dr. Okafor." U.S. Expert Disclosure at 5. He will also testify that the failure to document patient interactions—a shortcoming of which Okafor is accused here—often indicates that a physician did not examine a patient before prescribing a controlled substance, as the "usual course of professional practice" demands. Id.[1]

Naturally, Okafor wishes to counter these experts with one of his own. For the task, he has selected Dr. Joe Ybarra. See Medical Expert Witness Report – R. Joe Ybarra, MD [ECF No. 99-1] ("Ybarra Report"). Dr. Ybarra—the subject of the pending motion to exclude—is a physician with thirty-nine years of experience working in emergency rooms and family medicine. Id. at 1; see also Tr. of Mot. Hr'g, Dec. 18, 2024 [ECF No. 93] ("Hr'g Tr.") at 6–8. Dr. Ybarra largely proposes to contradict Dr. King: based on his review, Dr. Ybarra believes that Okafor's prescriptions in the individually charged counts were generally issued "in the usual course of

---

[1] The government also hopes to introduce several pharmacists as lay witnesses to explain that they refused to fill prescriptions issued by Okafor "based on their concerns about whether the prescriptions were issued" unlawfully. Id. at 6–8; see United States v. Robinson, 68 F.4th 1340, 1347 (D.C. Cir. 2023) (discussing the significance of this sort of testimony).

3

[Okafor's] medical practice and for legitimate medical purpose," see Ybarra Report at 2; and, based on his experience, Dr. Ybarra believes that failures in documentation are less worrisome than Dr. King would have it, see id.  To form these opinions, Dr. Ybarra reviewed Okafor's prescriptions and video recordings of encounters with four patients.  See Hr'g Tr. at 39, 50–51.

The government moved to exclude Dr. Ybarra.  See Gov't's Mot. to Exclude Expert Test. [ECF No. 74] ("Mot.").  After a hearing that included lengthy testimony from Dr. Ybarra and additional briefing from both sides, the motion is ripe for the Court's consideration.  See Def.'s Opp'n to Mot. [ECF No. 81] ("Opp'n"); Gov't's Suppl. Mot. to Exclude Expert Test. [ECF No. 82] ("Suppl. Mot."); Hr'g Tr.; Def.'s Suppl. Opp'n to Mot. [ECF No. 98] ("Suppl. Opp'n"); Gov't's Post-Hr'g Mot. to Exclude Expert Test. [ECF No. 99] ("Post-Hr'g Mot.").

**Analysis**

A court's role in adjudicating a motion to exclude an expert is the modest one of "gatekeep[er]."  Daubert v. Merrell Pharms., Inc., 509 U.S. 579, 597 (1993).  Criticism of "the accuracy of the conclusions" an expert reaches or "the limits of the research he undertook" generally provides fodder for cross-examination, not a motion to exclude.  United States v. Morgan, 45 F.4th 192, 201–02 (D.C. Cir. 2022) (quoting Ambrosini v. Labarraque, 101 F.3d 129, 140 (D.C. Cir. 1996)).  Still, the court may not leave the gate it keeps "without a sentry," United States v. Libby, 461 F. Supp. 2d 3, 18 (D.D.C. 2006), and thus must ensure that an expert's opinions result from a sound methodology, Morgan, 45 F.4th at 202.  Ultimately, a court aims to shield the jury from being misled into taking as scientific truth what is in fact "subjective belief or unsupported speculation."  Ambrosini, 101 F.3d at 133.

4

A district court has "broad discretion in determining whether to admit or exclude expert testimony." U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc., 608 F.3d 871, 895 (D.C. Cir. 2010). That discretion is guided by Federal Rule of Evidence 702, which provides in full:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Put simply, Rule 702 instructs the Court to assess Dr. Ybarra's qualifications, id., the relevance of his testimony, id. 702(a), the factual basis of that testimony, id. 702(b), and the reliability of his methodology and its application, id. 702(c)–(d). As the proponent of the expert, Okafor must persuade the Court of an affirmative answer to each Rule 702 question by a preponderance of the evidence. See Meister v. Med. Eng'g Corp., 267 F.3d 1123, 1127 n.9 (D.C. Cir. 2001); see also United States v. McGill, 815 F.3d 846, 903 (D.C. Cir. 2016).

