**UNITED STATES DISTRIC.T. COURT**
**FOR THE DISTRIC.T. OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 23-CR-116 (JDB)** |
| | : | |
| **v.** | : | |
| | : | |
| **NDUBUISI JOSEPH OKAFOR,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

As proven at trial, defendant Ndubuisi Joseph Okafor led a nationwide drug distribution business using his medical practice, Okafor Medical Associates, in Northwest, Washington, D.C., between approximately May of 2021 through his arrest in April of 2023. He issued countless prescriptions for oxycodone and promethazine with codeine in exchange for cash payment. The defendant distributed these dangerous, addictive opioids without a legitimate medical purpose to 1) his co-conspirators, who he knew to be diverting the medication, 2) civilian patients, who he knew to be abusing the medication, and 3) law enforcement sources posing as patients, who had no legitimate need for the medication. In total, the defendant issued at least 11,178 oxycodone and promethazine with codeine prescriptions to 3,180 unique patient identities[1] in 45 states, a figure representing 2,092,501 opioid dosage units.[2] And when the defendant learned that one of his patients, J.V., had died from an oxycodone overdose, he falsified records to try to justify his illegal prescribing and obstruct the D.C. Board of Medicine's investigation into his conduct. Even after learning of J.V.'s death, the defendant continued to prescribe to others in the same dangerous manner.

---

[1]    The defendant issued prescriptions to individuals under numerous false identities and pseudonyms. The term "unique patient identity" as used in this Memorandum refers to a unique name and date of birth combination to whom the defendant issued at least one prescription.

[2]    *See* Trial (Tr.) Ex. 10204.

The defendant's conduct was intentional and depraved. As a doctor, he knew well the dangers of these drugs. He knew they were highly regulated. But instead of heeding the warnings associated with them or adhering to regulations intended to protect patients, he abused the position of trust he held in the community and exploited the drugs' addictive qualities to generate wealth. This exploitation is neither novel nor nominal. The record before this Court reveals the breadth of the defendant's criminality. For the reasons outlined below, the government recommends that this Court impose a sentence of 20 years of incarceration and 3 years of supervised release on Counts 1, 2, 4, and 8-28 (to run concurrently) and a $215,737.97 money judgment. Such a sentence reflects the seriousness of the offense, provides just punishment, and affords adequate deterrence to similar conduct, consistent with the factors outlined in 18 U.S.C. § 3553.

## I.     THE EVIDENCE AT TRIAL[3]

Following an approximately three-week trial, a jury found the defendant guilty of Conspiracy to Distribute Controlled Substances (21 U.S.C. § 846), Maintaining a Drug Involved Premises (21 U.S.C. § 856) and 22 counts of Distribution of a Controlled Substance (Outside the Legitimate Practice of Medicine). Each conviction related to the defendant prescribing opioids to individuals without a legitimate medical purpose and outside the professional practice of medicine.

### A.     Maintaining Okafor Medical Associates as a Drug-Involved Premises

The defendant was convicted of maintaining a drug-involved premises, as charged in count 2 of the indictment. Testimony from witness L.D. established that the defendant's medical practice was little more than an open-air drug market. Drug seekers could show up without an appointment and write out their order for controlled substances on blank sheets of paper kept at the receptionist's

---

[3]     Section I of this Memorandum substantially replicates Section I of the Government's Response to Defense Objections and Arguments in Support of the Offense Level Calculation, ECF No. 155. The material is repeated herein for ease of reference and inclusion on the public docket.

desk. Typically, the orders included the patient name the prescription was to be issued to, the type and quantity of the desired drug, and the pharmacy where the purported patient[4] intended to fill the medication. Drug seekers were not limited to receiving prescriptions in their own names. Instead, they often received prescriptions under false identities.

L.D. shared her own experience receiving prescriptions from the defendant in this way. She paid the defendant's receptionist, co-conspirator Yuri Almendarez, to create fake patient profiles, so that the defendant could issue electronic prescriptions to her under multiple aliases. She gave the defendant patient information, including, at times, the fake patient's purported diagnosis, and medication and pharmacy information. She paid the defendant between $200 - $300 per prescription, and he issued them. She explained how she visited the defendant's office multiple times per week and would encounter the same people, who were there for the same reason. She revealed that she and these other "regulars" often referred to visiting the defendant's office as "going to work." She explained how she and others went on road trips together, traveling pharmacy to pharmacy to fill the defendant's prescriptions. And she explained that the substances the defendant prescribed could be resold on the street for $20 to $60 per pill of oxycodone and over $100 per ounce of promethazine with codeine. L.D. explained that, with the defendant, there was no pretense of doctor-patient care. The defendant did not examine her, nor did he question why she sought prescriptions issued to multiple names. Rather, the defendant knew she was there to get as many prescriptions as possible and he prescribed as many as she could pay.

Statistical evidence and testimony from Drug Enforcement Administration (DEA) Document and Media Exploitation (DOMEX) supervisor Paul Short further supported the drug-

---

[4]     The term "purported patient" is used throughout this Memorandum to acknowledge that the defendant often issued prescriptions to aliases used by his co-conspirators and drug-seeking patients.

involved premises count. As time passed, the defendant issued more opioid prescriptions. Mr. Short's testimony established that, prior to the charged time frame, the defendant rarely prescribed oxycodone or promethazine with codeine. Beginning around the start of the charged conduct, however, he issued an increasingly large number of prescriptions for these medications. Indeed, between approximately January of 2018 to April of 2021, the defendant issued approximately one promethazine with codeine prescription every four months. But, between May 2021 and April 2023, he averaged approximately 291 promethazine with codeine prescriptions per month – a substantial increase. The same held true for oxycodone. Between approximately January 2018 through 2020, the defendant issued approximately 8 oxycodone prescriptions per month, on average. Beginning in 2020, this number increased by 300% to 23 per month. By 2022, he averaged 207 per month. And, leading up to his arrest in April of 2023, he averaged 398 oxycodone prescriptions per month – roughly 50 times what he prescribed prior to the charged conduct. *See* Tr. Ex. 10205. Unsurprisingly, these medications accounted for over 48% of the defendant's overall prescriptions (including controlled and noncontrolled) and over 93% of the defendant's controlled substance prescriptions. *See* Tr. Ex. 10203 and 10202. This and other evidence, outlined throughout this Response, established that the defendant operated Okafor Medical Associates for the purpose of illegally distributing controlled substances.

### B.    The Conspiracy

The defendant conspired with known and unknown individuals to distribute controlled substances, including oxycodone and promethazine with codeine, without a medical basis and was convicted of conspiracy as charged in count 1 of the indictment. The defendant prescribed controlled substances to people who he knew were diverting the substances. He benefited from this arrangement by receiving cash from his co-conspirators, who would, in exchange, receive

prescriptions that they could fill and sell.

The evidence presented at trial established that the defendant used his industry-specific knowledge and license to prescribe to enable his co-conspirators to receive extreme quantities of drugs. Opioids are highly regulated within the medical field and by law enforcement. Indeed, upon receiving prescriptions for controlled substances, pharmacists are required to independently assess whether they should dispense the medication and can refuse to do so if he or she believes the prescription to be illegitimate or outside of the professional practice of medicine. Additionally, each state has a database cataloging all controlled substance prescriptions that are dispensed by pharmacies within that state. These databases are commonly referred to as Prescription Drug Monitoring Programs, or "PDMP." Testimony and evidence at trial established that pharmacists often check their state's PDMP data prior to dispensing controlled substances by searching for the patient by name and date of birth. That way, the pharmacist might know whether the patient is receiving too many controlled substances.

To circumvent this sort of monitoring, the defendant wrote prescriptions to his co-conspirators in names that were not their own and sent prescriptions for his co-conspirators to pharmacies nationwide. Evidence at trial established that the defendant wrote prescriptions to his co-conspirators in hundreds of variations of their identities and in false identities. The defendant often issued prescriptions to his co-conspirators using the co-conspirator's last name, but a different first name. The co-conspirator would then travel to the pharmacy and claim to be picking up medicine for a family member. For example, the defendant issued prescriptions to co-conspirator Yared Tesfaye using 144 unique name and date of birth combinations, all with the last name "Tesfaye." *See* Tr. Ex. 10213. The defendant also issued prescriptions to his co-conspirators in numerous false identities that did not include the co-conspirator's last name. For example, as

described further below, the defendant once issued prescriptions to co-conspirator Terry Turner in over 20 unique patient identities in a single day. *See* Tr. Ex. 1014. By issuing prescriptions in this manner, the defendant enabled his co-conspirators to avoid detection by pharmacists because, should a pharmacist search for an altered patient name in their state's PDMP, it would not reveal the aggregate quantity of narcotics received by each respective co-conspirator.

Testimony and evidence at trial further established that PDMPs are state specific, and there is no national database. And often, law enforcement and pharmacists within a given state do not have access to other states' PDMP data. The defendant took advantage of this shortcoming by issuing prescriptions to his co-conspirators nationwide, sometimes, to pharmacies in multiple states on the same day. *See* Tr. Ex. 10232. Indeed, evidence at trial established that he issued prescriptions to pharmacies in 45 states. *See* Tr. Ex. 10201. Because of the defendant's deceptive methods, if a pharmacist searched for any one patient identity in their state's PDMP, the results would not reveal the true quantity of drugs being dispensed to a single person and the pharmacist would therefore be more likely to dispense the medication in the first instance.

The defendant instructed his co-conspirators to avoid major pharmacy chains, thereby enabling each to cover their respective trails. Instead, co-conspirators would use "mom and pop" pharmacies, dodging scrutiny and detection. *See* Tr. Ex. 1015 at 8. Evidence at trial established that some of the bigger pharmacy chains have systems in place to detect illicit prescribing and can pull PDMP data from multiple states. And, by May of 2022, CVS and Walmart issued corporate blocks which precluded their pharmacists nationwide from dispensing controlled substance prescriptions issued by the defendant. *See* Tr. Ex. 6000 and 6100. Thus, by directing his co-conspirators and patients to independent pharmacies, it was more likely the co-conspirator would be able to have his prescription filled. Trial evidence further established that if a particular

pharmacy refused to fill a prescription for a co-conspirator, the co-conspirator could simply request a "reroute" from the defendant, and the defendant would send the prescription elsewhere. This, among other evidence, demonstrated that the defendant knew that his prescribing practice was outside the ordinary course of the medical profession.