In its initial motions, the government believed Dr. Ybarra faltered at the first step, calling him flatly unqualified to opine on opioid prescription and pain management. See Mot. at 1–2; Suppl. Mot. at 1–2. After the hearing elucidated the extent of Dr. Ybarra's experience, the government softened its position on Dr. Ybarra's expert bona fides, calling them "questionable" but acknowledging that they likely qualify him as an expert. See Post-Hr'g Mot. at 5 n.7.

The Court agrees. In addition to his medical training, Dr. Ybarra estimated that his thirty-nine years of medical practice have seen him treat "50,000 patients with pain issues," many with opioids. See Hr'g Tr. at 5–8, 12, 29, 60. He also testified that he sits on a peer-review quality assurance board tasked with analyzing opioid use in his emergency room, and occupies a similar

5

role as a consultant for insurance companies. Id. at 36–37, 68–69. This sort of "skill- or experience-based" expertise, Kumho Tire Co. v. Carmichael, 526 U.S. 137, 151 (1999), qualifies him to share with the jury the same sorts of opinions he regularly shares with his patients and peers.[2]

Of course, the fact that Dr. Ybarra is qualified to opine about managing pain with opioids does not mean he may riff on the subject. The Court's gatekeeping role requires it to ensure that his opinions are "grounded in the methods and procedures of science" rather than in "subjective belief or unsupported speculation." Bell v. Gonzales, Civ. A. No. 03-163 (JDB), 2005 WL 3555490, at *16 (D.D.C. Dec. 23, 2005) (quoting Ambrosini, 101 F.3d at 133). This is the "reliability" inquiry derived from subsections (b) through (d) of Rule 702. The government argues Dr. Ybarra fails them all. See Post-Hr'g Mot. at 1.

The scope of Dr. Ybarra's proposed testimony, recall, is similar to Dr. King's. Like Dr. King, Dr. Ybarra focuses on the propriety of specific instances of allegedly unlawful distribution. See Ybarra Report at 3–5. But Dr. Ybarra appears to have relied on significantly less information—fewer "facts or data," to borrow the language of Rule 702(b)—than Dr. King. For example, Dr. King reviewed PDMP and Surescripts data, which allowed him to identify treatment patterns and prescription frequency. See U.S. Expert Disclosure at 5. Dr. Ybarra did not. See Hr'g Tr. at 38–39, 52.

Instead, Dr. Ybarra relied on only two sources of information. First, for all twenty-one patients whose prescriptions he reviewed, Dr. Ybarra gathered the written prescriptions

---

[2] The second admissibility question, relevance, is undisputed. Dr. Ybarra seeks to opine that Okafor issued prescriptions within the usual course of his medical practice—a question that goes directly to the ultimate charge given to the jury, that is, whether Okafor knowingly or intentionally dispensed controlled substances in an unauthorized manner. See Ruan, 597 U.S. at 454. His testimony, if permitted, would thus doubtless "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

6

themselves. See id. at 39. Second Dr. Ybarra watched video-recorded visits of a few of the twenty-one patients. Id. at 49–51.[3] From that information, Dr. Ybarra concluded that, for each of the twenty-one patients, Okafor engaged in the sort of "deductive reasoning" characteristic of medical practice—that is, he listened to a patient describe her ailments, performed "a history and physical exam," and then "connect[ed] the two to come up with a diagnosis." Id. at 19–20; see also id. at 19 ("[Okafor] evaluated a patient and came up with a clinical diagnosis using his clinical judgment and prescribed what he thought was correct for the patient to help alleviate pain."). To Dr. Ybarra, that indicates Okafor engaged in the "nuanced" process of clinical judgment that defines responsible medicine. Id. at 21.[4]

Consider first the recorded visits. As to those, the Court has little difficulty concluding that Dr. Ybarra was armed with sufficient "facts or data" to make an assessment, and that he marshalled those facts using a sufficiently reliable methodology. Much of the government's case relies on its assertion that Okafor prescribed opioids "without meaningful examination or assessment," Mot. to Admit Evid. at 2, and therefore "demonstrated a gross lack of individualized care" by prescribing opioids "regardless of the patient's" actual needs, Indictment ¶ 20; see United States v. Robinson, 68 F.4th 1340, 1347 (D.C. Cir. 2023) (evidence that doctor "scarcely examined" patients supported