Finally, the defendant helped his co-conspirators get more drugs by running interference between them, the police, and pharmacists who questioned them. Evidence and testimony at trial established how, time and time again, when pharmacists or police called the defendant to verify a suspicious prescription, the defendant assured the caller that the prescription was legitimate, even when he knew he issued it to a fake identity. Indeed, the defendant's co-conspirators preemptively reached out to him with instructions to "verify" prescriptions they were attempting to fill. Each of these actions enabled the defendant's co-conspirators to avoid detection and obtain the sought-after medication.

The government's trial presentation focused on nine known co-conspirators: Yuri Almendarez, Christopher Harclerode, Kouassi Kpetemey, Obiama Ndubuka, Yared Tesfaye, Terry Turner, Matisse Woldou, Dawit Wondwosen, and Yafet Yohannes. The relationship between the defendant and his co-conspirators was established in part through communications recovered from the defendant's cell phone (Tr. Ex. 1001 – 1018), physical items recovered and photographed during the search of the defendant's medical practice and residence (Tr. Ex. 4100 – 4499), and his electronic prescribing data, which reflected extreme quantities of prescriptions issued to his co-conspirators and their pseudonyms (Tr. Ex. 0001 (Surescripts[5] data); Tr. Ex. 10209 (Oxycodone

---

[5]      Surescripts is a service provider that facilitates the transmission of electronically issued prescriptions between doctors' and pharmacies' systems. The Surescripts data in evidence at trial reflects every electronic prescription (both controlled and noncontrolled) issued by the defendant's account, regardless of whether that prescription was ultimately dispensed by a pharmacist.

and Promethazine with Codeine Last name Totals)).

Furthermore, some of these co-conspirators were intercepted by law enforcement while traveling to fill the defendant's prescriptions. At trial, law enforcement and pharmacists from North Carolina, New York, Pennsylvania, Ohio, North Dakota, and Washington, D.C., testified about some of these encounters and the evidence they recovered during them. Often, the co-conspirator would be found in possession of handwritten notes and documents cataloging fake patient identities and pharmacy information, controlled substances, and large quantities of cash. A review of the defendant's prescribing data further revealed that he would send staggering numbers of prescriptions to pharmacies in his co-conspirators' destinations for them to pick up. As a result, police and pharmacists often contacted the defendant, assuming that he was an unsuspecting victim of prescription fraud. He was not, of course, and thus verified the validity of each prescription. Evidence of the co-conspirators' participation in the conspiracy is summarized briefly below.[6]

### 1.    Co-Conspirator Matisse Woldou's February 8, 2022, arrest in Apex, N.C. and January 11, 2013, arrest in Warsaw, N.Y.

Leading up to February 8, 2022, several pharmacies in and around Apex, N.C. received suspicious controlled substance prescriptions issued by the defendant. As a result, the Apex Police Department began to investigate. The investigation revealed that co-conspirator Matisse Woldou had traveled to Apex, N.C. and attempted to fill numerous prescriptions issued by the defendant

---

Prescription Drug Monitoring Program (PDMP) data, on the other hand, is input by pharmacists after a prescription is dispensed, and pharmacists are only required to input controlled substance dispensations and select regulated noncontrolled substances, like Gabapentin. Thus, a state's PDMP data captures any hard copy or electronic controlled substance prescription dispensed within that state.

[6]    This filing assumes the Court's familiarity with the trial record and does not include a complete account of all evidence presented at trial.

in names that were not his own. Law enforcement noted that the prescriptions included obviously false information. Ultimately, police intercepted Woldou at a Walgreens pharmacy in Apex, and he was arrested. Local pharmacists P.B. and R.O. and Apex Police Department Officer Evan Churchill testified at trial about the investigation, Woldou's arrest, and evidence recovered. *See* Tr. Ex. 3000 – 3004, 2099. While Officer Churchill questioned Woldou about the illicit prescriptions, Woldou called the defendant, who told police that the prescriptions were legitimate. The defendant's prescribing data revealed that he issued numerous prescriptions to pharmacies in North Carolina leading up to Woldou's arrival. *See* Sent. Ex. 1 (N.C. Prescriptions Written – 1/20/2022 – 2/8/2022).[7]

Woldou was also arrested on January 11, 2023, in Warsaw, N.Y., under similar circumstances. Local Pharmacist J.R. testified at trial that his pharmacy received a suspicious prescription issued by the defendant to a patient by the name of "Hunter Collins." Pharmacist J.R. was familiar with the patient address on the prescription and knew the true resident. Pharmacist J.R. was also concerned with the quantity and type of medication the defendant prescribed. J.R. called the defendant for more information and the defendant claimed – despite the fraudulent address – the prescription was legitimate. J.R owned several independent pharmacies in the region and found that they, too, received suspicious prescriptions from the defendant around the same time. *See* Tr. Ex. 3230 – 3239.

On January 11, an individual claiming to be Hunter Collins' grandson came to J.R.'s pharmacy in Warsaw, N.Y. J.R. had previously alerted police Captain Peter Hoffmeister, who responded to the pharmacy. Captain Hoffmeister testified at trial and explained how, when he

---

[7]    Sentencing Exhibits 1 – 6 were compiled using data in evidence, to include Tr. Ex. 0001 (Surescripts records).

attempted to make contact with the individual at J.R.'s pharmacy, the individual fled in a car with two other suspects. Police stopped the car a short distance away and the individuals inside the car were placed under arrest. Matisse Woldou was among them. From within the car, police recovered numerous documents listing patient names, dates of birth, and pharmacy information, as well as prescription bottles issued by the defendant. *See* Tr. Ex. 3201 – 3229. The defendant's prescribing data revealed that he issued over 150 controlled substance prescriptions to pharmacies in Western, N.Y. leading up to Woldou's arrest. *See* Tr. Ex. 10228. Most of these prescriptions were issued to patient names that appeared on the papers recovered from Woldou's car when he was arrested there.

### 2.  Co-Conspirator Dawit Wondwosen's October 2022 Instagram Posts

Federal Bureau of Investigation (FBI) Special Agent Charles Smith testified that, in October of 2022, law enforcement captured numerous images of Wondwosen advertising oxycodone and promethazine with codeine for sale from his Instagram account "Dr1zzyy2." *See*, *e.g*., Tr. Ex. 1300, 1306, 1307, 1309, 1311, 1313 (promethazine with codeine); 1302, 1305, 1310, 1312, and 1314 (oxycodone). Trial testimony and evidence also revealed that many of these advertisements featured photographs of cough syrup bottles displayed inside of examination rooms at Okafor Medical Associates. *See* Tr. Ex. 1300, 1303, 1307, and 1313. Moreover, Surescripts and PDMP data confirmed that the defendant issued oxycodone and promethazine with codeine prescriptions to Wondwosen during the same time frame these advertisements were posted. *See* Tr. Ex. 0001 (Surescripts Data); 10220 (Wondwosen summary). More generally, references to Wondwosen were found throughout papers recovered during the search of Okafor Medical Associates and prescribing data confirmed that the defendant issued at least 27 controlled substance prescriptions to Wondwosen to pharmacies in at least 5 states. *See* Tr. Ex. 10220.

### 3. Co-Conspirator Obiama Ndubuka's Messages with the Defendant and November 29, 2022, encounter with Pennsylvania State Troopers

Evidence at trial established that co-conspirator Obiama Ndubuka routinely visited the defendant's office and communicated with him via messenger applications like text message, WhatsApp, and Telegram. *See generally* Tr. Ex. 4345, 4346 (Office Sign-In Sheets); Tr. Ex. 1011, 1011a (electronic messages). In these exchanges, Ndubuka would request numerous prescriptions from the defendant in various patient identities, which the defendant would issue. The defendant was charged and convicted of promethazine with codeine distributions in indictment counts 11 and 12 based, in part, on one such exchange, where Ndubuka, using Telegram username "Bankroll Baby", requested prescriptions for an Alexa Ndubuka and Lindsey Ndubuka, which pharmacy and Surescripts records confirmed the defendant issued in response. *See* Tr. Ex. 1011a (Telegram Exchange); Tr. Ex. 2006 – 2007 (prescription records); and Tr. Ex. 0001 (Surescripts records). Additionally, documents recovered during the search of Okafor Medical Associates bore numerous notes related to Ndubuka and patient identities bearing his last name. *See*, *e.g.*, Tr. Ex. 4470, 4483, 4487, 4488, 4489.

On November 29, 2022, Ndubuka was stopped in a vehicle by Pennsylvania State Police Corporal Christopher Isbitski while traveling through Clinton County, P.A. Cpl. Isbitski testified at trial that he initially stopped Ndubuka for a traffic violation but ultimately searched Ndubuka's vehicle after observing controlled substances in the car and finding that Ndubuka had no driver's license. During the search, he recovered prescriptions, pharmacy receipts, and bottles of promethazine with codeine, prescribed by the defendant to co-conspirator Ndubuka and patient names Andrika Jones, Lindsey Ndubuka, and Nema Ndubuka. *See* Tr. Ex. 3301 – 3309. The defendant's prescribing data revealed that, in the days surrounding Ndubuka's encounter with police, the defendant issued over 108 controlled substance prescriptions to pharmacies in the area,

including at least 22 to purported patients with the last name "Ndubuka" and four to "Andrika Jones." *See* Tr. Ex. 3313, Sent. Ex. 3 (P.A. Prescriptions Written 11/15/2022 – 12/6/2022). During Cpl. Isbitski's investigation, he called the defendant and recorded the call. The defendant told police that Obiama Ndubuka, Nema Ndubuka, Lindsey Ndubuka, and Andrika Jones, were all his patients and confirmed that he issued the prescriptions. *See* Tr. Ex. 3300.

### 4.    Co-Conspirator Yafet Yohannes and the November 29, 2022, Arlington County Jail Cell Search

Yafet Yohannes began receiving controlled substance prescriptions from the defendant in approximately August of 2021. Yohannes communicated directly with the defendant and worked with other co-conspirators to obtain prescriptions. *See*, *e.g.*, Tr. Ex. 1001 (Yohannes and defendant message thread); Tr. Ex. 1003 (Kpetemey and defendant message thread). Over the course of the conspiracy, the defendant issued at least 319 prescriptions to 80 unique patient identities bearing the last name Yohannes, at 179 addresses in 15 states. *See* Tr. Ex. 10224. Yohannes also received numerous additional prescriptions under other false identities. In and around late November 2022, Yohannes was incarcerated at the Arlington County, V.A. jail. A search of his cell revealed papers featuring other co-conspirators' nicknames and contact information, including co-conspirator Dawit Wondwosen. *See* Tr. Ex. 3100.