---

[3] The videos resulted from visits by cooperators and undercover law enforcement posing as patients. The number of videos Dr. Ybarra viewed is not entirely clear. Dr. Ybarra's report only makes obvious reference to video recordings of two individuals, UC3 and UC1. See Ybarra Report at 3, 5. At the hearing, Dr. Ybarra couldn't remember exactly how many videos he had watched or for which patients, see Hr'g Tr. at 50, 57, but the government explained that it has sixteen videos of visits by four patients, id. at 50–51. For purposes of this opinion, the Court assumes Dr. Ybarra reviewed all sixteen videos, but its ruling applies only to the visits the recordings of which Dr. Ybarra in fact viewed.

[4] Dr. Ybarra's report says that he was "heavily influenced" by a third source of information: his "direct interview with Dr. Okafor." Ybarra Report at 6. After the government objected that Dr. Ybarra thus sought to function "as a conduit for hearsay testimony" from Okafor, see Mot. at 6; Suppl. Mot. at 3, Dr. Ybarra minimized the importance of that conversation, testifying at the hearing that it influenced him only "somewhat . . . , but not mostly" and that he "would have had the same opinion" without the conversation, see Hr'g Tr. at 72. The Court agrees with the government that Dr. Ybarra may not relay to the jury Okafor's out-of-court statements and must rely on his own independent, objective review to form his expert opinion.

7

conclusion that he "simply did not establish a proper relationship with his patients before prescribing them oxycodone"); Moore, 423 U.S. at 142–43 (similar). Dr. Ybarra intends to opine that the videos show otherwise: Okafor "ask[ed] patients their symptoms, [did] a physical exam, and then [came] up with a diagnosis then a management plan," Hr'g Tr. at 57, all in keeping with a doctor's duty to use his "training and experience" to assess and meet a patient's needs, id. at 22.[5] Having watched Okafor interact with his patients on video, Dr. Ybarra is well-equipped to leverage his decades of experience with legitimate prescribing methods to assess the legitimacy of the resulting prescriptions.

To be sure, as the government posits, Dr. Ybarra could have done more, even with respect to the videoed patients. Reviewing PDMP or Surescripts data, for instance, could have helped him situate an individual patient's visit to Okafor in the context of her medical history and better understand whether Okafor met her needs. See Post-Hr'g Mot. at 7–8 (highlighting Dr. Ybarra's failure to review this data). But the question in this case is not whether Okafor's prescriptions were correct but whether they were legitimate—whether Okafor issued them in "the usual course" of a medical practice. 21 C.F.R. § 1306.04(a). For the reasons given above, Dr. Ybarra's review of the prescriptions and the videos combined with his experience qualifies him to speak to that question. So the government's perceived shortcomings simply attack "the limits of the research" Dr. Ybarra undertook—a tack that may persuade the jury to credit the government's witnesses over Dr. Ybarra, but not one that persuades the Court to exclude him altogether. See Morgan, 45 F.4th at 201.

---

[5] See also id. at 18 (Okafor "asked questions that were pertinent," such as the duration and severity of pain and previous medication, and "from that information, he did an exam and then made a clinical decision to prescribe medication"); id. at 49 (the videos show that Okafor "did a history, a physical, [] came up with a diagnosis," and implemented "a treatment plan").

The remaining seventeen patients are a different story. As explained above, Dr. Ybarra's conclusions as to these patients rely on only one thing: the prescriptions. Some of these prescriptions—eight of them, on the government's generous count, see Post-Hearing Mot. at 3–5—contain International Classification of Diseases (ICD) codes, which amount essentially to a diagnosis, see Hr'g Tr. at 18. The other nine do not include even that scant information.[6] Either way, as Dr. Ybarra conceded, a prescription alone—even with an ICD code—cannot tell him "how many times a patient saw a doctor," "when a patient saw a doctor," the patient's "symptoms," the duration of the patient's pain, "any other treatment methods that might have been employed to address their condition," "other medications the person's taking," "whether a patient has previously had issues with narcotics," or even whether Okafor showed interest in any of these questions. Id. at 55–56. Without more, a prescription conveys only "the outcome" of a medical encounter, while saying nothing about the encounter's content or the patient's medical context. See id. at 56. The prescriptions leave Dr. Ybarra in the dark about whether Okafor undertook the "nuanced" assessment he insists is a doctor's obligation. See id. at 21.