### 5.    Co-Conspirator Christopher Harclerode's Messenger Exchanges with the Defendant and March 3, 2023, arrest in Noble County, O.H.

Co-conspirator Christopher Harclerode, also known as "Chase", regularly communicated with the defendant through messaging applications like WhatsApp to request prescriptions in various patient identities. *See* Tr. Ex. 1012. Harclerode also worked with co-conspirator Yuri Almendarez to contact the defendant, Tr. Ex. 1017, and regularly came to the defendant's medical practice, Tr. Ex. 4345 and 4346 (Sign-In Sheets). The defendant was substantively charged and

convicted of oxycodone distributions in indictment counts 14 – 20 based in part on a WhatsApp exchange with Harclerode. In the exchange, Harclerode, using account name "benjiichasinnn", wrote the defendant, "Good morning Boss…You never sent none of my Oxys to Ohio" (*sic*) and provided patient identities including Robert Black, Serenity Stone, Maria White, Kiernan Ellis, Jessica Gunther, and Carl Gordon. *See* Tr. Ex. 1012. The defendant responded that he had, in fact, issued the prescriptions. Pharmacy and Surescripts records confirmed this. *See* Tr. Ex. 2008 – 2014 (pharmacy records); 0001 (Surescripts data). The defendant's prescribing data showed that he issued 14 additional controlled substance prescriptions to pharmacies in Ohio in the same timeframe. *See* Sent. Ex. 4 (O.H. Prescriptions Written – 11/15/2022 – December 6, 2022). Over the course of the charged conduct, the defendant issued over 108 oxycodone and promethazine with codeine prescriptions to patients with the last name Harclerode across 11 states. *See* Tr. Ex. 10216. Harclerode received many additional prescriptions under other patient identities.

Harclerode, like many others, routinely traveled long distances to fill the defendant's prescriptions at out-of-state pharmacies. The government presented evidence that Harclerode was arrested during one of these trips on March 3, 2023, in Noble County, O.H. Area pharmacist W.K., State of Ohio Board of Pharmacy (SOBP) Agent Richard Cologie, and Noble County, O.H. police Captain Kelly McGilton, testified about this arrest and their investigations into the Harclerode and the defendant's prescribing. Agent Cologie testified that he began investigating the defendant after pharmacies throughout Ohio received numerous suspicious prescriptions for oxycodone and promethazine with codeine issued by the defendant. During his investigation, Agent Cologie and other SOBP agents collected documents and data, and traveled to pharmacies to conduct recorded phone calls with the defendant. During these calls, the pharmacist would question the defendant about a suspicious prescription they'd received. Each time, the defendant confirmed that

prescription's validity. *See, e.g.,* Tr. Ex. 3538. Notably, one of these calls corroborated that the defendant knew "Dumbuya" was one of Harclerode's false patient identities. In a recorded call with Hock's Pharmacy in Vandalia, O.H., the defendant provided Harclerode's telephone number in response to a request for patient Hunter Dumbuya's phone number. *See* Tr. Ex. 3539. Additionally, area pharmacist W.K. testified that he received suspicious Okafor prescriptions issued to a patient with the last name "Vaughn." When W.K. questioned the defendant about the validity of these prescriptions, the defendant confirmed them. *See* Tr. Ex. 3538. As evidence throughout trial established, Harclerode routinely filled prescriptions under false patient identities with the last name "Dumbuya" and "Vaughn." Surveillance footage and records from pharmacies across Ohio captured Harclerode traveling pharmacy to pharmacy to obtain medication. *See* Tr. Ex. 3507 – 3512.

Harclerode was arrested with two others on March 3, 2023, after he attempted to fill a prescription at Gillespie's Drugs in Noble County, O.H. When his vehicle was searched by police, they recovered numerous papers containing notes of patient identities and pharmacy information. Patient names were written under labels like "Oxy" and "Drink" (a colloquial term for promethazine with codeine). And police recovered tab sheets detailing the street resale price for promethazine with codeine liquid and the co-conspirators' expected profits. *See* Tr. Ex. 3513 – 3537. Police also recovered over $5,000.00 in cash from Harclerode's vehicle. Following Harclerode's arrest, he called co-conspirator Kouassi Kpetemey from jail on a recorded line. Kpetemey placed Harclerode on the phone with the defendant, and Harclerode asked the defendant to help pay his bail. *See* Sentencing Exhibit 8 (Noble County Jail call).[8] Further investigation

---

[8]    This call was not introduced at trial, per the Court's September 23, 2024, Memorandum Opinion, ECF No. 71. The Court can, nonetheless, consider it in its sentencing decision.

revealed that, leading up to Harclerode's March 3 arrest, the defendant issued over 189 controlled substance prescriptions to pharmacies across Western Pennsylvania and Ohio in patient identities used by Harclerode. *See* Sent. Ex. 5 (P.A. and O.H. Prescriptions Written – 1/31/2023 – 3/3/2023). The defendant was substantively charged and convicted of a number of these distributions in indictment counts 21 – 25 to patient identities James Dumbuya, Omar Dumbuya, Raymond Dumbar, and Robert Dunbar – all fake names used by Harclerode to receive controlled substance prescriptions from the defendant. Pharmacy records and Surescripts data also showed the defendant issued prescriptions to these patient identities. *See* Tr. Ex. 2015 – 2019 (pharmacy records); 0001 (Surescripts data).

As to co-conspirator Kpetemey, the defendant issued at least 173 oxycodone and/or promethazine with codeine prescriptions to patient identities bearing the last name Kpetemey to 111 pharmacies across 12 states. Messages recovered from the defendant's phone also show that Kpetemey routinely requested prescriptions from the defendant in fake patient identities, to include the last names Offor, Ilochi, Edwards, Gleason, Mensah, Elliot, Vo, Lewis, and others. *See* Tr. Ex. 1003, 1003a. In these messages, Kpetemey also referred to other co-conspirators, including Yohannes. *Id*.

### 6. Co-Conspirator Terry Turner's Instagram Exchanges with Co-Conspirator Yuri Almendarez and March 3, 2023, Arrest in Washington, D.C.

Co-conspirator Terry Turner began receiving controlled substance prescriptions from the defendant as early as August of 2022. Around that time, Turner also began to contact the defendant via messaging applications and placed orders for prescriptions, which the defendant issued. *See* Tr. Ex. 1014. Turner used numerous pseudonyms, to include Michael Skala, Michael Schertz, Zachary Arnold, and more. At times, Turner requested prescriptions under at least 20 patient

identities in a single message exchange with the defendant. *Id*. Turner often requested that prescriptions for his patient identities be sent to pharmacies in New York and Connecticut. The defendant's prescribing data shows that between August 30, 2022, and September 30, 2022, when he first began prescribing to Turner, the defendant issued over 36 controlled substance prescriptions to pharmacies in New York and Connecticut to patient identities used by Turner. *See* Sent. Ex. 2 (N.Y. and C.T. Prescriptions Written – 8/15/2022 – 9/30/2022).

On March 3, 2023, Terry Turner was arrested in Washington, D.C. after police found him in possession of controlled substances prescribed by the defendant, among other items. Metropolitan Police Department (MPD) Officer Aleksander De'Plour testified at trial about Turner's arrest. What began as a response to a car accident quickly turned into a criminal investigation when Officer De'Plour observed bottles of promethazine with codeine and orange pill bottles in Turner's car. A full search of the car and Turner's person revealed loose papers containing numerous patient names, additional controlled substances, fake credit cards and identification cards, and over $2000.00 in cash. *See* Tr. Ex. 3600 – 3614. Many of the fake identification and credit cards bore Turner's false patient identities.

Evidence at trial also established that the defendant's receptionist, Yuri Almendarez, facilitated the illicit distribution of controlled substances by inputting fake patient information into the office's computer system, as discussed above in the summary of L.D.'s testimony, and by taking orders and payment from co-conspirators, including Turner. For example, Turner provided Almendarez with patient identities, dates of birth, and pharmacy information via Instagram messenger. *See* Tr. Ex. 1201. Almendarez, in turn, relayed this information to the defendant, who issued the requested prescriptions. The defendant was substantively charged and convicted of a number of these distributions in counts 26 – 28 of the indictment. These oxycodone distributions

originated from a March 31, 2023, Instagram exchange between Almendarez and Turner, where Almendarez stated "send the info" and Turner provided patient names, including Michael Schertz, Trent Walker, and Kaymon Evans. *See* Tr. Ex. 1201. Almendarez then followed up, stating "Send this cash app so he can do some of this work before he leave….Cause he ready to go…." (*sic*). *Id*. Pharmacy and Surescripts records confirmed that the defendant issued prescriptions to the patient identities Turner requested that same day. *See* Tr. Ex. 2020 – 2022 (pharmacy records); 0001 (Surescripts data). Prescribing data also showed that, in the month leading up to this exchange between Almendarez and Turner, the defendant issued at least 103 controlled substance prescriptions to pharmacies in New York and Connecticut, many in patient identities known to be used by Turner. *See* Sent. Ex. 6 (N.Y. and C.T. Prescriptions Written – 3/1/2023 – 3/31/2023). Over the course of the conspiracy, the defendant issued at least 43 controlled substance prescriptions to patients with the last name "Turner" across ten states, and over 22 controlled substance prescriptions across six states to the identity "Michael Schertz," a known Turner pseudonym. *See* Tr. Ex. 10218, 10230.

### 7. Co-Conspirator Yared Tesfaye and the February 27, 2023, encounter with North Dakota Police.

Co-conspirator Yared Tesfaye began receiving prescriptions from the defendant in approximately December of 2021. Over the course of the conspiracy, the defendant issued 249 oxycodone and/or promethazine with codeine prescriptions to 144 patient identities bearing the last name Tesfaye to 177 pharmacies across 21 states. Records from the defendant's office revealed that Tesfaye came in almost daily, often with other co-conspirators, and papers recovered during the search of the premises contained numerous references to Tesfaye and patient identities associated with him. *See* Tr. Ex. 4300 – 4355.