It is unsurprising, then, that in his decades of experience Dr. Ybarra has never before been asked, in any context, to opine on a prescription using only the prescription itself—even with an ICD code. Id. at 38. This trial will not be the first time, for this Court's obligation is to ensure that an expert "employs in the courtroom the same level of intellectual rigor" he employs in the field. Kumho Tire Co., 526 U.S. at 152.

Dr. Ybarra himself offers little defense of his methodology regarding these prescriptions. Rather than suggesting that he can glean more from the prescriptions than the Court realizes, Dr.

---

[6] Dr. Ybarra's report noted that, while Okafor's "documenting lacked detail," Okafor included an ICD code "for MOST controlled substance prescriptions." Ybarra Report at 2. At the hearing, however, Dr. Ybarra conceded that "not most, but many" of the prescriptions he reviewed had an ICD code. Hr'g Tr. at 26.

Ybarra simply extrapolates from the videos he watched: "based on the videotapes," Dr. Ybarra gathered that Okafor's "pattern" was to examine before prescribing—and so Dr. Ybarra assumed the same happened in the unrecorded visits. Hr'g Tr. at 57; see also id. at 59 (Okafor "followed a methodology or pattern of making a diagnosis and having a treatment plan"). Maybe so, but without medical records or anything else to back it up, that is nothing more than "unsupported speculation." See Ambrosini, 101 F.3d at 140. It may be an inference the jury is free to draw. But it is not one Dr. Ybarra has drawn from anything resembling the requisite "scientific method." Meister, 267 F.3d at 1127; see United States v. Tran Trong Cuong, 18 F.3d 1132, 1141–42 (4th Cir. 1994) (expert physician could not opine on legitimacy of unreviewed prescriptions on the assumption that they "followed a pattern").[7]

Hence, the Court concludes that Dr. Ybarra's opinion on the prescriptions for which he did not review recorded visits are a product of insufficient "facts or data" and unreliable "principles and methods." See Fed. R. Evid. 702(b), (c). Dr. Ybarra thus may not share these opinions with the jury.

The government's final objection can be dealt with in short order. In passing and without elaboration, the government calls it "improper" for Dr. Ybarra to testify to his view that a failure in documentation need not indicate a failure in care, saying that such testimony has no basis and asks the jury "to excuse the defendant's criminal behavior." See Post-Hr'g Mot. at 1. The Court sees nothing wrong with this testimony. Given his experience as a physician and a peer-reviewer of prescriptions, Dr. Ybarra is well positioned to opine on what sloppy documentation might imply

---

[7] The same is true to the extent Dr. Ybarra attempts to testify about Okafor's prescribing practices beyond the patients whose prescriptions he reviewed. See Post-Hr'g Mot. at 11–12 (asking the Court to preclude testimony "about the defendant's general practices"). If the jury credits Dr. Ybarra's testimony about the four recorded patients, then—just as it may extrapolate from that to the remaining seventeen—it may extrapolate even further and conclude that Okafor's general practices were just as careful. But because any such extrapolation would derive from common sense, not the scientific method, it is a job for the jury; Dr. Ybarra may not imprint it with his stamp of expertise.

about a doctor's practices. That his answer—"not much"—differs from Dr. King's, <u>see</u> U.S. Expert Disclosure at 5, might make his testimony idiosyncratic, but it does not make it inadmissible.

## Conclusion

For these reasons, the Court will deny the government's motion to exclude Dr. Ybarra but will strictly limit Dr. Ybarra to testifying about prescriptions resulting from recorded visits that Dr. Ybarra reviewed. A separate order will issue.

/s/
JOHN D. BATES
United States District Judge

Dated: February 4, 2025