On February 27, 2023, Tesfaye was stopped by police in Grand Forks, N.D. while

attempting to fill the defendant's controlled substance prescriptions. On and around that date, numerous pharmacies in Fargo and Grand Forks received suspicious prescriptions issued by the defendant to patient identities used by Tesfaye. Local pharmacist C.V., who testified at trial, contacted police regarding the prescriptions. Officer Joy Muniz, who also testified at trial, intercepted Tesfaye at a pharmacy in Grand Forks and interviewed him there. During the interview, Tesfaye attempted to put police in contact with the defendant, who Tesfaye insisted would verify the legitimacy of the prescriptions. Officer Muniz watched Tesfaye place a call, and heard him say "hey Juju, put him on the phone" to the female who answered. Unbeknownst to Officer Muniz, "Juju" was co-conspirator Yuri Almendarez's nickname. Ultimately, the defendant joined the call, spoke with pharmacist C.V., and confirmed that he issued the prescriptions Tesfaye sought to fill. Officer Muniz's investigation revealed that the defendant issued numerous prescriptions to Tesfaye at other pharmacies in Grand Forks and Fargo on the same day. *See* Tr. Ex. 3400 – 3404b. Prescribing data also shows that the defendant issued at least 15 controlled substance prescriptions to patients with the last name "Tesfaye" or a known pseudonym, to pharmacies in North Dakota between February 22, 2023, and February 27, 2023.

### C.   Distributions to Law Enforcement Sources

From February to November 2022, the FBI sent confidential human sources (CSs) and undercover agents (UCs) into Okafor Medical Associates, where they engaged in surreptitiously monitored patient visits with the defendant. On more than 20 occasions, the defendant wrote prescriptions for oxycodone to the UCs and CSs. The UCs and CSs each paid the defendant in cash in the examination room for their prescriptions. Dr. Timothy King, a medical expert, reviewed the visits and opined that each prescription was distributed outside the usual course of professional practice and not for a legitimate medical purpose. Dr. King noted that the defendant failed to

perform the most basic of medical care for any of UCs or CSs. Rather, recordings of the monitored visits showed a general pattern of a typical drug dealer and their customer. During these visits, the defendant negotiated drug type and quantity, and even prescribed oxycodone (a Schedule II opioid) upon request after initially prescribing tramadol (a Schedule IV opioid).

The government presented evidence of some of these encounters at trial. CS-2 (witness M.T.) testified that she went to the defendant's medical practice numerous times between July 12, 2022, and October 31, 2022. After each visit, she obtained oxycodone prescriptions from the defendant after little to no examination. During the July 21, 2022, visit, for which the defendant was convicted in Count 4, the defendant did no examination whatsoever. These visits with the defendant were recorded, admitted as evidence at trial, and analyzed and testified to by Dr. King. *See Tr.* Ex. 2100a – 2100e (July 12, 2022), 2101a – 2101c (July 21, 2022), and 2104a – 2111a (remainder).

UC-2 (witness J.B.) testified that he went to the defendant's medical practice on November 1, 2022, and again with UC-3 (B.J.) on November 14 and 30, 2022. UC-2 obtained oxycodone prescriptions from the defendant on each visit after little to no examination. UC-3 obtained oxycodone prescriptions from the defendant on November 14, 2022, and on November 30, 2022, even though UC-3 was not physically present on that day. The defendant was convicted after trial of the November 30, 2022, oxycodone distribution to UC-3, as charged in Count 8. These visits with the defendant were recorded, admitted as evidence at trial, and analyzed and testified to by Dr. King. *See* Tr. Ex. 2102a – 2102h (November 14, 2022), 2103c – 2103d (November 30, 2022), and 2109a (November 1, 2022); *see also* Sent. Ex. 11 (Dr. King Overall Report) (previously submitted as Exhibit E to the Government's September 13, 2024, Expert Notice).

Dr. King found that all the defendant's prescriptions to the CSs/UCs were outside the usual

course of professional practice and without a legitimate medical purpose, and not within the standard of care practiced in the District of Columbia, in violation of 21 C.F.R. § 1306.04. *Sent. Ex.* 11. Dr. King based his conclusions on multiple factors, including that:

- There was simply no meaningful or medically acceptable exam or care performed during any of the CS/UC recordings.

- The defendant issued opioid prescriptions even when a patient did not report pain, or for a report of vague back or knee pain, even though he didn't seek to justify such a prescription with other diagnostic tools.

- The defendant did not perform a complete physical exam on the CS/UCs, nor did he take an appropriate medical history documenting the provenance of the pain, prior use of pain medications, screenings for addiction-related issues, or any significant history related to the alleged pain.

*Id.*

Dr. King found that the defendant used opioids as the primary treatment option for every recorded visit, in contradiction to all established guidelines nationally by the CD.C. and in violation of the D.C. Board of Health's published guidelines for prescribing opioids for pain, which demand that opioids are not the primary options for treatment of acute or chronic pain. Based on his review of the recordings, Dr. King observed that the defendant was operating a classic "pill mill." *Sent. Ex.* 11 at 3. The CS/UCs were able to pick their own pills, with little questioning. Based on his training and experience in the observed recordings, Dr. King also noted that the behavior exhibited at the defendant's practice would not occur at a normal internal medicine practice, including boisterous behavior, smoking, and abnormally long waits in crowded waiting rooms.

### D.    Distributions to Patient J.V.

J.V. was the defendant's patient from approximately October 2019 to November 16, 2022. Between May of 2021 and November 2022, the defendant issued J.V. at least 30 prescriptions for

oxycodone. Ultimately, J.V. died of an oxycodone overdose on November 17, 2022.[9] The defendant was charged with oxycodone distributions to J.V. on June 30, 2022, November 1, 2022, and November 16, 2022. Dr. King testified about the prescriptions to J.V. and his medical records were entered as evidence at trial. *See* Tr. Ex. 7100; Sent. Ex. 10 (Dr. King_J.V. Report) (previously provided as Exhibit F to the Government's September 13, 2024, Expert Notice).

On June 30, 2022, as charged in count 9, the defendant prescribed J.V. oxycodone 15 mg. Although the prescription was a decrease from the previous prescription for oxycodone 20 mg, written on February 8, 2022, the defendant issued J.V. the oxycodone 15 mg prescription (resulting in an MME[10] of 90) while J.V. also received lorazepam (filled on 5/7 and 6/27/2022) and diazepam (filled on 5/17/2022) from other prescribers; notwithstanding the FDA's Black Box warning and

---

[9]    The defendant was not charged in connection with J.V.'s death, nor does the government seek any enhancements to the defendant's sentence on that basis.

[10]    As explained at trial, dosage in one or multiple concurrently prescribed opioids is measured through Morphine Milligram Equivalents ("MME"). MME measures a patient's daily dosage of opioids, based upon a conversion factor of the strength of the opioid (using morphine as a base of 1) and the quantity of the controlled substance prescribed per day. The U.S. Centers for Disease Control and Prevention ("CD.C.") have medically determined the relative strength of opioids and made the list publicly available. For example: a patient who is prescribed and ingests a single milligram of morphine once a day will have a 1 MME over the life of the prescription. However, a patient who ingests prescribed oxycodone (at a conversion factor of 1.5 MME) in the standard prescription of 5 milligram dose four times a day will have a 30 MME over the life of that prescription.

On November 4, 2022, the CD.C. released an update to its 2016 Guideline for Prescribing Opioids for Chronic Pain. The 2022 Guidelines Recommendations do not include an absolute dosage threshold, but note that for opioid-naïve patients, "clinicians should prescribe the lowest effective dosage" and if opioids are continued for subacute or chronic pain, "clinicians should use caution when prescribing opioids at any dosage, should carefully evaluate individual benefits and risks when considering increasing dosage and should avoid increasing dosage above levels likely to yield diminishing returns in benefits relative to risks to patients." The Guidelines note, in part, the importance of clinicians weighing the risks and benefits of increasing opioid dosages to ≥50 MME but instruct that "[t]he recommendations related to opioid dosages are not intended to be used as an inflexible, rigid standard of care; rather, they are intended to be guideposts to help inform clinician-patient decision-making."

the CD.C.'s 2016 Guidance against concomitant prescriptions for an opioid and a benzodiazepine without serious medical consideration; without any records confirming a claim that J.V. had knee surgery; that J.V. tried any form of treatment besides opioid therapy; and four-months after J.V.'s last office visit.

As charged in counts 10 and 11, on November 1 and 16, 2022, the defendant wrote J.V. prescriptions for oxycodone 20 mg (resulting in an MME of 120). The defendant issued these prescriptions, again without any records confirming a claim that J.V. had knee surgery; any other diagnostic tests to identify the source of J.V.'s pain, without J.V. trying any form of treatment besides opioid therapy; a second claim that J.V. had been beaten by the police, and J.V.'s claim (on November 1, 2022) that the medication was not helping to suppress the pain.

Upon reviewing the defendant's alleged medical records for J.V. and J.V.'s PDMP data, Dr. King opined that the defendant prescribed controlled substances to J.V. outside the usual course of professional practice and without a legitimate medical purpose. *See* Sent. Ex. 10 at 2-3. In so finding, he noted that the defendant failed to establish a medical condition that justified the use of chronic opioid therapy. *Id*. Dr. King also noted that:

- The defendant failed to perform a complete and through evaluation.

- The defendant failed to evaluate the bio-psychosocial contributions to J.V.'s pain and failed to implement a multidisciplinary treatment regime.

- The defendant failed to note that J.V. demonstrated symptoms consistent with substance use disorder; required appropriate treatment consisting of opiate weaning and cessation; and required referral for medication assisted treatment; and

- The defendant prescribed dangerous and addictive combinations of medication; failed to monitor and coordinate care with J.V.'s mental health provider; failed to monitor treatment compliance; failed to address benzodiazepine concurrently prescribed by other providers; failed to monitor medication compliance on a routine basis; failed to establish an opiate responsive medical condition; and failed to exercise an opiate exit strategy after a failed therapeutic trial.

*Id*.

In short, Dr. King found the defendant's prescribing to J.V. represented an "extreme departure from the standard of care." *Id*. at 4. As evidence of the defendant's knowing unlawful distributions to J.V., the government presented extensive evidence at trial demonstrating that the defendant created backdated and fraudulent medical records for J.V. after he was notified by the D.C. Board of Medicine of J.V.'s death. The defendant's conduct is summarized below in Section II(E)(3)(a). The defendant was convicted of each count of distribution to J.V.

## II.     SENTENCING GUIDELINES ANALYSIS

Post *United States v. Booker*, 543 U.S. 220, 264 (2005), a sentencing court must follow the three-step process set forth by *Gall v. United States*, 552 U.S. 38 (2007). First, the court must properly determine the Guideline range. Second, if applicable, the court must determine whether to apply any of the Guidelines' departure policy statements to adjust the Guideline range. Third, the court must consider all the factors set forth in 18 U.S.C. § 3553(a) as a whole, to include, *inter alia*, 1) the nature and circumstances of the offense and history and characteristics of the defendant; and 2) the need for the sentence imposed. A sentence of 20 years of incarceration and 3 years of supervised release on Counts 1, 2, 4, and 8-28 (to run concurrently) properly accounts for the defendant's longstanding and repeated criminal conduct.

### A.     Criminal History

The government concurs with U.S. Probation's assessment of the defendant's criminal history score, as set forth in the Presentence Investigation Report ("PSR"). ECF No. 156 at ¶ 59. The total criminal history score is 3, placing the defendant in criminal history Category II. *Id*.

### B.     Applicability of the Advisory Guidelines

Even though the Sentencing Guidelines are advisory, *Booker* provides that sentencing

courts "must consult those Guidelines and take them into account when sentencing." 543 U.S. at 264; *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that the Guidelines provide "the starting point and the initial benchmark" for sentencing. *Gall*, 590 U.S. at 49; *see also United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006) ("*Booker* has not changed how the Guidelines range is to be calculated.") Moreover, the Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve [18 U.S.C.] § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) (*quoting Rita v. United States*, 551 U.S. 338, 347-50 (2007)); *Dorcely*, 454 F.3d at 376 (noting that "a sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness"). To calculate a Guidelines sentence, a district court must first select the applicable offense guideline and then select the base offense level within that applicable offense guideline. *United States v. Flores*, 912 F.3d 613, 616 (D.C. Cir. 2019).

### C.  Total Offense Level Calculation

Under the advisory Guidelines, the total offense level is 43 and the Guidelines range is life imprisonment. However, because the statutorily authorized maximum sentence of 240 months per count is less than the maximum of the applicable guidelines' range, the guideline range is 240 months for each count, consistent with United States Probation's assessment as set forth in the PSR. ECF No. 156 at ¶ 108, 109. *See* U.S.S.G. §5G1.1(c). The government respectfully submits the following calculation of the defendant's total offense level:

| Points | U.S.S.G. Provision | Description |
|---|---|---|
| **Base Offense Level** | | |
| 32 | §2D1.1(c)(4) | The defendant is accountable for a quantity of at least 3,000 kilograms but less than 10,000 kilograms of converted drug weight. |
| **Sentencing Enhancements** | | |
| +4 | §3B1.1(a) | The defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. |
| +2 | §3B1.3 | Abuse of Trust or Use of a Special Skill |
| +2 | §3C1.1 | Obstruction |
| +2 | §2D1.1(b)(7) | The defendant, or a person for whose conduct the defendant is accountable under §1B1.3 (Relevant Conduct), distributed a controlled substance through mass marketing by means of an interactive computer service. |
| +2 | §2D1.1(b)(12) | The defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance. |
| +2 | §2D1.1(b)(16)(B)(iv) and (E) | The defendant received an adjustment under §3B1.1 (Aggravating Role) and distributed a controlled substance to an individual who was unusually vulnerable due to physical or mental condition or otherwise particularly susceptible to the criminal conduct (2D1.1(b)(16)(B)(iv)) and committed the offense as part of a pattern of criminal conduct engaged in as a livelihood (2D1.1(b)(16)(E)). |
| **Total Offense Level** | | |
| 43 – While the total offense level is estimated to be 46, it is capped out at 43. *See* U.S.S.G. Chapter 5, part A (comment n.2) (43 as the maximum offense level under the guidelines). | | |

## D.    The Evidence Supports a Base Offense Level of 32[11]

### 1.    Legal Standard

"The base offense level for a drug distribution offense is calculated by determining the quantity of drugs attributable to the defendant." *United States v. Ignasiak*, 808 Fed. App'x 709, 717 (11th Cir. 2020) (citing U.S.S.G. §2D1.1(a)(5)). Under the Controlled Substances Act, courts consider all controlled substances for which the defendant's relevant conduct may be attributable.

---

[11]    Section II(D) of this Memorandum largely replicates Section III of the Government's Response to Defense Objections and Arguments in Support of the Offense Level Calculation, ECF No. 155. The material is repeated herein for ease of reference and inclusion on the public docket.

*See id.*; U.S.S.G. §2D1.1(a)(5), Note 5. And, if the "offense involved both a substantive drug offense and an attempt or conspiracy…the total quantity involved shall be aggregated to determine the scale of the offense." U.S.S.G. §2D1.1(a)(5), Note 5. The government bears the burden of proving drug quantity by a preponderance of the evidence at sentencing. *See United States v. Douglas*, 885 F.3d 145, 150 (3d Cir. 2018). In cases involving unlawful prescribing by a DEA registrant, "the drug quantity for which [the defendant] may be criminally punished is the amount of *illegal* prescriptions." *United States v. Titus*, 78 F.4th 595, 600 (3d Cir. 2023).

In prescriber cases, caselaw varies in terms of what the government must prove for a distribution (here, a prescription) to be counted as relevant conduct. The Seventh Circuit, for example, has said that a sentencing court "must explain its findings with respect to each patient and make a reasoned determination whether or not the government has carried its burden." *United States v. Chube*, 538 F.3d 693, 694 (7th Cir. 2008). The Sixth Circuit, on the other hand, does not necessarily require patient-by-patient analysis. Instead, the Sixth Circuit has recognized that courts may be required to estimate the percentage of prescriptions that were written without a legitimate medical purpose. *United States v. Geralt*, 682 Fed. App'x 394, 407 (6th Cir. 2017) (no clear error in district court's finding that 90% of Geralt's prescriptions were unlawful). The Sixth Circuit further emphasized that the sentencing court should include in its drug-quantity calculation all prescriptions that were "part of the same course of conduct or common scheme or plan as the offense of conviction." *United States v. Godofsky*, 943 F.3d 1011, 1030 (6th Cir. 2019) (no error where district court counted all the prescriptions written by the defendant—90% of which were for oxycodone—and not just the prescriptions included in the five counts for which he was convicted), *abrogated on other grounds by United States v. Anderson*, 67 F.4th 755 (6th Cir. 2023) (quoting U.S.S.G. §1B1.3(a)(2)). The Sixth Circuit in *United States v. Rodriguez-Iznaga*,

expressing concern that the Seventh Circuit's approach would be "needlessly cumbersome" given the more than 600 patients involved in the case before it, distinguished the holding in *Chube* on the basis that "here the district court did explain why the prescriptions to the O.H.–KY–WV residents were not merely unnecessary but instead indicative of drug trafficking," pointing to the district court's finding "that no reasonable person in that much pain would travel 15–plus hours to Florida (every 30 days) when he or she could get the same medication 'down the street' or 'across the road.'" 575 F. App'x 583, 586 (6th Cir. 2014). Notably, however, even in the Seventh Circuit, where the government must address particular patients, it is "not necessary…for the government to systematically discuss every single prescription that every single patient received" finding such a requirement "duplicitous and meaningless." *United States v. Rosenberg*, 585 F.3d 355, 357 (7th Cir. 2009).

To undersigned counsel's knowledge, the D.C. Circuit has not spoken on this issue.[12] In the interest of providing this Court with the most conservative estimate of drug quantity, the government's calculation here counts all prescriptions for oxycodone and promethazine with codeine issued to purported patients in the following categories: 1) substantive distributions for which the defendant was convicted at trial; 2) all oxycodone distributions to J.V.; 3) all distributions to co-conspirators; and 4) all distributions to known pseudonyms and false identities used by the defendant's co-conspirators. The government's estimation likely significantly undercounts the true number of illicit prescriptions the defendant issued, as the total number of aliases to whom the defendant prescribed controlled substances is unknown.[13] However, the

---

[12]     The Circuit, nonetheless, has recognized that "drug quantity calculations are an art, not a science", so long as the district court chose a reasonable method of evaluation and/or extrapolation. *See United States v. Tucker*, 12 F.4th 804, 829 (D.C. Cir. 2021) (internal citations omitted).

[13]     For example, if every oxycodone distribution captured via Surescripts or PDMP between

government's estimation here relies on evidence admitted at trial and, with applicable enhancements, the defendant is maxed out at a Total Offense Level of 43 – the same result as if all distributions were counted and the base offense level was 36. Combining the four sources listed above, the government identified 813 unique patient identities, listed in Sentencing Exhibit 7 (Pill Calculator and Patient Summary Charts), to whom distributions should be counted in the drug quantity total. The government's calculation includes all 833 oxycodone and 2,608 promethazine with codeine prescriptions issued to these 813 patient identities during the charged time frame, as reflected by Surescripts and PDMP data, and results in a total converted drug weight of 5,089.16 kilograms and a base offense level of 32. *See* Sentencing Exhibit 7 (Pill Calculator and Patient Summary Charts); U.S.S.G. §2D1.1(c)(4).

The government's analysis demonstrates that even the most conservative approach places the defendant's distributions well within §2D1.1(c)(4)'s bounds of between of at least 3,000 kilograms but less than 10,000 kilograms of converted drug weight. And, as the "Source in Evidence" column in the Patient Summary tab indicates, each patient identity to whom the defendant issued prescriptions is supported by trial evidence or at least one trial exhibit. *See* Sentencing Exhibit 7 (Pill Calculator and Patient Summary Charts).

### 2.    Distributions Included in the Government's Calculation

The Court should count all oxycodone and promethazine with codeine prescriptions issued to the 813 patient identities listed in Sentencing Exhibit 7, as the evidence at trial proves each identity came from 1) substantive distributions for which the defendant was convicted at trial; 2) distributions to patient J.V.; 3) distributions to co-conspirators; or 4) distributions to aliases used

---

May 1, 2021, and April 10, 2023, were counted, the drug quantity would fall in Offense Level 36 and represent over 33,000 KG of converted drug weight.

by the defendant's co-conspirators. The below sections outline the trial evidence supporting their inclusion.

### a)        Substantive Counts of Distribution

Included in the government's calculation are all oxycodone prescriptions issued to patient J.V. (as reflected in indictment counts 9 – 11, and Tr. Ex. 10231); all oxycodone and promethazine with codeine prescriptions issued to patients identified as Alexa Ndubuka, Lindsey Ndubuka, Kiernan Ellis, Maria White, Robert Black, Serenity Stone, Jessica Gunther, Carl Gordon, James Dumbuya, Omar Dumbuya, Raymond Dunbar, Robert Dunbar, Michael Schertz, Trent Walker, and Kaymon Evans (as reflected in indictment counts 12 – 28, for which the defendant was convicted),[14] and the oxycodone distributions to CS-2 and UC-3 as charged in indictment counts 4 and 8, for which the defendant was convicted.[15]

### b)        Distributions to Purported Patients Bearing Co-Conspirators' Last Names

At trial, the jury heard evidence that the defendant routinely issued prescriptions to his co-conspirators' aliases, where the first name varied but the last name was that of the co-conspirator. The jury also received evidence that the co-conspirator would then travel to the pharmacy where the prescription was sent and act as though he or she was picking up medication for a family member. The jury saw additional evidence of this scheme through Tr. Ex. 10210 – 10226 and 10230, which summarized prescriptions issued to patients bearing the last names or variations of

---

[14]        Distributions to patient identity "Antonio Smith" were not included because the defendant was acquitted of count 29 and the government does not seek such calculations for sentencing purposes.

[15]        The government's calculation did not include distributions as charged in counts 3 and 5 – 7, of which the defendant was acquitted. And, in the interest of providing the most conversative estimate, distributions charged in the original indictment dated April 6, 2023, of which the jury heard no evidence, were not included.

the names Woldou, Tesfaye, Harclerode, Turner, Wondwosen, Ndubuka, Kpetemey, Yohannes, Tedla (a commonly used Tesfaye alias) and Schertz (a known Turner alias). The government's calculation includes all oxycodone and promethazine with codeine distributions to patient identities included in these exhibits and bearing co-conspirators' last names.

### c) Distributions to Purported Patients Bearing Other Last Names

The government's calculation includes all oxycodone and promethazine with codeine prescriptions issued to patient identities with the following last names:

| Last Name | Reason for Inclusion |
|---|---|
| Dunbar, Dumbar, Dumbuya and Vaughn | Evidence at trial, particularly Tr. Ex. 3513 – 3542 (items recovered in connection with the March 2023, Noble County, O.H., arrest of co-conspirator Christopher Harclerode), demonstrated that the defendant routinely issued illicit prescriptions to Harclerode using these aliases. |
| Zebabena | As outlined in Tr. Ex. 10209, Zebabena was issued numerous prescriptions in multiple states and his last name was used by various co-conspirators to receive illicit prescriptions. |
| Pierrelus, Sesay, Ball, Stanley | Evidence at trial demonstrated that witness L.D. received prescriptions under these aliases. |

### i. Patient Identities Derived from Tr. Ex. 1001 – 1099

The government's trial exhibits in the 1000 series included electronic messages between the defendant and co-conspirators, recovered from the defendant's cellular phone. In these messages, co-conspirators asked the defendant to issue prescriptions to them under numerous patient identities. All oxycodone and promethazine with codeine prescriptions issued to patient identities appearing in 1000 series exhibits are included in the government's calculation.

### ii. Patient Identities Derived from Tr. Ex. 3000 – 3099

The government's trial exhibits in the 3000 series contained evidence recovered during co-conspirators' interactions with law enforcement over the course of the conspiracy, to include 1) Matisse Woldou's interaction with police in Apex, N.C. in February 2022; 2) Obiama Ndubuka's interaction with police in Clinton County, P.A. in November 2022; 3) Matisse

Woldou's interaction with police in Warsaw, N.Y. in January 2023; 4) Yared Tesfaye's interaction with police in Grand Forks, N.D. in February 2023; 5) Terry Turner's interaction with police in Washington, D.C. in March 2023; and 6) Christopher Harclerode's interaction with police in Noble County, O.H. in March 2023.

During many of these encounters, law enforcement recovered papers listing patient identities and pharmacy information, prescription records from pharmacies the co-conspirator was traveling to or from, and medication and/or packaging the co-conspirators obtained from these pharmacies. The government's evidence supported that the co-conspirators had numerous patient identities under which they received prescriptions, to include variations of their own names and unrelated names. All oxycodone and promethazine with codeine prescriptions issued to patient identities derived from evidence in the 3000 series from co-conspirators' interactions with law enforcement are included in the government's calculation.

### iii.    Patient Identities Derived from Tr. Ex. 4300 – 4355

Law enforcement recovered numerous documents during the search of Okafor Medical Associates on April 11, 2023, including notes with patient names and drug orders as well as tab sheets tracking money owed to the defendant by various co-conspirators. *See* Tr. Ex. 4300 – 4355. This evidence is consistent with Witness L.D.'s testimony that, upon arriving at the defendant's office, she wrote her prescription orders on blank sheets of paper left at the front desk. L.D. described that her order would include the type of drugs she wanted and the patient identity she wanted the prescription issued to. All oxycodone and promethazine with codeine prescriptions issued to patient identities appearing in Tr. Ex. 4300 – 4355 are included in the government's calculation.[16]

---

[16]    Notably, Tr. Ex. 4300 – 4355 represent a selection of items recovered during the search

### iv.    Tr. Ex. 10228, 10229, and Sentencing Exhibits 1 – 6

The defendant's co-conspirators traveled to pharmacies nationwide to fill his illicit prescriptions. Indeed, the defendant issued prescriptions to co-conspirators in at least 45 states. *See* Tr. Ex. 10201 (Totals by State). The evidence further established that the defendant flooded pharmacies in his co-conspirators' destinations with oxycodone and promethazine with codeine prescriptions in advance of the co-conspirator's arrival. The defendant also facilitated pharmacy shopping by issuing prescriptions to the same patient identity in multiple states on the same day. *See* Tr. Ex. 10232. Pulling from Surescripts and PDMP data, DOMEX Analyst Paul Short compiled summaries outlining the defendant's conduct in the below exhibits. The 813 patient identities included in the government's guidelines calculation include all patient identities from the following sources:

| Exhibit | Conduct Captured |
|---|---|
| Tr. Ex. 10228 | Prescriptions issued to pharmacies in Western New York in the days preceding co-conspirator Matisse Woldou's January 11, 2023, arrest in Warsaw, N.Y., outlined in Section I(B)(1). |
| Tr. Ex. 10229 | Prescriptions issued to pharmacies in North Dakota in the days preceding co-conspirator Yared Tesfaye's February 28, 2023, encounter with Grand Forks, N.D. narcotics task force officer Joy Muniz in Grand Forks, N.D., outlined in Section I(B)(7). |
| Sent. Ex. 1 | Prescriptions issued to pharmacies in North Carolina in the days preceding co-conspirator Matisse Woldou's February 8, 2022, arrest in Apex, N.C., outlined in Section I(B)(1). |
| Sent. Ex. 2 | Prescriptions issued to pharmacies in the greater New York City area between August 15, 2022, and September 30, 2022, outlined in Section I(B)(6). |
| Sent. Ex. 3 | Prescriptions issued to pharmacies in Pennsylvania in the days surrounding co-conspirator Obiama Ndubuka's November 28, 2022, interaction with Pennsylvania State Trooper Christopher Isbitski, outlined in Section I(B)(3). |
| Sent. Ex. 4 | Prescriptions issued to pharmacies in Ohio between November 15, 2022, and December 6, 2022, outlined in Section I(B)(5). |

---

and were presented at trial because of their connection to the co-conspirators.

| Exhibit | Conduct Captured |
|---------|------------------|
| Sent. Ex. 5 | Prescriptions issued to pharmacies in Western Pennsylvania and Ohio between January 31, 2023, and March 3, 2023, leading up to co-conspirator Christopher Harclerode's March 3, 2023, arrest in Noble County, O.H., outlined in Section I(B)(5). |
| Sent. Ex. 6 | Prescriptions issued to pharmacies in New York and Connecticut between March 1, 2023, and March 31, 2023,[17] outlined in Section I(B)(6). |

### E.    Enhancements to the Defendant's Base Offense Level

The defendant should receive the following enhancements to his base offense level:

### 1.    §3B1.1(a) – Organizer or Leader

Under U.S.S.G. §3B1.1(a), the defendant's base offense level increases by four points if a preponderance of the evidence shows that he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. §3B1.1(a). The district court can apply the enhancement under the "five or more participant" or "otherwise extensive" theory. *See United States v. Tuma*, 738 F.3d 681, 693-94 (5th Cir. 2013).

Here, the trial evidence proved that the defendant conspired with more than five others to unlawfully distribute controlled substances, to include the nine co-conspirators discussed throughout this Memorandum. Moreover, as the owner and sole practitioner of Okafor Medical Associates, each illicit distribution to any co-conspirator or false patient identity originated with him. *See, e.g., United States v. Roe*, 790 F. App'x 25, 27 (6th Cir. 2019) ("As the district court appropriately observed, 'this was an extensive ongoing large scale opioid pill mill. … [Roe] was the central figure in it and had the connection between patients, pills, transportation, [and sales].' Because he 'organiz[ed] key features of the conspiracy and direct[ed] the actions of his coconspirators,' *United States v. Sierra-Villegas*, 774 F.3d 1093, 1101 (6th Cir. 2014), we accord

---

[17]    The chart title, indicating a date range of 8/15/2022 – 9/30/2022, is incorrect. As the data within the chart itself shows, the timeframe covered is March 1, 2023 – March 31, 2023.

the district court's conclusion (applying the leader enhancement) the deference it deserves.").

Second, the defendant's criminal activity was extensive. Between May 1, 2021, and April 10, 2023, he issued at least 11,178 oxycodone and promethazine with codeine prescriptions to 3,180 unique patient identities across 4,011 pharmacies in 45 states. *See* Tr. Ex. 10209. Even counting only prescriptions issued to co-conspirator last names, the defendant's conduct was far spread. *See id*. (Tesfaye: 177 pharmacies in 21 states; Yohannes: 197 pharmacies in 15 states; Kpetemey: 111 pharmacies in 12 states; Turner: 36 pharmacies in 10 states; Ndubuka: 153 pharmacies in 9 states; Harclerode: 57 pharmacies in 10 states; Wondwosen: 23 pharmacies in 5 states; and Woldou: 7 pharmacies in 4 states). Accordingly, the defendant should receive a four point assessment under §3B1.1(a).

### 2.    §3B1.3 – Abuse of Trust or Use of a Special Skill

U.S.S.G. §3B1.3 provides for a two-level enhancement if the defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." Courts have routinely found that medical doctors, like the defendant, possess special skills and hold positions of trust, such that this enhancement applies. *See, e.g*., *United States v. Gilliam*, 315 F.3d 614, 618 (6th Cir. 2003) (a "position of trust arises almost as if by implication when a person or organization intentionally makes himself or itself vulnerable to someone in a particular position, ceding to the other's presumed better judgment some control over their affairs" (internal quotation marks omitted)); *United States v. Fata*, 650 Fed. App'x 260, 263 (6th Cir. 2016) ("That a doctor works with little supervision and exercises 'substantial discretionary judgment that is ordinarily given considerable deference' is axiomatic."); *United States v. Kaminski*, 501 F.3d 655, 667 (6th Cir. 2007) (noting the "mantle of trust" accorded to medical doctors). Here, the defendant, with essentially no supervision, issued

countless prescriptions for dangerous and addictive opioids to patients "who relied on his presumed integrity and accepted his presumed professional judgements." *Fata*, 650 Fed. App'x at 263. The Court should apply the §3B1.3 enhancement based on the defendant's special skill and abuse of trust of his patients.

Nor does the defendant's role as an organizer or leader under §3B1.1(a) preclude this Court from also applying the abuse-of-trust enhancement under §3B1.3. While a §3B1.3 enhancement based *solely* on the use of a special skill cannot be applied in addition to an enhancement under §3B1.1, the Guidelines permit the §3B1.3 enhancement in conjunction with §3B1.1 where it is based on a defendant's "abuse of a position of trust *and* his use of special skills." *United States v. Bryant*, 849 Fed. App'x 565, 573 (6th Cir. 2021) (applying enhancements under §3B1.1 and §3B1.3 where the defendants, as pharmacists, "abused their positions of trust as individuals holding special skills as pharmacists…because as pharmacists they created this scheme whereby individuals were provided medications that were not medically necessary and without proper consultation."); *see also United States v. Bolos*, 2022 U.S. Dist. LEXIS 96747, *27-28 (E.D. Tn. May 31, 2022) (applying both §3B1.1 and §3B1.3 where defendant abused his position of trust in addition to using a special skill). As discussed above, the defendant here both used a special skill and abused a position of trust, and this Court should apply enhancements under both §3B1.1 and §3B1.3.

### 3. §3C1.1 – Obstruction

U.S.S.G. §3C1.1 provides for a two-level increase to the base offense level if (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice, with respect to the investigation, prosecution or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction

and any relevant conduct; or (B) a closely related offense…." Examples of covered conduct include "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding" and "providing materially false information to a judge or magistrate judge." U.S.S.G. §3C1.1, Application Note 4(C) and (F). This Court should apply the obstruction enhancement based on 1) the defendant creating back-dated medical records for patient J.V. in response to the D.C. Board of Medicine's demand and subpoena, as demonstrated at trial; and 2) the defendant's material misrepresentations to Magistrate Judge Moxila Upadhyaya during his detention hearing in April of 2023.

### a)    The Defendant Created False Records During an Official Investigation

As evidence at trial established, on February 21, 2023, patient J.V.'s family member, W.V., submitted a formal complaint to the D.C. Board of Medicine that the defendant overprescribed oxycodone, ibuprofen, and the muscle relaxant Flexeril to J.V. *See* Tr. Ex. 5005. Though not presented to the jury, the complaint also indicated that J.V. died from an oxycodone overdose in November of 2022. The D.C. Board of Medicine issued the defendant an Order to Answer W.V.'s complaint on March 15, 2023. *See* Tr. Ex. 5006. Trial testimony from D.C. Board of Medicine representative Lisa Robinson established that, in addition to issuing the Order to Answer, investigators with the D.C. Board of Medicine served the defendant with a subpoena for J.V.'s medical records following this complaint. Records from the defendant's Electronic Health Records provider, Tebra Technologies, and testimony from a company representative, revealed that, beginning March 19, 2023, and continuing through March 29, 2023, the defendant created back dated and fraudulent records of at least 44 alleged medical appointments with J.V. between October 2, 2019, and November 16, 2022. *See* Tr. Ex. 7000a (Tebra Audit Log). D.C. PDMP Query data further supported that the defendant created these records based on his queries of J.V.'s

PDMP records on March 16, 18, 21, 28, and 29, 2023. *See* Tr. Ex. 0002 (D.C. PDMP Query Records). In short, the defendant looked at PDMP records to remind himself when he had issued prescriptions to J.V. and created back dated records in an attempt to support his prescribing on each of those dates. Trial testimony also established that the defendant provided these records to the D.C. Board of Medicine in response to their investigator's subpoena and the Order to Answer. Trial Exhibit 10501 summarizes the defendant's conduct in response to the D.C. Board of Medicine's investigation and inquiry.

The defendant's conduct falls squarely within §3C1.1's prohibition against producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation. *See*, *e.g. United States v. Tampas*, 493 F.3d 1291, 1304 (11th Cir. 2007) (district court properly applied §3C1.1 enhancement where defendant created records to make fraudulent expenditures appear legitimate). The §3C1.1 enhancement applies even though the conduct occurred before the defendant knew he was being investigated by the FBI. While he lacked awareness of the federal investigation, the defendant knew he was under investigation by the D.C. Board of Medicine, a government agency, and produced the altered records directly in response to their subpoena. *See*, *e.g.*, *United States v. Brooks*, 681 F.3d 678, 716 n.43 (5th Cir. 2012) (citing *Untied States v. Emery*, 991 F.3d 907, 911-12 (1st Cir. 1993)) (affirming application of the §3C1.1 enhancement where a defendant destroyed documents during a related state civil investigation, noting that the Guidelines "did not require the investigation to be led by the federal government, or to be a criminal investigation, so long as it was led by government officials" and upholding the enhancement for two other defendants who lied to outside counsel during an internal investigation because the defendants "knew that the internal investigation was in response to specific inquiries from the CFTC, the Federal Energy Regulatory Commission, and the United States Attorney's

Office). Further, the obstructive conduct here is directly related to the defendant's convictions to counts 9 – 11 (unlawful distribution of oxycodone to patient J.V.), as required by §3C1.1.

### b)    False Statements to the Magistrate Judge

At the defendant's April 2023 detention hearing, the government argued for detention based on risk of flight. In support, among other material, the government offered evidence that the defendant was a dual citizen of the United States and Nigeria and owned property in Nigeria. *See* ECF No. 17, Attachment A at 1. In response, the defendant "represented to the Court at the first day of his detention hearing that he would have no ability to flee to that property because it is a dilapidated and uninhabitable bungalow." *Id*. at 1 – 2. The defendant also claimed that both his U.S. and Nigerian passports had recently been stolen. *Id*. at 4. At his continued detention hearing, "the government submitted evidence, including photographs, that revealed that the 'uninhabitable bungalow' was actually a waterfront home in an upscale gated community." As the Magistrate found based on the government's evidence, "[f]ar from being uninhabitable…the home appeared to be an attractive residence in an exclusive community in Lagos." *Id*. at 4. The Magistrate Court concluded that "the defendant intentionally misrepresented the nature of his home in Nigeria so that the Court would not consider him a flight risk" and further noted the defendant's "pattern of overly deceptive conduct, including with this Court during his detention hearing." *Id*. at 3 – 4. Based on this conduct, the two-level increase under §3C1.1 is appropriate. *See, e.g*., *United States v. Taylor*, 749 F.3d 842, 846 (9th Cir. 2014) (the phrase "prosecution of…the instant offense of conviction" in §3C1.1 includes proceedings collateral to that adjudication, including pretrial detention hearings); *United States v. Crousore*, 1 F.3d 382, 386 (6th Cir. 1993) (same).

### 4.    §2D1.1(b)(7) – Mass Marketing via Interactive Computer Service

U.S.S.G. §2D1.1(b)(7) provides for a two-level increase to the base offense level if the

defendant, or a person for whose conduct the defendant is accountable under §1B1.3 (Relevant Conduct), distributed a controlled substance through mass-marketing by means of an interactive computer service. Evidence at trial established that the defendant's co-conspirator, Dawit Wondwosen, advertised controlled substances for sale from his Instagram Account "Dr1zzyy2." *See*, *e.g*., Tr. Ex. 1300, 1306, 1307, 1309, 1311, 1313 (promethazine with codeine); 1302, 1305, 1310, 1312, and 1314 (oxycodone). As outlined above, many of these advertisements featured photographs taken inside of Okafor Medical Associates. *See* Tr. Ex. 1300, 1303, 1307, and 1313. And evidence from Surescripts and PDMP data confirmed that the defendant issued oxycodone and promethazine with codeine prescriptions to Wondwosen during the time these advertisements were posted. *See* Tr. Ex. 0001 (Surescripts Data); 10220 (Wondwosen summary). Thus, the Court should apply the two-level increase under §2D1.1(b)(7) for mass marketing through an interactive computer service. *See*, *e.g. United States v. Perez*, 840 Fed. App'x 792, 794 (5th Cir. 2021) (applying §2D1.1(b)(7) enhancement based on conspiracy members' use of Facebook and Facebook messenger to advertise synthetic cannabinoids for sale).

### 5.    §2D1.1(b)(12) – Drug Premises

This Court should apply the two-level enhancement for maintaining a premises for the purpose of manufacturing or distributing a controlled substance, under U.S.S.G. §2D1.1(b)(12). This enhancement is supported by the defendant's conviction to maintaining Okafor Medical Associates as a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1), as charged in count 2 of the indictment.

Application of §2D1.1(b)(12) does not constitute impermissible double counting, particularly where, as here, the defendant was convicted of accompanying drug-trafficking offenses. Under U.S.S.G. §2D1.8(a)(1), the base offense level for the drug-involved premises

count is the same as for the defendant's other drug offense convictions. Moreover, the defendant's convictions all group pursuant to §3D1.2(d) because the offense levels are "determined largely on the basis of…the quantity of a substance involved." As the Eleventh Circuit observed in *United States v. Anderson*, "the guideline for § 856(a)(1) offenses, §2D1.8, expressly directs courts to use 'the offense level from §2D1.1 applicable to the underlying controlled substance offense,' without further limitation" and "the harm the §2D1.1(b)(12) enhancement accounts for…is not otherwise accounted for by §2D1.1." 816 Fed. App'x 318, 322 (11th Cir. 2020).

### 6.    §2D1.1(b)(16)(B)(iv) and (E) – Distribution to a Vulnerable Person and Criminal Livelihood

U.S.S.G. §2D1.1(b)(16) provides for a two-level increase to the base offense level if the defendant received an adjustment under §3B1.1 (Aggravating Role) and the offense involved 1 or more factors, to include (under §2D1.1(b)(16)(B)(iv)) the defendant, knowing that an individual was…unusually vulnerable due to physical or mental condition or otherwise particularly susceptible to the criminal conduct, distributed a controlled substance to that individual….or (under §2D1.1(b)(16)(E)) committed the offense as part of a pattern of criminal conduct engaged in as a livelihood. This Court can apply the enhancement under either theory.

#### a)    Distributions to Vulnerable Individuals

The defendant should receive an enhancement under this section because he illegitimately prescribed controlled substances to individuals, including J.V. and patient D.E., knowing they were in poor health, showed signs of substance use disorder, and, in D.E.'s case, his overdose history. *See*, *e.g.*, *United States v. Sanchez*, 807 Fed. App'x 950, 951-52 (11th Cir. 2020) (no error in applying the vulnerable-individual enhancement based on defendant's illegitimate prescribing under these circumstances). As to patient J.V., expert testimony from Dr. King established that J.V. exhibited numerous symptoms consistent with substance use disorder, to include overtaking

medication, escalation of stimulants and opiates, doctor shopping, fabricated stories about pain, failure to manage work and personal responsibilities, and not managing medical responsibilities. And the defendant was aware of these conditions as he made note of them in the fraudulent, back-dated records he created in response to the D.C. Board of Medicine's Order to Answer, discussed above. Despite knowing J.V. was in poor health, an addict, and exhibiting signs of substance abuse disorder, the defendant illegitimately prescribed him controlled substances on numerous occasions.

As to patient D.E., Tr. Ex. 2030 (Tidal Health Medical Records) established that, in May of 2021, D.E. was admitted to the hospital for an overdose. Moreover, the records note that emergency room physician contacted the defendant and conveyed his concerns regarding potential oxycodone abuse. *See* Tr. Ex. 2030 at 5. Though D.E. did not testify at trial due to a medical emergency, he confirmed in his interviews with agents prior to trial that he told the defendant he had overdosed, and the defendant continued to issue oxycodone prescriptions to him. *See* Sent. Ex. 9, Jan. 26, 2024, Interview of D.E. (under seal). As evidenced by the Surescripts records, the defendant prescribed oxycodone to D.E. on numerous occasions following D.E.'s overdose. *See* Tr. Ex. 0001.

### b) Criminal Livelihood

Pursuant to Application Note 20, for the purposes of §2D1.1(b)(16)(E), "pattern of criminal conduct" and "engaged in as a livelihood" have the same meaning given such terms in §4B1.3 (Criminal Livelihood). "Pattern of criminal conduct" means planned criminal acts occurring over a substantial period of time and "engaged in as a livelihood" means that (A) the defendant derived income from the pattern of criminal conduct that in any twelve-month period exceeded 2,000 times the then-existing hourly minimum wage under federal law; and (B) the totality of circumstances

shows that such criminal conduct was the defendant's primary occupation in that twelve-month period (e.g., the defendant engaged in criminal conduct rather than regular, legitimate employment; or the defendant's legitimate employment was merely a front for the defendant's criminal conduct).

The defendant's criminal conduct was his primary occupation, and he derived income far in excess of the requirements outlined above. The defendant's worked as the sole practitioner and owner of Okafor Medical Associates between May 2021 and his arrest in April 2023. During that time, he operated a primarily cash business, where he charged between 180 – 300 dollars per prescription. The defendant issued a total of 833 oxycodone prescriptions and 2,608 promethazine with codeine prescriptions to the 813 patient identities included in the government's base offense level calculation. Assuming a conservative rate of 180 dollars per prescription, these distributions alone yielded $619,380.00 of income during the charged timeframe of 28 months. This figure far exceeds 2,000 times the then-existing federal minimum wage of $7.25 per hour (totaling $14,500 annually). By any calculation, the defendant committed the offenses as part of a pattern of criminal conduct engaged in as a livelihood, and a two-level assessment is appropriate. *See United States v. Blake*, 695 Fed. App'x 859, 863 (6th Cir. 2017) (applying enhancement where defendant operated pill-mill as her primary occupation).

## III.    Recommended Sentence

The defendant was at the helm of a nationwide drug trafficking organization, which he ran from his medical practice in Washington, D.C. From May 2021 to April 2023, the defendant wantonly prescribed dangerous, addictive controlled substances, specifically opioids and promethazine with codeine, outside the usual course of professional practice and not for a legitimate medical purpose in at least 45 states, including the District of Columbia. The

defendant's drug distribution conspiracy operated like a business, where the defendant sold prescriptions in exchange for cash. His co-conspirators dictated the recipient of the prescription (often fake), the type of controlled substance, and the corresponding quantity. He routinely issued controlled substance prescriptions to co-conspirators traveling to numerous states, with knowledge that they were traveling to fill illicit prescriptions under false names. The defendant kept a running record of the money owed by each co-conspirator.

The defendant also unlawfully distributed controlled substances to law enforcement agents and a confidential source posing as walk-in patients and to a civilian patient, J.V. As individual patients, the agents and source presented themselves as someone seeking treatment for purported pain, and the defendant, without meaningful examination or assessment, prescribed large quantities of opioids to them outside the course of professional practice and not for a legitimate medical purpose. Similarly, the defendant prescribed oxycodone to J.V. outside the course of professional practice and not for a legitimate medical purpose. After receiving notice of J.V.'s overdose death by the D.C. Board of Medicine, the defendant created false and backdated medical records for J.V. in his Electronic Health Records system, which he provided to the Board of Medicine during its investigation into J.V.'s death.

The nature and circumstances of the offenses support the requested sentence of 20 years' incarceration on each count of conviction (to run concurrently). So, too, do the defendant's history and characteristics. As outlined in the Government's Motion *in Limine* to Impeach the Defendant with His Prior Conviction and Specific Instances of Conduct, ECF No. 39, the defendant has a longstanding history of criminality and dishonesty. In July 2008, the defendant was convicted in District of Maryland case 8:07-CR-00190 of tax evasion (26 U.S.C. § 7201); filing false income tax returns (26 U.S.C. § 7206); and health care fraud (18 U.S.C. § 1347). He was sentenced to 65

months' imprisonment. There, the defendant evaded the reporting and payment of income taxes through a complex scheme of dishonesty. But evading taxes was not enough: the defendant sought to further enrich himself during the same time by defrauding Medicare and other health benefit programs. Notably, the defendant was first licensed to practice medicine in D.C. in 1992. The offenses that were the subject of the Maryland conviction date from at least 1997 to 2005, when he was charged federally. And, even while that case was pending, he obstructed justice by creating false, backdated invoices which he intended to introduce as evidence in his trial.

When the defendant was released from jail in 2013, his criminal and dishonest conduct continued. He submitted false supervision reports to U.S. Probation, where he failed to note relevant expenses and provided inaccurate information regarding his income. He lied on his applications for reinstatement of his medical license to the Maryland and D.C. Boards of Medicine about the nature of his prior conviction and his debts. And, from 2017 onward, he failed to make any payments towards the $802,252.80 restitution owed in his federal Maryland case. His criminal conduct in this case began a short time later and did not stop until his arrest and incarceration. The nature and circumstances of this offense, when viewed considering the defendant's history and characteristics, warrant the recommended sentence of 20 years' incarceration followed by 3 years of supervised release.

## IV.    Requested Money Judgment

"[T]he court must determine what property is subject to forfeiture under the applicable statute." *United States v. Sterlingov*, 755 F. Supp. 3d 17, 24 (D.D.C. 2024). This determination may be based on evidence already in the record and additional information offered by the parties. *Id*., citing Fed. R. Crim. P. 32.2(b)(1)(B). The government must prove its forfeiture allegations by a preponderance of the evidence. *Sterlingov*, 755 F. Supp. 3d at 24 (citing *United States v. DeFries*,

129 F.3d 1293, 1312 (D.C. Cir. 1997).

The government requests a money judgment in the amount of $215,737.97, which may be satisfied through substitute property. *See* 21 U.S.C. § 853(p). In connection with this investigation, the government seized: 1) $31,920.00 in United States currency on or about April 11, 2023, from the defendant's residence in Upper Marlboro, MD; 2) $178,617.97 in United States currency on or about April 11, 2023, from Bank Account #X4822 in the name of Ndubuisi Joseph Okafor at Wells Fargo Bank; 3) $2,300.00 in United States currency on or about April 11, 2023 from the defendant's person and $300.00 from a filing cabinet at Okafor Medical Associates.

The trial evidence supports a money judgment in the requested amount. As outlined in Section E(6), above, the distributions included in the government's offense level calculations yield at minimum $619,380.00 of income during the charged timeframe of 28 months. Finally, testimony from Financial Analyst Matthew Sweeney corroborated the defendant's significant increase in income over the course of the charged conspiracy. *See* Tr. Ex. 10001.

Respectfully Submitted,

JEANINE PIRRO
ACTING UNITED STATES ATTORNEY
District of Columbia

 /s/
Meredith E. Mayer-Dempsey
N.Y. Bar No. 5213202
Assistant United States Attorney
United States Attorney's Office
for the District of Columbia
601 D Street, Northwest
Washington, D.C. 20530
(202) 252-7259
Meredith.Mayer-Dempsey@usdoj.gov